# ORIGINAL

# Time Charter Party

SINGAPORE, 29 May 2007

IT IS THIS DAY AGREED between **Makko Maritime Inc.**                                                    1
Of     80 Broad Street, Monrovia,Liberia           (hereinafter referred to as "Owners"), being owners of the    2
Good motor tanker                           vessel called HIGHTIDE (TBR PACIFIC TOURMALINE)     3
(hereinafter referred to as "the vessel") described as per Clause 1 hereof and **Navig8 Pte Ltd**    4
of Singapore                        (hereinafter referred to as "Charterers") :,                        5

| | |
|---|---|
| Description and Condition of Vessel | 1. At the date of delivery of the vessel under this charter                                6 |

she shall be classed : ABS                                                                          7
   (b) she shall be in every way fit to carry (see Clause 88 – Cargo Clause) ~~crude petroleum and/or its products :~~;   8
   (c) she shall be tight, staunch, strong, in good order and condition, and in every way fit for the     9
service, with her machinery, boilers, hull and other equipment (including but not limited to hull stress calculator    10
and radar) in a good and efficient state :                                                          11
   (d) her tanks, valves and pipelines shall be oil-tight;                                            12
   (e) she shall be in every way fitted for burning                                                  13
~~at sea – fueloil with a viscosity of      Centistokes at 50 degrees Centigrade/any~~                14
~~commercial grade of fueloil ("ACGFO") for main-propulsion, Gasoil marine diesel oil/ACGFO~~        15
~~for auxiliaries~~                                                                                  16
   ~~in port – gasoil marine diesel oil/ACGFO for auxiliaries :~~ see Clause 96 - Bunker Specification Clause.    17
   (f) she shall comply with the regulations in force so as to enable her to pass through the Suez and Panama Canals    18
by day and night without delay :                                                                    19
   (g) she shall have on board all certificates, documents and equipment required from time to time by     20
any applicable law to enable her to perform the charter service without delay :                     21
   (h) she  shall comply with  the  description  in ~~Form B~~ OCIMF Questionnaire to be appended hereto,    22
provided however  that if there
is any conflict between  the provisions of ~~Form B~~ OCIMF Questionnaire and any other provision, including this    23
Clause 1, of this charter  such other provision shall govern.                                       24

| | |
|---|---|
| Shipboard Personnel and their Duties | 2. (a) At the date of delivery of the vessel under this charter                            25 |

           (i) she  shall have a full and efficient complement  of master, officers and crew  for  a vessel  of her     26
tonnage, who shall in any event be not less than the number required by the laws of the flag state and who shall be    27
trained to operate the vessel and her equipment competently and safely ;
           (ii) all shipboard personnel shall hold valid certificates of competence in accordance with the     29
requirements of the law of the flag state :                                                         30
           (iii) all shipboard personnel shall be trained in accordance with the relevant provisions of the International    31
Convention on Standards of Training. Certification and Watchkeeping for Seafarers, 1978             32
           (iv) there shall be on board sufficient personnel with a good working knowledge of the English    33
language to enable cargo operations at loading and discharging places to be carried out efficiently and safely and     to     34
enable communications between the vessel and those loading the vessel or accepting discharge therefrom to be carried    35
out quickly and efficiently.                                                                         36

   (b) Owners  guarantee  that throughout the charter service the master shall with the vessel's officers and crew,    37
unless otherwise ordered by Charterers,                                                             38
       (i) prosecute all voyages with the utmost despatch ;                                          39
       (ii) render all customary assistance ; and                                                   40
       (iii) load  and discharge cargo  as rapidly  as possible  when required  by Charterers  or their  agents     41
to do so, by night or by day, but always in accordance with the laws of the place of loading or discharging (as the  case     42
may be) and in each case in accordance with any applicable laws of the flag state.                  43

| | |
|---|---|
| Duty to Maintain | 3.      (i) Throughout  the charter  service Owners shall, whenever  the passage of time, wear and  tear or any     44 |

event (whether  or not coming  within Clause 27 hereof) requires steps to be taken to  maintain or restore the     45
conditions stipulated in Clauses 1 and 2(a), exercise due diligence so to maintain or restore the vessel.     46
           (ii) If at any time whilst the vessel is on hire under this charter the vessel fails to comply with the     47
requirements of Clauses 1, 2(a) or 10, then hire shall be reduced to the extent necessary to indemnify Charterers for     48
such failure. If and to the extent that such failure affects the time taken by the vessel to perform any services under this     49
charter, hire shall be reduced by an amount equal to the value, calculated at the rate of hire, of the time so lost.     50
                                                                                                    51
   Any reduction of hire under this sub-clause (ii) shall be without prejudice to any or other remedy available     52
to Charterers, but where such reduction of hire is in respect of time lost; such time shall be excluded from any     53
calculation under Clause 24.                                                                        54
           (iii) If Owners are  in breach of their obligation under Clause 3(i) Charterers may so notify Owners in     55
writing; and if, after the expiry of 30 days following the receipt by Owners of any such notice, Owners have failed to     56
demonstrate to Charterers' reasonable satisfaction the exercise of due diligence as required in Clause 3(i), the vessel     57
shall be off-hire, and no further hire payments shall be due, until Owners have so demonstrated that they are exercising     58
such due diligence.                                                                                 59
           ~~Furthermore, at any time while the vessel is off-hire under this Clause 3 Charterers have the option to~~    60
~~terminate this charter by giving notice in writing with effect from the date on which such notice of termination is~~    61
~~received by Owners or from any later date stated in such notice.~~ This sub-Clause (iii) is without prejudice to any rights     62
of Charterers or obligations of Owners under this charter or otherwise (including without limitation Charterers' rights     63
under Clause 21 hereof).                                                                            64

| | |
|---|---|
| Period Trading | 4. Owners agree to let and Charterers agree to hire the vessel for a period of 24 months with up to 30 days more or     65 |

## EXHIBIT A

| | | |
|---|---|---|
| Limits | ~~less in Charterers' option~~ | |
| | commencing from the time and date of delivery of the vessel, for the purpose of carrying (see Clause 88 – Cargo Clause) ~~all lawful merchandise~~ | 66 |
| | (subject always to Clause 28) ~~including in particular~~ | 67 |
| | ~~in any part of the world~~ as Charterers shall direct within the ranges defined in Clause 87 – Trading Limits Clause, subject to the limits of the current ~~British Institute Warranties~~ Institute Warranties Limits and any subsequent | 68 |
| | amendments thereof. ~~Notwithstanding the foregoing, but subject to Clause 75, Charterers may order the vessel to ice-~~ | 69 |
| | ~~bound waters or to any part of the world outside such limits provided that Owners consent thereto (such consent not to~~ | 70 |
| | ~~be unreasonably withheld) and that Charterers pay for any insurance premium required by the vessel's underwriters~~ | 71 |
| | ~~as a consequence of such order.~~ | 72 |

Charterers shall use due diligence to ensure that the vessel is only employed between and at safe places [73]
(which expression when used in this charter shall include ports, berths, wharves, docks, anchorages, submarine lines, [74]
alongside vessels or lighters, and other locations including locations at sea) where she can safely lie always afloat. [75]
Notwithstanding anything contained in this or any other clause of this charter. Charterers do not warrant the safety of [76]
any place to which they order the vessel and shall be under no liability in respect thereof except for loss or damage [77]
caused by their failure to exercise due diligence as aforesaid. Subject as above, the vessel shall be loaded and [78]
discharged at any places as Charterers may direct, provided that Charterers shall exercise due diligence to ensure that [79]
any ship-to-ship transfer operations shall conform to standards not less than those set out in the latest published edition [80]
of the ICS/OCIMF Ship-to-Ship Transfer Guide. [81]

The vessel shall be delivered by Owners ~~at a port in~~ dropping last outgoing seapilot one safe port within East [82]
Coast UK/Continent (Bordeaux-Hamburg) range or European Mediterranean range (from Gibraltar and not east of but
including Greece) or US Gulf/Caribbean/USAC range (not north of but including New York) or Fujairah-Singapore-
Japan range or Mombasa or Dar-Es-Salam or Red Sea with port in Owner's option.

~~At Owners' option~~ and redelivered to Owners ~~at a port in~~ dropping last outgoing seapilot one safe port within East [83]
Coast UK/Continent (Bordeaux-Hamburg) range or European Mediterranean range (from Gibraltar and not east of but
including Greece) or US Gulf/Caribbean/USAC range (not north of but including New York) or Fujairah-Singapore-
Japan range or Mombasa or Dar-Es-Salam or Red Sea with port
at Charterers' option. [84]

| | | |
|---|---|---|
| Laydays/ Cancelling | 5. The vessel shall not be delivered to Charterers before 15 September 2007 and Charterers shall | 85 |
| | have the option of cancelling this charter if the vessel is not ready and at their disposal on or before 31 October 2007. | 86 |

| | | |
|---|---|---|
| Owners to Provide | 6. Except as otherwise provided for in this Charter Party including its additional clauses Owners undertake to | 87 |
| | provide and to pay for all provisions including lubricating oils, wages, and shipping and discharging fees and all other | 88 |
| | expenses of the master, officers and crew; also, except as provided in Clause 4 and 34 hereof, for all insurance on the | 89 |
| | vessel, for all deck, cabin and engine-room stores, and for water except for water purchased for Charterers' purposes; | 90 |
| | for all drydocking, overhaul, maintenance and repairs to the vessel ; and for all fumigation expenses and de-rat | 91 |
| | certificates. Owners' obligations under this Clause 6 extend to all liabilities for customs or import duties arising at | 92 |
| | any time during the performance of this charter in relation to the personal effects of the master, officers and crew, and | 93 |
| | in relation to the stores, provisions and other matters aforesaid which Owners are to provide and pay for and | 94 |
| | Owners shall refund to Charterers any sums Charterers or their agents may have paid or been compelled to pay in | 95 |
| | respect of any such liability. Any amounts allowable in general average for wages and provisions and stores shall | 96 |
| | be credited to Charterers insofar as such amounts are in respect of a period when the vessel is on-hire. | |

| | | |
|---|---|---|
| Charterers to Provide | 7. Charterers shall provide and pay for all fuel (~~except fuel used for domestic services~~), towage and pilotage and | 97 |
| | shall pay agency fees (see Clause 71), port charges, commissions, expenses of loading and unloading cargoes, canal | 98 |
| | dues and all charges other than those payable by Owners in accordance with Clause 6 hereof, provided that all charges, | 99 |
| | for the said items shall be for Owners' account when such items are consumed, employed or incurred for Owner's | 100 |
| | purposes or while the vessel is off-hire (unless such items reasonably relate to any service given or distance made | 101 |
| | good and taken into account under Clause 21 or 22) ; and provided further that any fuel used in connection with a | 102 |
| | general average sacrifice or expenditure shall be paid for by Owners. | 103 |

| | | |
|---|---|---|
| Rate of Hire | 8. Subject as herein provided, Charterers shall pay for the use and hire of the vessel at the rate of US$ 19,500 per | 104 |
| | day, and pro rata for any part of a day, Charterers to pay additional lump sum of US$2,000 per month pro rata for | 105 |
| | communication on Charterers' behalf from the time and date of her delivery (local time) until the time and date of | 106 |
| | her redelivery (local time) to Owners. | |

| | | |
|---|---|---|
| Payment of Hire | 9. Subject to Clause 3(iii), payment of hire shall be made in immediately available funds to : | 107 |

Hongkong Shanghai Banking Corp., USA
452 Fifth Avenue New York, NY 10018, USA
Swift: MRMDUS33, Chips: 108
ABA No. 021001088
In Favour of: Tatiana Maritime Inc.,
USD A/c No. 000135275
Ref. Pacific Tourmaline / Navig8 TCP

~~Account~~ [108]
in US Dollars per calendar month in advance, less : [109]
(i) any hire paid which Charterers reasonably estimate to relate to off-hire periods, and [110]
(ii) any amounts disbursed on Owners' behalf, any advances and commission thereon, and charges [111]
which are for Owners' account pursuant to any provision hereof, and [112]
(iii) any amounts due or reasonably estimated to become due to Charterers under Clause 3 (ii) or 24 [113]
hereof, [114]
any such adjustments to be made at the due date for the next monthly payment after the facts have been ascertained. [115]

Charterers shall not be responsible for any delay or error by Owners' bank in crediting Owners'       account provided [116] that Charterers have made proper and timely payment. [117]

In default of such proper and timely payment. [118]

(a) Owners shall notify Charterers of such default and Charterers shall within seven days of receipt of       such [119] notice pay to Owners the amount due including interest, failing which Owners may withdraw the vessel from the [120] service of Charterers without prejudice to any other rights Owners may have under this charter or otherwise ;    and [121]
[122]

(b) Interest on any amount due but not paid on the due date shall accrue from the day after that date up to and [123] including the day when payment is made, at a rate per annum which shall be 1 % above the U.S. Prime Interest Rate as [124] published by the Chase Manhattan Bank in New York at 12.00 New York time on the due date, or, if no such interest [125] rate is published on that day, the interest rate published on the next preceding day on which such a rate was so [126] published, computed on the basis of a 360 day year of twelve 30-day months, compounded    semi-annually. [127]
[128]

| | | |
|---|---|---|
| Space Available to Charterers | 10. The whole reach, burthen and decks of the vessel and any passenger accommodation (including Owners' suite) shall be at Charterers' disposal, reserving only proper and sufficient space for the vessel's master, officers, crew, tackle, apparel, furniture, provisions and stores, provided that the weight of stores on board shall    not, unless specially agreed, exceed 500 metric tonnes excluding bunkers and fresh water~~tonnes~~, at any time during the charter period. | [129] [130] [131] [132] |

| | | |
|---|---|---|
| Overtime | 11. Overtime pay of the master, officers and crew in accordance with ship's articles shall be for Charterers'    when incurred, as a result of complying with the request of Charterers or their agents, for loading, discharging, heating of cargo, bunkering or tank cleaning. | [133] [134] [135] |

| | | |
|---|---|---|
| Instructions and Logs | 12. Charterers shall from time to time give the master all requisite instructions and sailing directions, and he shall keep a full and correct log of the voyage or voyages, which Charterers or their agents may inspect as required. The master shall when required furnish Charterers or their agents with a true copy of such log and with properly completed loading and discharging ports sheets and voyage reports for each voyage and other returns as Charterers may require. Charterers shall be entitled to take copies at Owners' expense of any such documents       which are not provided by the master. | [136] [137] [138] [139] [140] [141] |

| | | |
|---|---|---|
| Bills of Lading | 13. (a) The master (although appointed by Owners) shall be under the orders and direction of Charterers as regards employment of the vessel, agency and other arrangements, and shall sign bills of lading as Charterers or their agents may direct (subject always to Clause 35(a) and 40) without prejudice to this charter. Charterers hereby indemnify Owners against all consequences or liabilities that may arise.<br>(i) from signing bills of lading in accordance with the directions of Charterers or their agents, to the extent that the terms of such bills of lading fail to conform to the requirements of this charter, or (except as provided in Clause 13(b)) from the master otherwise complying with Charterers' or their agents' orders :<br>(ii) from any irregularities in papers supplied by Charterers or their agents.<br>(b) Notwithstanding the foregoing, Owners shall not be obliged to comply with any orders from Charterers to discharge all or part of the cargo.<br>(i) at any place other than that shown on the bill of lading and/or<br>(ii) without presentation of an original bill of lading<br>unless they have received from Charterers both written confirmation of such orders and an indemnity in a form acceptable to Owners. | [142] [143] [144] [145] [146] [147] [148] [149] [150] [151] [152] [153] [154] [155] |

| | | |
|---|---|---|
| Conduct of Vessel's Personnel | 14. If Charterers complain the conduct of the master or any of the officers or crew, Owner shall immediately investigate the complaint. If the Complaint proves to be well founded, Owners shall, without delay, make a change in the appointments and Owners shall in any event communicate the result of their investigations     to Charterers as soon as possible. | [156] [157] [158] [159] |

| | | |
|---|---|---|
| Bunkers at Delivery and Redelivery | ~~15. Charterers shall accept and pay for all bunkers on board at time of delivery, and Owners shall on redelivery (whether it occurs at the end of the charter period or on the earlier termination of this charter) accept and pay for all bunkers remaining on board, at the then current market prices at the port of delivery or redelivery, as the case may be, or if such prices are not available payment shall be at the then current market prices at the nearest port at which such prices are available ; provided that if delivery or redelivery does not take place in a port payment shall be at the price paid at the vessel's last port of bunkering before delivery or redelivery, as the case may be. Owners shall give Charterers the use and benefit of any fuel contracts they may have in force from time to time, if so required by Charterers, provided suppliers agree.~~ | [160] [161] [162] [163] [164] [165] [166] [167] |

(see Clause 89 – Bunkers Clause)

| | | |
|---|---|---|
| Stevedores, Pilots, Tugs | 16. Stevedores when required shall be employed and paid by Charterers, but this shall not relieve Owners from responsibility at all times for proper stowage, which must be controlled by the master who shall keep a strict account of all cargo loaded and discharged. Owners shall indemnify Charterers, their servants and agents against all losses, claims, responsibilities and liabilities arising in any way whatsoever from the employment of pilots, tugboats or stevedores, who although employed by Charterers shall be deemed to be the servants of and in   the service of Owners and under their instructions (even if such pilots, tugboat personnel or stevedores are in fact   the servants of Charterers their agents or any affiliated company) ; provided, however, that<br>(i) the foregoing indemnity shall not exceed the amount to which Owners would have been   entitled to limit their liability if they had themselves employed such pilots, tugboats or stevedores, and<br>(ii) Charterers shall be liable for any damage to the vessel caused by or arising out of the use of   stevedores, fair wear and tear excepted, to the extent that Owners are unable by the exercise of due diligence to  obtain redress therefore from stevedores. | [168] [169] [170] [171] [172] [173] [174] [175] [176] [177] [178] [179] |

| | | |
|---|---|---|
| Supernumeraries | 17. Charterers may send maximum two representatives at any time in the vessel's available accommodation upon any voyage made    under this charter, Owners finding provisions and all requisites as supplied to officers, except liquors, Charterers paying at the rate of    USD 20  per day for each representative while on board the vessel, subject to Clause 95– Passenger Indemnity Clause. | [180] [181] [182] |

| | | |
|---|---|---|
| Sub-letting | 18. Charterers may sub-let the vessel, but shall always remain responsible to Owners for due fulfilment of this | [183] |

charter. 184

**Final Voyage**    19. If when a payment of hire is due hereunder Charterers reasonably except to redeliver the vessel before the next 185
payment of hire would fall due, the hire to be paid shall be assessed on Charterers' reasonable estimate of the time 186
necessary to complete Charterers' programme up to redelivery, and from which estimate Charterers may deduct 187
amounts due or reasonably expected to become due for 188
    (i) disbursements on Owners' behalf or charges for Owners' account pursuant to any provision hereof, and 189

For all Owners' expenses effected on behalf of the Vessel and at the request of the Master, Charterers will present the
proper claim(s) fully documented and Owners will pay immediately. Claim will not be deducted from hire.
    (ii) bunkers on board at redelivery pursuant to Clause 15. 190
191

Promptly after redelivery any overpayment shall be refunded by Owners or any underpayment made good by 192
Charterers. 193
If at the time this charter would otherwise terminate in accordance with Clause 4 the vessel is on a 194
ballast voyage to a port of redelivery or is upon a laden voyage, Charterers shall continue to have the use of the vessel 195
at the same rate and conditions as stand herein for as long as necessary to complete such ballast voyage, or to complete 196
such laden voyage and return to a port of redelivery as provided by this charter, as the case may be. 197

**Loss of**    20. Should the vessel be lost, this charter shall terminate and hire shall cease at noon on the day of her loss; should 198
**Vessel** the vessel be a constructive total loss, this charter shall terminate and hire shall cease at noon on the day on which the 199
vessel's underwriters agree that the vessel is a constructive total loss; should the vessel be missing, this charter shall 200
terminate and hire shall cease at noon on the day on which she was last heard of. Any hire paid in advance and not 201
earned shall be returned to Charterers and Owners shall reimburse Charterers for the value of the estimated quantity of 202
bunkers on board at the time of termination, at the price paid by Charterers at the last bunkering port. 203
204

**Off-hire**    21. (a) On each and every occasion that there is loss of time (whether by way of interruption in the vessel's service 205
of, from reduction in the vessel's performance, or in any other manner). 206
    (i) due to deficiency of personnel or stores ; repairs ; gas-freeing for repairs ; time in and waiting to enter 207
dry dock for repairs ; breakdown (whether partial or total) of machinery, boilers or other parts of the vessel or her 208
equipment (including without limitation tank coatings) ; overhaul, maintenance or survey; collision, stranding, 209
accident or damage to the vessel ; or any other similar cause preventing the efficient working of the vessel ; and such 210
loss continues for more than, three consecutive hours or if the accumulation of such losses under 3 hours totals in 211
excess of 36 hours per annum (if resulting from interruption in the vessel's service) or cumulates to more than three 212
hours (if resulting from partial loss of service) ; or 213
    (ii) due to industrial action, refusal to sail, breach of orders or neglect of duty on the part of the 213
master, officers or crew ; or 214
    (iii) for the purpose of obtaining medical advice or treatment for or landing any sick or injured 215
person (other than a Charterers' representative carried under Clause 17 hereof) or for the purpose of landing the body 216
of any person (other than a Charterers' representative), and such loss continues for more than three consecutive hours : 217
or 218
    (iv) due to any delay in quarantine arising from the master, officers or crew having had communication 219
with the shore at any infected area without the written consent or instructions of Charterers or their agents, or to any 220
detention by customs or other authorities caused by smuggling or other infraction of local law on the part of the 221
master, officers, or crew ; or 222
    (v) due to detention of the vessel by authorities at home or abroad attributable to legal action 223
against or breach of regulations by the vessel, the vessel's owners, or Owners (unless brought about by the act or 224
neglect of Charterers) ; then 225
    without prejudice to Charterers' rights under Clause 3 or to any other rights of Charterers hereunder or 226
otherwise the vessel shall be off-hire from the commencement of such loss of time until she is again ready and in an 227
efficient state to resume her service from a position not less favourable to Charterers than that at which such loss of 228
time commenced ; provided, however, that any service given or distance made good by the vessel whilst off-hire 229
shall be taken into account in assessing the amount to be deducted from hire. 230
    (b) If the vessel fails to proceed at any guaranteed speed pursuant to Clause 24, and such failure arises wholly or 231
partly from any of the causes set out in Clause 21(a) above, then the period for which the vessel shall be off-hire under 232
this Clause 21 shall be the difference between 233
    (i) the time the vessel would have required to perform the relevant service at such guaranteed 234
speed, and 235
    (ii) the time actually taken to perform such service (including any loss of time arising from 236
interruption in the performance of such service). 237
    For the avoidance of doubt, all time included under (ii) above shall be excluded from any 238
computation under Clause 24. 239
    (c) Further and without prejudice to the foregoing, in the event of the vessel deviating (which expression includes 240
without limitation putting back, or putting into any port other than that to which she is bound under the instructions of 241
Charterers) for any cause or purpose mentioned in Clause 21(a), the vessel shall be off-hire from the commencement of 242
such deviation until the time when she is again ready and in an efficient state to resume her service from a position 243
not less favourable to Charterers than that at which the deviation commenced, provided, however, that any service 244
given or distance made good by the vessel whilst so off-hire shall be taken into account in assessing the amount to be 245
deducted from hire. If the vessel, for any cause or purpose mentioned in Clause 21(a), puts into any port other than 246
the port to which she is bound on the instructions of Charterers, the port charges, pilotage and other expenses at such 247
port shall be borne by Owners. Should the vessel be driven into any port or anchorage by stress of weather hire shall 248
continue to be due and payable during any time lost thereby. 249
    (d) If the vessel's flag state becomes engaged in hostilities, and Charterers in consequence of such hostilities find it 250
commercially impracticable to employ the vessel and have given Owners written notice thereof then from the date of 251
receipt by Owners of such notice until the termination of such commercial impracticability the vessel shall be off-hire 252
and Owners shall have the right to employ the vessel on their own account, for the purpose of avoiding such off-hire, 253
Owners shall have the option to transfer the Vessel to another flag. New flag shall always be subject to Clause 45 – 254
Ownership Flag Clause. 255
    (e) Time during which the vessel is off-hire under this charter shall count as part of the charter period. 256

**Periodical**
**Drydocking**

22. (a) Owners have the right and obligation to drydock the vessel at regular intervals <u>as required by technical</u>   257
<u>management and/or class, or</u> However, Owners shall endeavour to drydock vessel with maximum 30-months intervals.
On each occasion Owners shall propose to Charterers a date on which they wish to   258
drydock the vessel, not less than  <u>45 days</u>  before such date, and Charterers shall offer a port for such periodical   259
drydocking <u>within the trading limits (see Clause 87 – Trading Limits Clause)</u> and shall take all reasonable steps to   260
make the vessel available as near to such date as practicable.   261

Owners shall put the vessel in drydock at their expense as soon as practicable after Charterers place the vessel   262
at Owners' disposal clear of cargo other than tank washings and residues. Owners shall be responsible for and pay for   263
the disposal into reception facilities of such tank washings and residues and shall have the right to retain any monies   264
received therefore, without prejudice to any claim for loss of cargo under any bill of lading or this charter.   265
   266

(b) If a periodical drydocking is carried out in the port offered by Charterers (which must have suitable   267
accommodation for the purpose and reception facilities for tank washings and residues), the vessel shall be off-hire   268
from the time she arrives at such port until drydocking is completed and she is in every way ready to resume   269
Charterers' service and is at the position at which she went off-hire or a position no less favourable to Charterers,   270
whichever she first attains. However,   271

(i) provided that Owners exercise due diligence in gas-freeing, any time lost in gas-freeing to   272
the standard required for entry into drydock for cleaning and painting the hull shall not count as off-hire, whether lost   273
on passage to the drydocking port or after arrival there (notwithstanding Clause 21), and   274

(ii) any additional time lost in further gas-freeing to meet the standard required for hot work or entry to   275
cargo tanks shall count as off-hire, whether lost on passage to the drydocking port or after arrival there.   276

Any time which, but for sub-Clause (i) above, would be off-hire, shall not be included in any calculation   277
under Clause 24.   278

The expenses of gas-freeing, including without limitation the cost of bunkers, shall be for Owners'   279
account.   280

(c) If Owners require the vessel, instead of proceeding to the offered port, to carry out periodical drydocking at a   281
special port selected by them, the vessel shall be off-hire from the time when she is released to proceed to the special   282
port until she next presents for loading in accordance with Charterers' instructions, provided, however, that Charterers   283
shall credit Owners with the time which would have been taken on passage at the service speed had the vessel not   284
proceeded to drydock. All fuel consumed shall be paid for by Owners but Charterers shall credit Owners with the value   285
of the fuel which would have been used on such notional passage calculated at the guaranteed daily consumption for   286
the service speed<u>.</u> <s>, and shall further credit Owners with any benefit they may gain in purchasing bunkers at the</s>   287
<s>special port.</s>   288

<s>(d) Charterers shall, insofar as cleaning for periodical drydocking may have reduced the amount of tank-cleaning</s>   289
<s>necessary to meet Charterers' requirements, credit Owners with the value of any bunkers which Charterers calculate to</s>   290
<s>have been saved thereby, whether the vessel drydocks at an offered or a special port.</s>   291

**Ship Inspection**

23. Charterers shall have the right at any time during the charter period to make such inspection of the vessel as they   292
may consider necessary. This right may be exercised as often and at such intervals as Charterers in their absolute   293
discretion may determine and whether the vessel is in port or on passage. Owners affording all necessary co-operation   294
and accommodation on board provided, however,   295

(i) that neither the exercise nor the non-exercise, nor anything done or not done in the exercise or non-   296
exercise, by Charterers of such right shall in any way reduce the master's or Owner's authority over, or responsibility to   297
Charterers or third parties for, the vessel and every aspect of her operation, nor increase Charterers' responsibilities to   298
Owners or third parties for the same ; and   299

(ii) that Charterers shall not be liable for any act, neglect or default by themselves, their servants or agents   300
in the exercise or non-exercise of the aforesaid right.   301

**Detailed**
**Description**
**and Performance**

24. (a) Owners guarantee that the speed and consumption of the vessel <u>at sea</u> shall be as follows<u>:</u>   302

| Average speed in knots | | Maximum average bunker consumption | | |
|---|---|---|---|---|
| | | main propulsion | - | auxiliaries |   303/304
| | | fuel oil/<u>diesel oil</u> | | <s>fuel oil/</s> <u>marine</u> diesel oil |
| | | <u>metric</u> tonnes per day | | <u>metric</u> tonnes per day |   306
| Laden <u>14.0 knots</u> | on | <u>35.0</u> | + | <u>2.5</u> |
| Ballast <u>14.5 knots</u> | on | <u>35.0</u> | + | <u>2.5</u> |   307

<u>Owners give indicative non-warranted in-port consumptions as follows:</u>

| | |
|---|---|
| Maneuvering: | 1 mt/hr IFO + 0.2 mt/hr MDO |
| Idle (standby condition): | 3.0 mt/day IFO + 2.5 mt/day MDO |
| Loading | 3.0 mt/day IFO + 3.0 mt/day MDO |
| Discharging | 10 mt/per pump/day IFO + 3.3 mt/day MDO |
| Inerting all tanks | 11 mt/day MDO |
| Ballasting/Deballasting | 4 mt/day MDO |
| Tank cleaning | 11 mt IFO + 3.0 mt/day MDO (+5 mt IFO if heat) |

<u>* 3.5 MT MDO per month to be allowed for miscellaneous purposes</u>

The foregoing bunker consumptions are for <u>propulsion only</u> except cargo heating, <u>re-inerting, ballasting and</u>   308
<u>deballasting, cargo operation</u> and tank cleaning and shall be pro-rated between the speeds shown.   309

The service speed of the vessel is   ... knots laden and   ... knots in ballast and in the absence   310
of Charterers' orders to the contrary the vessel shall proceed at the service speed. <s>However if more than one laden and</s>   311
<s>one ballast speed are shown in the table above Charterers shall have the right to order the vessel to steam at any speed</s>   312

~~within the range set out in the table (the "ordered speed").~~ 313

~~If the vessel is ordered to proceed at any speed other than the highest speed shown in the table, and the average~~ 314
~~speed actually attained by the vessel during the currency of such order exceeds such ordered speed plus 0.5 knots (the~~ 315
~~"maximum recognised speed"), then for the purpose of calculating any increase or decrease of hire under this Clause~~ 316
~~24 the maximum recognised speed shall be used in place of the average speed actually attained.~~ 317

~~For the purposes of this charter the "guaranteed speed" at any time shall be the then current ordered speed~~ 318
~~or the service speed, as the case may be.~~ 319

The average speeds and bunker consumptions shall for the purposes of this Clause 24 be calculated by 320
reference to the observed distance from pilot station to pilot station on all sea passages during each period stipulated in 321
Clause 24 (c), but excluding any time during which the vessel is (or but for Clause 22(b) (i) would be) off-hire and also 322
excluding "Adverse Weather Periods", being (i) any periods during which reduction of speed is necessary for safety in 323
congested waters or in poor visibility (ii) any days, noon to noon, when winds exceed force ~~8~~ 5 on the Beaufort Scale 324
for more than ~~6~~12 hours. 325
326

(b) If during any year from the date on which the vessel enters service (anniversary to anniversary) the vessel falls 327
below or exceeds the performance guaranteed in Clause 24(a) by 5 percent then if such shortfall or excess results. 328
329

(i) from a reduction or an increase in the average speed of the vessel, compared to the speed guaranteed in 330
Clause 24(a), then an amount equal to the value at the hire rate of the time so lost or gained, as the case may be, shall 331
be deducted from or added to the hire paid; 332
(ii) from an increase or a decrease in the total bunkers consumed, compared to the total bunkers which 333
would have been consumed had the vessel performed as guaranteed in Clause 24(a), an amount equivalent to the value 334
of the additional bunkers consumed or the bunkers saved, as the case may be, based on the average price paid by 335
Charterers for the vessel's bunkers in such period, shall be deducted from or added to the hire paid. 336
The addition to or deduction from hire so calculated for laden and ballast mileage respectively shall be 337
adjusted to take into account the mileage steamed in each such condition during Adverse Weather Periods, by dividing 338
such addition or deduction by the number of miles over which the performance has been calculated and multiplying by 339
the same number of miles plus the miles steamed during the Adverse Weather Periods, in order to establish the total 340
addition to or deduction from hire to be made for such period. 341
Reduction of hire under the foregoing sub-Clause (b) shall be without prejudice to any other remedy 342
available to Charterers. 343
(c) Calculations under this Clause 24 shall be made for the yearly periods terminating on each successive 344
anniversary of the date on which the vessel enters service, and for the period between the last such anniversary and the 345
date of termination of this charter if less than a year. Claims in respect of reduction of hire arising under this Clause 346
during the final year or part year of the charter period shall in the first instance be settled in accordance with 347
Charterers' estimate made two months before the end of the charter period. Any necessary adjustment after this charter
terminates shall be made by payment by Owners to Charterers or by Charterers to Owners as the case may require.

Payments in respect of increase of hire arising under this Clause shall be made promptly after receipt by Charterers
of all the information necessary to calculate such increase. Both parties may claim against the other for over-
performance respectively under-performance, but the right to claim only occurs if and to the extent the cumulative 352
positive or negative variance from the warranted figures be it the aggregated speed and consumption performance
exceeds 5%. Same to be calculated on a 12-months basis. See Clause 94 – Minimum Speed (Slow Speed – Speed Up
Clause).

Salvage    25. Subject to the provisions of Clause 21 hereof, all loss of time and all expenses (excluding any damage to or loss 353
of the vessel or tortious liabilities to third parties) incurred in saving or attempting to save life or in successful or 354
unsuccessful attempts at salvage shall be borne equally by Owners and Charterers provided that Charterers shall not be 355
liable to contribute towards any salvage payable by Owners arising in any way out of services rendered under this 356
Clause 25. 357

All salvage and all proceeds from derelicts shall be divided equally between Owners and Charterers after 358
deducting the master's, officers' and crew's share. 359

Lien    26. Owners shall have a lien upon all cargoes and all freights, sub-freights and demurrage for any amounts due 360
under this charter; and Charterers shall have a lien on the vessel for all monies paid in advance and not earned, and for 361
all claims for damages arising from any breach by Owners of this charter. 362

Exceptions    27. (a) The vessel, her master and Owners shall not, unless otherwise in this charter expressly provided, be liable for 363
any loss or damage or delay or failure arising or resulting from any act, neglect or default of the master, pilots, 364
mariners or other servants of Owners in the navigation or management of the vessel ; fire, unless caused by the actual 365
fault or privity of Owners ; collision or stranding ; dangers and accidents of the sea ; explosion, bursting of boilers, 366
breakage of shafts or any latent defect in hull, equipment or machinery ; provided, however, that Clauses 1, 2, 3 and 24 367
hereof shall be unaffected by the foregoing. Further, neither the vessel, her master or Owners, nor Charterers shall, 368
unless otherwise in this charter expressly provided, be liable for any loss or damage or delay or failure in performance 369
hereunder arising or resulting from act of God, act of war, seizure under legal process, quarantine restrictions, strikes, 370
lock-outs, riots, restraints of labour, civil commotions or arrest or restraint of princes, rulers or people. 371
372

(b) The vessel shall have liberty to sail with or without pilots, to tow or go to the assistance of vessels in distress 373
and to deviate for the purpose of saving life or property. 374
(c) Clause 27(a) shall not apply to or affect any liability of Owners or the vessel or any other relevant person in 375
respect of 376
(i) loss or damage caused to any berth, jetty, docks, dolphin, buoy, mooring line, pipe or crane or other 377
works or equipment whatsoever at or near any place to which the vessel may proceed under this charter, whether or not 378
such works or equipment belong to Charterers, or 379
(ii) any claim (whether brought by Charterers or any other person) arising out of any loss of or damage to 380
or in connection with cargo. Any All such claims shall be subject to the Hague Rules or the Hague-Visby Rules or the 381
Hamburg rules, as the case may be, which ought pursuant to Clause 38 hereof to have been incorporated in the relevant 382
bill of lading (whether or not such Rules were so incorporated) or, if no such bill of lading is issued, to the Hague- 383
Visby Rules unless the Hamburg rules compulsorily apply in which case to the Hamburg rules. 384

(d) In particular and without limitation, the foregoing subsections (a) and (b) of this Clause shall not apply to or in any way affect any provision in this charter relating to off-hire or to reduction of hire. 385 386

**Injurious Cargoes**

28. No acids, explosives or cargoes injurious to the vessel shall be shipped and without prejudice to the foregoing any damage to the vessel caused by the shipment of any such cargo, and the time taken to repair such damage, shall be for Charterers' account. No voyage shall be undertaken, nor any goods or cargoes loaded, that would expose the vessel to capture or seizure by rulers or governments. 387 388 389 390

**Grade of Bunkers**

29. Charterers shall supply ~~marine diesel oil/fuel oil with a maximum viscosity of 380 Centistokes RMG 35 as per ISO 8217/96 at 50 degrees Centigrade/ACGFO for main propulsion and DMX or DMA diesel oil/ACGFO for the auxiliaries. If Owners require the vessel to be supplied with more expensive bunkers they shall be liable for the extra cost thereof. In case of emergency, vessel shall have the possibility to burn marine diesel oil DMA as per ISO 8217/96. Provided situation permits, vessel not to burn DMA without Charterers' prior agreement. In any case, situation and consumptions to be duly documented and explained.~~ 391 392 393 394 395 396

Fuel Oil
- RMG380 as per ISO 8217 (2005), Viscosity minimum 300cst, Sulphur between 1.5 - 4.5%
Diesel Oil
- DMC as per ISO 8217 (2005)
Gas Oil
Marine Gas Oil to be supplied as per ISO 8217 2005 DMA Grade.
~~Charterers warrant that all bunkers provided by them in accordance herewith shall be of a quality complying with the International Marine Bunker Supply Terms and Conditions of Shell International Trading Company and with its specification for marine fuels as amended from time to time.~~

**Disbursements**

~~30. Should the master require advances for ordinary disbursements at any port, Charterers or their agents shall make such advances to him, in consideration of which Owners shall pay a commission of two and a half per cent, and all such advances and commission shall be deducted from hire.~~ 397 398 399

**Laying-up**

31. Charterers shall have the option, after consultation with Owners, of requiring Owners to lay up the vessel always afloat at a safe place nominated by Charterers, in which case the hire provided for under this charter shall be adjusted to reflect any net increases in expenditure reasonably incurred or any net saving which should reasonably be made by Owners as a result of such lay-up. Charterers may exercise the said option any number of times during the charter period. 400 401 402 403 404

**Requisition**

32. Should the vessel be requisitioned by any government, de facto or de jure, during the period of this charter, the vessel shall be off-hire during the period of such requisition, and any hire paid by such government in respect of such requisition period shall be for Owners' account. Any such requisition period shall count as part of the charter period. 405 406 407 408

**Outbreak of War**

33. If war or hostilities break out between any two or more of the following countries: <u>Singapore and USA</u> ~~UK, Netherlands~~ both Owners and Charterers shall have the right to cancel this charter. <u>Should the Vessel's flag state be at war with any of the countries above, Owners shall change the flag of the Vessel as per the flag clause – see Clause 45.</u> 409 410

**Additional War Expenses**

34. If the vessel is ordered to trade in areas where there is war (de facto or de jure) or threat of war, Charterers shall reimburse Owners for any additional insurance premia <u>for hull and machinery,</u> crew bonuses and other expenses which are reasonably incurred by Owners as a consequence of such orders, provided that Charterers are given notice of such expenses as soon as practicable and in any event before such expenses are incurred, and provided further that Owners obtain from their insurers a waiver of any subrogated rights against Charterers in respect of any claims by Owners under their war risk insurance arising out of compliance with such orders. 411 412 413 414 415 416

**War Risks**

35. (a) The master shall not be required or bound to sign bills of lading for any place which in his or Owners' reasonable opinion is dangerous or impossible for the vessel to enter or reach owing to any blockade, war, hostilities, warlike operations, civil war, civil commotions or revolutions. 417 418 419

(b) If in the reasonable opinion of the master or Owners it becomes, for any of the reasons set out in Clause 35(a) or by the operation of international law, dangerous, impossible or prohibited for the vessel to reach or enter, or to load or discharge cargo at, any place to which the vessel has been ordered pursuant to this charter (a "place of peril"), then Charterers or their agents shall be immediately notified by telex or radio messages, and Charterers shall thereupon have the right to order the cargo, or such part of it as may be affected, to be loaded or discharged, as the case may be, at any other place within the trading limits of this charter (provided such other place is not itself a place of peril). If any place of discharge is or becomes a place of peril, and no orders have been received from Charterers or their agents within 48 hours after dispatch of such messages, then Owners shall be at liberty to discharge the cargo or such part of it as may be affected at any place which they or the master may in their or his discretion select within the trading limits of this charter and such discharge shall be deemed to be due fulfilment of Owners' obligations under this charter so far as cargo so discharged is concerned. 420 421 422 423 424 425 426 427 428 429 430

(c) The vessel shall have liberty to comply with any directions or recommendations as to departure, arrival, routes, ports of call, stoppages, destinations, zones, waters, delivery or in any other wise whatsoever given by the government of the state under whose flag the vessel sails or any other government or local authority or by any person or body acting or purporting to act as or with the authority of any such government or local authority including any de facto government or local authority or by any person or body acting or purporting to act as or with the authority of any such government or local authority or by any committee or person having under the terms of the war risks insurance on the vessel the right to give any such directions or recommendations. If by reason of or in compliance with any such directions or recommendations anything is done or is not done, such shall not be deemed a deviation. 431 432 433 434 435 436 437 438

If by reason of or in compliance with any such direction or recommendation the vessel does not proceed to any place of discharge to which she has been ordered pursuant to this charter, the vessel may proceed to any place which the master or Owners in his or their discretion select and there discharge the cargo or such part of it as may be affected. Such discharge shall be deemed to be due fulfilment of Owners' obligations under this charter so far as cargo so discharged is concerned. 439 440 441 442 443

Charterers shall <u>use best efforts to</u> ensure ~~procure~~ that all bills of lading issued under this charter shall contain the Chamber of Shipping War Risks Clause 1952. 444 445 446

**Both to Blame**

36. If the liability for any collision in which the vessel is involved while performing this charter falls to be 447

**Collision Clause**

determined in accordance with the laws of the United States of America, the following provision shall apply : 448

"If the ship comes into collision with another ships as a result of the negligence of the other ship and any act, 449
neglect or default of the master, mariner, pilot or the servants of the carrier in the navigation or in the management of 450
the ship, the owners of the cargo carried hereunder will indemnify the carrier against all loss, or liability to the other or 451
non-carrying ship or her owners in so far as such loss or liability represents loss of, or damage to, or any claim 452
whatsoever of the owners of the said cargo, paid or payable by the other or non-carrying ship or her owners to the 453
owners of the said cargo and set off, recouped or recovered by the other or non-carrying ship or her owners as part of 454
their claim against the carrying ship or carrier". 455

"The foregoing provisions shall also apply where the owners, operators or those in charge of any ship or ships or 456
objects other than, or in addition to, the colliding ships or objects are at fault in respect of a collision or contact." 457

Charterers shall procure that all bills of lading issued under this charter shall contain a provision in the 458
foregoing terms to be applicable where the liability for any collision in which the vessel is involved falls to be 459
determined in accordance with the laws of the United States of America. 460

461

**New Jason Clause**

37. General average contributions shall be payable according to the York/Antwerp Rules, 1974, as amended 1994, 462
and shall be adjusted in London in accordance with English law and practice but should adjustment be made in 463
accordance with the law and practice of the United States of America, the following provision shall apply : 464

"In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting 465
from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the carrier is 466
not responsible by statute, contract or otherwise, the cargo, shippers, consignees or owners of the cargo shall contribute 467
with the carrier in general average to the payment of any sacrifices, losses or expenses of a general average nature that 468
may be made or incurred and shall pay salvage and special charges incurred in respect of the cargo." 469

If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully as if the said salving ship 470
or ships belonged to strangers. Such deposit as the carrier or his agents may deem sufficient to cover the estimated 471
contribution of the cargo and any salvage and special charges thereon shall, if required, be made by the cargo, 472
shippers, consignees or owners of the cargo to the carrier before delivery." 473

Charterers shall procure that all bills of lading issued under this charter shall contain a provision in the 474
foregoing terms, to be applicable where adjustment of general average is made in accordance with the laws and 475
practice of the United States of America. 476

477

**Clause Paramount**

~~38. Charterers shall procure that all bills of lading issued pursuant to this charter shall contain the following clause :~~ 478

479

~~"(1) Subject to sub-clause (2) or (3) hereof, this bill of lading shall be governed by, and have effect subject 480
to, the rules contained in the International Convention for the Unification of Certain Rules relating to Bills of Lading 481
signed at Brussels on 25th August 1924 (hereafter the "Hagues Rules") as amended by the Protocol signed at 482
Brussels on 23rd February 1968 (hereafter the "Hague-Visby Rules"). Nothing contained herein shall be deemed to 483
be either a surrender by the carrier of any of his rights or immunities or any increase of any of his responsibilities or 484
liabilities under the Hague Visby Rules."~~ 485

~~"(2) If there is governing legislation which applies the Hague Rules Compulsorily to this bill of lading, to the 486
exclusion of the Hague-Visby Rules, then this bill of lading shall have effect subject to the Hague Rules. Nothing 487
herein contained shall be deemed to be either a surrender by the carrier of any of his rights or immunities or an 488
increase of any of his responsibilities or liabilities under the Hague Rules.~~ 489

~~"-3) if there is governing legislation which applies the Hamburg Rules compulsorily to this Bill of Lading, to the 490
exclusion of the Hague-Visby rules, then this Bill of Lading shall have effect to the Hamburg rules. Nothing herein 491
contained shall be deemed to be either a surrender by the carrier of any of his rights or immunities or an increase of 492
any of his responsibilities or liabilities under the Hamburg rules.~~ 493

~~"(3) (4) If any term of this bill of lading is repugnant to the Hague-Visby Rules, or Hague Rules or Hamburg rules if 494~~ (blank)
~~applicable, such term shall be void to that extent but not further."~~

~~"(4) (5) Nothing in this bill of lading shall be construed as in any way restricting, excluding or waiving the 495~~ (blank)
~~right of any relevant party or person to limit his liability under any available legislation and/or law".~~

(see Clause 52 – Paramount Clause)

**TOVALOP**

39. Owners warrant that the vessel is : 494
(i) a tanker in ITOPF and 495
(ii) properly entered in North of England            P & I Club 496

and will so remain during the currency of this charter. 497
~~When an escape or discharge of Oil occurs from the vessel and causes or threatens to cause Pollution Damage, or 498
when there is the threat of an escape or discharge of Oil (i.e. a grave and imminent danger of the escape or discharge 499
of Oil which, if it occurred, would create a serious danger of Pollution Damage, whether or not an escape or 500
discharge in fact subsequently occurs), then Charterers may, at their option, upon notice to Owners or master, 501
undertake such measures as are reasonably necessary to remove or minimise such Pollution Damage or to remove the 502
Threat, unless Owners promptly undertake the same. Charterers shall keep Owners advised of the nature and result of 503
any such measures taken by them and, if time permits, the nature of the measures intended to be taken by them. 504
Any of the aforementioned measures taken by Charterers shall be deemed taken on Owners' authority as Owners' 505
agent, and shall be at Owners' expense except to the extent that :~~ 506

~~(1) any such escape or discharge or Threat was caused or contributed to by Charterers, or 507
(2) by reason of the exceptions set out in Article III, paragraph 2, of the 1969 International Convention on Civil 508
Liability for Oil Pollution Damage, Owners are or, had the said Convention applied to such escape or discharge or to 509
the Threat, would have been exempt from liability for the same, or 510
(3) the cost of such measures together with all other liabilities, costs and expenses of Pollution arising out of or in 511
connection with such escape or discharge or Threat exceeds one hundred and sixty United States Dollars (US $160) 512
per don of the vessel's Tonnage or sixteen million eight hundred thousand United States Dollars (US $16,800,000), 513
whichever is the lesser, save and insofar as Owners shall be entitled to recover such excess under either the 1971 514
International Convention on the Establishment of an International Fund for Compensation for Oil Pollution Damage or 515
under CRISTAL.~~ 516

~~PROVIDED ALWAYS that if Owners in their absolute discretion consider said measures should be~~ 517

~~discontinued, Owners shall so notify Charterers and thereafter Charterers shall have no right to continue said~~ 518
~~measures under the provisions of this Clause 39 and all further liability to Charterers under this Clause 39 shall~~ 519
~~thereupon cease.~~ 520
~~The above provisions are not in derogation of such other rights as Charterers or Owners may have under this charter~~ 521
~~or may otherwise have or acquire by law or any International Convention or TOVALOP.~~ 522
~~The term "TOVALOP" means the Tanker Owners' Voluntary Agreement Concerning Liability for Oil Pollution~~ 523
~~dated 7th January 1969, as amended from time to time, and the term "CRISTAL" means the Contract Regarding an~~ 524
~~Interim Supplement to Tanker Liability for Oil Pollution dated 14th January 1971, as amended from time to time. The~~ 525
~~terms "Oil", "Pollution Damage", and "Tonnage" shall for the purposes of this Clause 39 have the meanings ascribed~~ 526
~~to them in TOVALOP. (see additional clause 49 and 55)~~ 527

**Export
Restrictions**

40. The master shall not be required or bound to sign bills of lading for the carriage of cargo to any place to which 528
export of such cargo is prohibited under the laws, rules or regulations of the country in which the cargo was produced 529
and/or shipped. 530

Charterers shall procure that all bills of lading issued under this charter shall contain the following clause : 531
532

"If any laws rules or regulation applied by the government of the country in which the cargo was produced 533
and/or shipped, or any relevant agency thereof, impose a prohibition on export of the cargo to the place 534
of discharge designated in or ordered under this bill of lading, carriers shall be entitled to require cargo 535
owners forthwith to nominate an alternative discharge place for the discharge of the cargo, or such part 536
of it as may be affected, which alternative place shall not be subject to the prohibition, and carriers shall 537
be entitled to accept orders from cargo owners to proceed to and discharge at such alternative place. If 538
cargo owners fail to nominate an alternative place within 72 hours after they or their agents have 539
received from cargo owners notice of such prohibition, carriers shall be at liberty to discharge the cargo or 540
such part of it as may be affected by the prohibition at any safe place on which they or the master may in 541
their or his absolute discretion decide and which is not subject to the prohibition, and such discharge constitute 542
due performance of the contract contained in this bill of lading so far as the cargo so discharged 543
is concerned". 544

The foregoing provision shall apply mutatis mutandis to this charter, the references to a bill of lading being 545
deemed to be references to this charter. 546

**Law and
Litigation**

~~41. (a) This charter shall be construed and the relations between the parties determined in accordance~~ 547
~~with the laws of England.~~ 548
~~(b) Any dispute arising under this charter shall be decided by the English High Courts in London to whose~~ 549
~~jurisdiction the parties hereby agree.~~ 550
~~(c) Notwithstanding the foregoing, but without prejudice to any party's right to arrest or maintain the~~ 551
~~arrest of any maritime property, either party may, by giving written notice of election to the other party, elect to~~ 552
~~have any such dispute referred to the arbitration of a single arbitrator in London in accordance with the provisions of~~ 553
~~the Arbitration Act 1950, or any statutory modification or re-enactment thereof for the time being in force.~~ 554
555
~~(i) A party shall lose its right to make such an election only if:~~ 556
~~(a) it receives from the other party a written notice of dispute which—~~ 557
~~(1) states expressly that a dispute has arisen out of this charter ;~~ 558
~~(2) specifies the nature of the dispute ; and~~ 559
~~(3) refers expressly to this clause 41(c)~~ 560
~~and~~ 561
~~(b) it fails to give notice of election to have the dispute referred to arbitration not later than~~ 562
~~30 days from the date of receipt of such notice of dispute.~~ 563
~~(ii) The parties hereby agree that either party may—~~ 564
~~(a) appeal to the High Court on any question of law arising out of an award ;~~ 565
~~(b) apply to the High Court for an order that the arbitrator state the reasons for his award ;~~ 566
~~(c) give notice to the arbitrator that a reasoned award is required ; and~~ 567
~~(d) apply to the High Court to determine any question of law arising in the course of the~~ 568
~~reference~~ 568
~~(d) It shall be a condition precedent to the right of any party to a stay of any legal proceedings in which~~ 570
~~maritime property has been, or may be, arrested in connection with a dispute under this charter, that that party~~ 571
~~furnishes to the other party such security to which that other party would have been entitled in such legal proceedings in the~~ 572
~~absence of a stay. For smaller disputes upto US$ 50 000 the small claim procedure laid down by the London Maritime~~ 573
~~Arbitrators' Association and any subsequent amendment thereto shall apply.~~

<u>See Clause 47 -- LMAA Arbitration Clause</u>

**Construction**

42. The side headings have been included in this charter for convenience of reference and shall in no way affect 574
the construction hereof. 575

<u>**Additional clauses 43 to 99 and also the OCIMF Questionnaire, as herewith attached are
deemed to be incorporated in the Charter Party and to form an integral part of this Charter Party.**</u>

*THE OWNERS*

*ATTORNEY-IN-FACT*

*THE CHARTERERS*

Peder J Moller
**Director**

ORIGINAL

**Additional Clauses 43 - 99 to M.T. Highseas to be re-named Pacific Turguoise/Navig8 Time Charter Party dated 29 May 2007**

**43. Private and Confidential Clause**

**44. Unique Bills of Lading Clause**

**45. Ownership - Flag Clause**

**46. Taxes Clause**

**47. LMAA Arbitration Clause**

**48. Third-Party Arrest Clause**

**49. Civil Liability Convention Clause**

**50. Detention Clause**

**51. Excess Berth Occupancy Clause**

**52. Clause Paramount**

**53. Drugs and Alcohol Policy Clause**

**54. Oil Major Approval's Clause**

**55. International Transport Workers Federation Clause**

**56. United States Coast Guard Clause**

**57. I.S.M. Clause**

**58. United States Oil Pollution Act of 1990 (OPA90) Clause**

**59. Protocols and Certificates Clause**

**60. Boycott Clause**

**61. Arab Boycott / League Clause**

**62. Eligibility Clause**

**63. Traffic Separation Clause**

**64. UK Water Traffic Routeing Clause**

1

**65. Oil Pollution Clause**

**66. Blocking and Trapping Clause**

**67. Delivery and Redelivery Survey Clause**

**68. Inert Gas System Clause**

**69. Cast Iron Clause**

**70. Vaccination Clause**

**71. Agents Clause**

**72. Loading Rate / Pumping Capacity Clause**

**73. Hoses Clause**

**74. De-ballast Clause**

**75. Cargo Retention Clause**

**76. Ship-to-Ship Transfer Clause**

**77. Cleaning Clause**

**78. Watchmen Clause**

**79. Re-measurement Clause**

**80. Blending Clause**

**81. Operational Compliance Clause**

**82. In Transit Loss Clause**

**83. Sea Terminal Clause**

**84. Smuggling Clause**

**85. Notice Of Readiness Clause**

**86. Pumping Logs Clause**

**87. Trading Limits Clause**

**88. Cargo Clause**

**89. Bunkers Clause:**

**90. War Risk Clause**

**91. Letter of Indemnity Clause**

**92.ITOPF Clause**

**93.Minimum Speed (slow speed - speed up) Clause**

**94.Passenger Indemnity Clause**

**95.Delivery and Redelivery notices Clause**

**96. Commission Clause**

**97. BIMCO ISPS Clause**

**98. U.S. Customs Advance Notification / AMS Clause**

**99. Bottom Cleaning Clause**

## 43. Private and Confidential Clause

Both parties hereof shall keep this fixture and any details private and confidential.

## 44. Unique Bills of Lading Clause

Owners warrant that they are registered for the use of Unique Bills of Lading Identifiers and will apply a suitable code to all Bills of Lading issued for trading into the United States of America.

## 45. Ownership - Flag Clause

Owners have the option to change Vessel's flag to Panama or Singapore at any time during the term of this Charter without first obtaining Charterers consent, but Owner will inform Charterers of their intention to change the flag at least 45 days in advance. If Owners wish to change Vessel's flag to another registry than Panama and Singapore, then Charterers written consent shall first be obtained, which shall, however, not be unreasonably withheld.

## 46. Taxes Clause

All taxes, withholding taxes and/or dues and/or charges on the Vessel and/or cargo and/or stores and/or bunkers and on freight and/or charter hire (except income tax of charter hire payable by original Owners in country of residency of registration) and and/or crew wages and/or tax or voyage related expenses arising out of cargoes carried under this Charter Party, including cost/duty etc. payable for coastal conversion shall be for Charterer's account and be settled by them directly.

## 47. LMAA Arbitration Clause

This contract shall be governed by and construed in accordance with English law.

Any dispute arising out of or in connection with this contract shall be referred to Arbitration in London under the latest version of the London Maritime Arbitrators' Association ("LMAA") Terms (or, if the amount in dispute does not exceed US$ 50,000, the LMAA Small Claims Procedure) then in force, before a sole Arbitrator who shall be an LMAA full member appointed either

(a)     By agreement between the parties, or

(b)     Failing agreement within 30 days after one party serves on the other notice referring the matter to arbitration and proposing one or more candidates for arbitrator, appointed on the application of either party by the President for the time being of the London Maritime Arbitrators' Association.

The language of the arbitration shall be English. The arbitration award shall be final and binding on the parties and may be enforced by any court having jurisdiction.

## 48. Third-Party Arrest Clause
In the event of arrest (by party other than authorities at home or abroad - refer to Clause 21 (a)(v)) or other sanction levied against the Vessel or time-Charterers arising out of Owners' breach or any fault of the Owner, the Owner agrees to assume full responsibility for all penalties and the Vessel shall be considered off-hire during any delay or detention arising there from.

## 49. Civil Liability Convention Clause
The Owner warrant that the Vessel has onboard a valid certificate as required by Article 7 of the International Convention of Civil Liability for Oil Pollution Damage of 1969 as amended 1976 and 1992.

Owner further warrants that the said certificate will be maintained in effect throughout the duration of performance under this charter. Any delay or consequences due to Owner's failure to have or to maintain said certificate, to be for Owners' account.

## 50. Detention Clause
Should the Vessel be seized or detained by any authority, or arrested at the suit of any party having or purporting to have a claim against any interest in the Vessel, hire shall not be payable in respect of any period during which the Vessel is not fully at Charterers' use and all extra expenses shall be for the Owners' account, unless such seizure or detention is occasioned by any personal act or omission or default of the Charterers or their agents, or by reason of cargo carried.

## 51. Excess Berth Occupancy Clause
If after disconnection of hoses Vessel remains alongside the berth exclusively for Vessel's purposes, the Owner shall be responsible for direct and/or indirect costs charged to the Charterer by terminal/suppliers/receivers/port authority.

## 52. Clause Paramount
The Charterer shall use best efforts to ensure that all Bills of Lading issued pursuant to this charter shall contain a Clause Paramount in the following form: -

"(1) Subject to sub-clauses (2) or (3) hereof, this Bill of Lading shall be governed by, and have effect subject to, the rules contained in the International Convention for the Unification of Certain Rules relating to Bills of Lading signed at Brussels on 25th August 1924 (hereafter the "Hague Rules") as amended by the Protocol signed at Brussels on 23rd February 1968 (hereafter the "Hague-Visby Rules"). Nothing contained herein shall be deemed to be either a surrender by the carrier of any of his rights or immunities or any increase of any of his responsibilities or liabilities under the Hague-Visby Rules".

"(2) If there is governing legislation which applies the Hague Rules compulsorily to this Bill Of Lading, to the exclusion of the Hague and Hague-Visby Rules, then this Bill of Lading shall have effect subject to the Hague

Rules. Nothing herein contained shall be deemed to be either a surrender by the carrier of any of his rights or immunities or an increase of any of his responsibilities or liabilities under the Hague Rules."

"(3) If there is governing legislation which applies the Hamburg Rules compulsorily to this Bill Of Lading to the exclusion of the Hague-Visby Rules, then this Bill of Lading shall have effect subject to the Hamburg Rules. Nothing herein contained shall be deemed to be either a surrender by the carrier of any of his rights or immunities or an increase of any of his responsibilities or liabilities under the Hamburg Rules."

"(4) If any term of this Bill of Lading is repugnant to the Hague-Visby Rules, or Hague Rules or Hamburg Rules, if applicable, such term shall be void to that extent but no further."

"(5) Nothing in this Bill of Lading shall be construed as in any way restricting, excluding or waiving the right of any party or person to limit his liability under any available legislation and/or law."

## 53. Drugs and Alcohol Policy Clause
Owners warrant that it has a policy on drug and alcohol abuse ("Policy") applicable to the vessel that meets or exceeds the standards in the Oil Companies International Marine Forum (OCIMF) guidelines for the control of drugs and alcohol. Under the Policy, alcohol impairment shall be defined as a blood alcohol content of 40-mg/100 ml or greater; the appropriate seafarers to be tested shall be all vessel officers and the drug/alcohol testing and screening shall include unannounced testing in addition to routine medical examinations. An objective of the policy should be that the frequency of the unannounced testing be adequate to act as an effective abuse deterrent, and that all officers be tested at least once a year through a combined program of unannounced testing and routine medical examinations.

Owners further warrant that the policy will remain in effect during the term of this charter and that Owners shall exercise due diligence to ensure that the policy is complied with. It is understood that an actual impairment or any test findings of impairment shall not in and of itself mean that Owners has failed to exercise due diligence.

Owners confirm that they have signed and sent to Exxon a blanket declaration confirming that the vessel is included in Owners' policy concerning drugs and alcohol, and that this policy includes unannounced testing according to OCIMF/ EXXON guidelines.

## 54. Oil Major Approval's Clause
The Owner will arrange for regular vetting inspections by major oil companies to ensure that as many vetting approvals as possible are obtained and maintained.

Subject to Charterer's directing the Vessel to ports and places where such vetting inspections can take place, the Owner will warrant that a S.I.R.E. report, not more than 6 months old, will at all times be available in the system.

Owner also warrant that any two (2) of the following oil majors will be maintained provided the Charterer directs the Vessel to ports and places where such vetting inspections can take place; Exxon-Mobil, Chevron-Texaco and Shell.

Should the Vessel become blacklisted and/or boycotted by oil companies and thereby hindering the Vessel's ability to trade freely under this Charter Party, Owners shall immediately take steps to rectify the deficiencies. Time and expenses for vetting inspections shall be borne by the Owner.

After delivery of the Vessel, if any new requirements of major oil companies, and/or international rules and regulations and/or class requirements become essential during the currency of this Charter, the Owner and the Charterer will discuss together how to best implement the requirements and apportion the costs thereof.

## 55. International Transport Workers Federation Clause
During the term of this Charter the officers and crew will fully comply with ITF or equivalent.

## 56. United States Coast Guard Clause
The Owner warrant that during the term of this Charter the Vessel will comply, and if not in compliance will hold necessary waivers, with all applicable United States Coast Guard (USCG) Regulations in effect including, but not limited to, pollution and safety regulations of the Code of Federal Regulations, as amended, and all other applicable state pollution and safety laws, rules and regulations as may be promulgated and subsequent amendment thereto. Any delay penalties, costs and consequences resulting from Vessel's non-compliance shall be treated as off-hire. However, the Charterer shall not place the Vessel off-hire during the first inspection by the USCG in order to obtain the TVEL/LOC.

The Vessel to have valid certificate complying with the regulations at all times during the term of this Charter Party.

## 57. I.S.M. Clause
The Owner warrants that a Safety Management System (SMS) in accordance with the ISM Code will be in operation throughout the term of this charter. It is a condition of this Charter Party that the Owners' or "the Company" (as defined by the ISM Code) shall have a valid Document Of Compliance (DOC) and the Vessel shall have a valid Safety Management Certificate (SMC). Upon request the Owners' shall provide a copy of the relevant DOC and SMC to the Charterers. Without limitation to Charterers' remedies under this clause, any loss, damages or expenses attributed to vessel's non-compliance with the ISM code and/or to Owners' failure to respond (or delay in responding) to Charterers request for the foregoing certificates, shall be for Owners' account and any time lost to the extent arising from such non-compliance or failure/delay in responding, shall be off hire.

## 58. United States Oil Pollution Act of 1990 (OPA90) Clause
Owners warrant:
a) That they and/or the Vessel operator has submitted to the United States

4

Coast Guard for approval a response plan for the vessel (VRP) which meets in full the requirements of the United States Oil Pollution Act of 1990, the Government Regulations issued there under and any change, rule or regulation in substitution of, or supplementary to, such Circular (collectively 'VRP Requirements').

b) That the VRP is approved and the vessel is operated in compliance therewith, when and as required by the VRP requirements.

c) That the Owners or operator of the vessel, and the vessel, fully meets all other requirements of OPA and any Governments Regulations or guidelines issued there under.

This clause does not in any way lessen the overall effect of the Owners of any State obligation in respect of Vessel Response Plans or other pollution requirements.

## 59. Protocols and Certificates Clause
The Owner warrant that throughout the period of this Charter the Vessel shall comply with the requirements of SOLAS (IMO Protocol of 1978 relating to the International Convention for the Safety of Life at Sea, 1974) and MARPOL (IMO Protocol of 1978 relating to the International Convention for the Prevention of Pollution from Ships 1983 and subsequent updates. The Owner further warrant that with particular reference to these protocols and any further amendments or successors to these protocols, the Vessel shall have on board necessary certification of compliance to enable the Vessel to trade without restriction.

The Owner further warrants that the Vessel has on board a valid certificate as required by Article VII of the International Convention on Civil Liability for oil pollution of 1992 as amended.

In no case shall the Charterer be liable for loss of time and/or other expenses as a result of Owners' failure to obtain or maintain the aforementioned certificates.

The Vessel shall have on board valid certificates at all times during the term of this Charter.

## 60. Boycott Clause
In the event the Vessel is being subject to boycott, being delayed, or rendered inoperative by strikes, labour stoppages, or any other difficulties arising from Vessel's flag, ownership, crew, or terms of employment of crew (see Clause 55), or of chartered vessel or any other vessel under the same Ownership, operation or control, such time lost is to be considered as off-hire and all expenses incurred thereby, including fuel consumed during such periods, to be for Owners' account.

## 61. Arab Boycott / League Clause
The Owner warrants that to the best of their knowledge, at the time of signing this Charter Party, the Vessel is not blacklisted by any Arab League country.

## 62. Eligibility Clause
The Owner warrants that the Vessel is in all respects eligible under applicable laws and regulations for trading to the areas, ports and places specified in Clause 4, and that at all necessary times she shall have on board all certificates

(including International Tonnage Certificate 1969) records and other documents required for such service. Any delay incurred because of the Vessel's failure to comply with the above shall be considered as off-hire.

## 63. Traffic Separation Clause
In the interest of safety, the Owner will recommend the Master to observe the recommendation as to traffic separation and routing as issued from time to time by the Intergovernmental Maritime Consultive Organization or as promulgated by the state of the flag of the Vessel or the state in which the effective management of the Vessel is exercised.

Sea Pilots, whether the use of these are compulsory, recommended or optional are always to be engaged at Owners' / Master's discretion (except when compulsory) and the cost of engaging them shall always be for Charterers account.

## 64. UK Water Traffic Routeing Clause
The Owner shall observe, and shall instruct the Master to observe, the code of practice relating (inter alia) to recommendations as to routes to be taken by tankers in certain sensitive locations in UK Waters, as drawn up by the British Chamber of Shipping in March 1993.

Sea Pilots, whether the use of these are compulsory, recommended or optional are always to be engaged at Owners' / Master's discretion (except when compulsory) and the cost of engaging them shall always be for Charterers account.

## 65. Oil Pollution Clause
The Owner warrants that throughout the term of this Charter the Vessel shall be entered for standard oil pollution liability cover with a P & I Club belonging to the International Group of P & I Clubs in compliance with the clause.

Owners shall promptly furnish evidence of the Vessel's entry into a P & I Club and the limits of oil pollution liability cover afforded thereby.

Owners warrant that they have and will maintain throughout the period of this charter:

a) The Standard Oil Pollution Insurance Covers (currently US$ 1,000 Million), available from their P+I Club; and

b) Any additional Oil Pollution Cover (Currently 0), which becomes mandatory via their P+I Club or through acceptable Underwriters providing First Class Security.

Upfront fees and non-voyage related costs of entering and maintaining compliance with the requirement of the US Oil Pollution Act of 1990 for the entire term of this charter are the responsibility of the Owners. The entering of a scheme shall be required for the duration of this Charter Party. The choice of scheme shall be with Owners.

All voyage related costs including port specific charges, fees for transit and for

port spill response coverage, shall be for Charterers account and shall be paid by them immediately upon presentation of Owners invoice including supporting documentation.

1. Owners warrant that throughout the currency of this charter they will provide the Vessel with the following certificates:
   a) Certificate issued pursuant to the Civil Liability Convention 1992 ("CLC"), as and when in force.
   b) Certificate of Financial Responsibility (COFR) issued pursuant to section 1016 (a) of the Oil Pollution Act 1990, and section 108 (a) of the Comprehensive Environmental Response, Compensation and Liability Act 1980, as amended in accordance with Part 138 of Coasts Guard Regulation 33 CFR, so long as these can be obtained by the Owners from or by the United States Coast Guard.

2. Notwithstanding anything whether printed or typed herein to the contrary,
   a) Save as required for compliance with paragraph (1) hereof, the Owner shall not be required to establish or maintain financial security or responsibility in respect of oil or other pollution damage to enable the Vessel lawfully to enter, remain or leave any port, place, territorial or contiguous water of any country state or territory in performance of this charter;
   b) The Charterer shall indemnify the Owner and hold them harmless in respect of any loss, damage liability or expense (including but not limited to costs or delay incurred by the Vessel as a result of any failure by the Charterer to promptly give voyage orders) whatsoever and howsoever arising which the Owner may sustain by reason of any requirement to establish or maintain financial security or responsibility in order to enter, remain in or leave any port, place or waters other than to the extent provided in paragraph 1 hereof.
   c) The Owner shall not be liable for any loss, damage, liability or expense whatsoever and howsoever arising which the Charterer and/or holders of any bill of lading issued pursuant to this Charter may sustain by reason of any requirements to establish or maintain financial security or responsibility in order to enter, remain in or leave any port, place or waters, other than to the extent provided in paragraph 1 hereof.
   d) In the event that legislation, other than as set out in paragraph (1) hereof, comes into effect which has the effect of requiring the Owner to establish or maintain financial security or responsibility in respect of oil or other pollution damage to enable the Vessel lawfully to enter, remain or leave any port, place, territorial or contiguous waters of any country, state or territory in performance of this Charter, the costs of complying with such requirements to the extent required in connection with any then current voyage will be for the account of the Charterer. Thereafter, all such costs will in the future be for the Charterers' account unless the Charterer serves notice on the Owner rejecting liability of such costs in the future. In the event that the Charterer rejects liability for such future costs it will cease to have liability from the end of any voyage current at the time when such notice is served. The Owner will have the option of (i) accepting that such costs will be for its own account or (ii) terminating this Charter forthwith at the end of the then current voyage and accepting the immediate redelivery of the Vessel or (iii) notifying the Charterer that the

trading limits under this Charter shall, with effect from the date of the Owner's notice, be amended to exclude any jurisdiction in which such new legislation applies.

3. The Charterer shall endeavour that the terms of this clause will be incorporated effectively into any Bill of Lading issued pursuant to this Charter.

## 66. Blocking and Trapping Clause
Expenses for blocking and trapping insurance is for Owner's account. The Vessel shall be considered off-hire whilst blocked or trapped.

## 67. Delivery and Redelivery Survey Clause
No delivery survey shall be carried out. One surveyor, acceptable to both parties, shall carry out a redelivery survey, the cost of which to be for Charterer's account.

## 68. Inert Gas System Clause
The Owner warrants that the Vessel is equipped with a fully functional and efficient inert gas system, which is in use on the date hereof and shall remain so during the term of this Charter and that the officers and crew are properly qualified by way of certification for, and experienced in, the operation of such system. Any time loss due to a deficient or improper operation of the inert gas system shall be considered as off-hire.

The vessel's inert gas system shall fully comply with regulation 62, chapter 11-2 of the SOLAS Convention 1974 as modified by its protocol of 1978 and the Owner undertake that such system shall be operated by the officers and crew in accordance with the operational procedures set out in the IMO publication entitled "Inert Gas System 1983" as may, from time to time, be amended.

If the Charterer so require, the Owner shall arrange for the Vessel's tanks to be de-inerted to facilitate inspection, gauging and sampling. Any time taken in de-inerting, inspecting, gauging, sampling, and re-inerting thereafter shall count as time on-hire.

## 69. Cast Iron Clause
The Owner warrants that all riser valves and fittings, outboard of the last fixed rigid support to the Vessel's deck that are used in the transfer of cargo or ballast, will be made of steel or nodular iron and that only steel reducer or spacer will be used between the ship's valve and the loading arm. The fixed rigid support must be designed to prevent both lateral and vertical movement of the transfer manifold.

## 70. Vaccination Clause
The Owner to arrange at their expense that the Master, Officer and Crew of the Vessel, are to hold valid vaccination certificates against yellow fever, cholera, as per International Health Regulations 1969 and subsequent amendments, upon delivery of the vessel and throughout the time charter period. Any other vaccination requirement, which may come up from time to time throughout the world and are relevant to the Vessel's trading, shall be carried out at Owners'

expense.

## 71. Agents Clause
The Owner to appoint their own Agents when and if there is major Owners' business such as extensive repairs, docking and other extended off-hire etc. However, Charterers' Agents to attend to Owners' minor matters such as postage, cash advanced to Master, crew transportation, medical expenses, telexes etc. on Owners' behalf (See Clause 30) free of charge unless Agents bill the Charterer additionally for providing such services.

## 72. Loading Rate / Pumping Capacity Clause
The Owner warrants that throughout the term of this Charter the Vessel can discharge an entire homogenous cargo within 24 hours excluding time for stripping, or maintain an average backpressure of 100 PSI at ship's manifold provided that shore facilities permit. Should the Vessel fail to perform in accordance with the above warranties, the Owner shall compensate the Charterer at the rate of 1/24 of the daily hire per hour for any proven loss suffered by the Charterer. Should it become necessary to withdraw the Vessel from the berth because of her failure to maintain the discharge rate, all time and expenses incurred are to be for Owner's account.

## 73. Hoses Clause
If required by the Charterer, the Vessel's crew is to connect and disconnect hoses, without charge to Charterers' for any time or overtime involved.

## 74. De-ballast Clause
The Owner warrants that the Vessel shall be able to discharge ballast and load back cargo simultaneously with double valve segregation, while maintaining minimum thirty percent (30%) deadweight. Any delay due to non-compliance with this clause to be for Owners' account.

## 75. Cargo Retention Clause
In the event that any cargo remains on board upon completion of discharge, the Charterer has the right to claim from Owner an amount equal to the FOB port of loading value of such undisputed cargo plus freight with respect thereto, provided that the volume of cargo remaining on board is liquid, reachable and pumpable by Vessel's normal discharge equipment as determined by an independent surveyor.

Any action or lack of action in accordance with this provision shall be without prejudice to any rights or obligations of the parties.

In making claim for cargo retention, Charterer agrees to indemnify Owner against any claim(s) brought forward by any third parties.

## 76. Ship-to-Ship Transfer Clause
The Charterer has the option to load or discharge the Vessel via ship to ship transfer, weather permitted and subject to Master's approval which is not to be unreasonably withheld, at anchor, underway, or adrift.
The Charterer is to provide adequate fenders, hoses, supervisory personnel and equipment necessary to perform the lightering operation. Owner agrees to allow

Charterers' supervisory personnel on board, including mooring master to assist in the performance of the lightering operation.

Any lighterage operation shall always take place in accordance with the OCIMF Ship to Ship Transfer Guide (Petroleum).

### 77. Cleaning Clause
The Owner / Master shall clean tanks for intended cargoes to Charterers' Inspector's satisfaction using the Vessel's cleaning equipment. Additional cleaning materials, if needed, to be for Charterers' account.

### 78. Watchmen Clause
Gangway and fire watchmen arranged by the Owner to be for Owner's account, however the cost of watchmen, including compulsory watchmen, shall always be for Charterers account.

### 79. Re-measurement Clause
The Charterer has the option to re-measure the Vessel up or down, as the case may be, for the purpose of satisfying certain port/terminal regulations. All cost for certification and time to be for Charterers' account and the Charterer shall be liable to re-measure the Vessel back to the original deadweight at their time and expenses prior to redelivery.

### 80. Blending Clause
The Owner agrees if requested to commingle, re-circulate or transfer cargo between tanks in accordance with Charterers' instructions in order to obtain a homogenous blend subject only to the Vessel's safety and stability and pumping arrangement and the Charterer shall on each occasion indemnify the Owner for any cargo claims and for re-documentation as consequences of such operations.

### 81. Operational Compliance Clause
The Master shall communicate his noon position, plus average speed, distance steamed, weather conditions and bunker ROB, every day during this Charter. Furthermore the Master to keep Charterers fully advised of Vessel's ETA at all times and any change in ETA of more than 6 hours immediately be notified to the Charterer. The Owner further agrees that, unless thee Charterer require otherwise, the Master will follow voyage orders issued by the Charterer.

The Owner shall be responsible for any consequences or additional expenses arising as a result of non-compliance with this Clause.

If a conflict arises between terminal orders and Charterers' voyage instructions, the Master shall stop cargo operations and contact the Charterer immediately. Terminal orders shall never supersede Charterers' voyage instructions and any conflict shall be resolved prior to resumption of cargo operations. The Vessel is not to resume cargo operations until the Charterer have directed the Vessel to do so.

## 82. In Transit Loss Clause

Vessel is to be allowed maximum 0,5 % of in-transit loss, which shall be the difference between the ships figures of net standard volume after loading at the load port and before discharge at the discharge port. Calculation is to be based on 60 Degrees Fahrenheit.

Any loss exceeding the said 0,5% is to be reimbursed by Owners to Charterers at an amount equal to the FOB port of loading value of such cargo plus freight due with respect thereto.

In making claim for in-transit loss, Charterers agree to indemnify Owner against any claim(s) brought forward by 3rd parties.

## 83. Sea Terminal Clause

The Owner warrants that the Vessel, when calling at sea terminal will maintain her engines in stand-by and will be loaded and discharged in such manner that she at any stage of loading or discharging operations is able, if necessary for any reason, to immediately shut down cargo operations, and promptly disconnect hoses and mooring lines and proceed to another anchorage at sea.

## 84. Smuggling Clause

Any delay, expenses and/or fines incurred on account of smuggling, to be for Owners' account, if caused by the Master, Officers, Crew or Owners' servant.

## 85. Notice Of Readiness Clause

At every load port and discharge port, throughout the term of this Charter, the Vessel shall tender her Notice of Readiness immediately on arrival in the customary way. Until such time as the Vessel is all fast at the berth/jetty, the Master shall re-tender Vessel's Notice of Readiness daily, at 09:00 hours local time, to all parties as instructed in the Charterers' load and discharge orders. The text of subsequent daily NOR's, as above, to be: "Without prejudice to original Notice of Readiness tendered ................ Hrs on..............20.... (To be completed as appropriate), on Vessel's arrival, please be advised that my vessel is and remains ready in all respects to commence loading/discharging (delete as appropriate) of the cargo of ............... (complete as appropriate)".

## 86. Pumping Logs Clause

At each port of discharge, the Vessel is to maintain a proper and accurate discharge pumping record. As a Minimum this log will be signed by the Vessel's Master who will also endeavour to obtain countersignature on this log by the discharge port inspector and an authorised representative of the receiving terminal. If such signatures are not obtainable, Master to issue a letter of protest to relevant parties.

## 87. Trading Limits Clause

Always world wide within Institute Warranty Limits, always safely afloat and always excluding Cuba, Eritrea, Haiti, Orinoco River, Turkish occupied Cyprus, Syria, Libya, Lebanon, Israel, Iraq, North Korea, Alaska (except only within the period from 1st May to 31st October by Charterers' payment of extra insurance and costs (including Owners' appointed Qualified Individual (QI)/Owners superintendent attendance), subject to weather forecasts and ICG conditions

provided by competent authorities at the time Charterers requesting Alaska calls) and any U.N. sanctioned area or country and any country which from time to time may be prohibited by the Vessel's flag state or any competent authority. Sea Pilots employed to be for the Charterer's account.

Vessel not to force ice, trade in icebound waters or follow icebreakers in channels opened up. No direct trade between PRC and Taiwan or vice versa. Trading to, through and from war zone areas always subject to Owner's prior approval which is not to be unreasonably withheld.'

In case U.N. sanctions against Iraq is lifted during the term of this charter party and Iraqi ports are deemed safe and accessible, the Vessel shall be allowed to call at Iraqi ports subject to Owners' prior written approval which shall not unreasonably withheld.

## 88. Cargo Clause
Always lawful cargoes that is not injurious to the Vessel, her Crew, pumps, cargo valves and any other part of her cargo system; always Clean Petroleum Products and clean condensates. Always maximum 4 grades within vessel's natural segregation and always excluding casing head, lubricating oils and additives, chemicals, MTBE, solvents, pygas, vegetable and/or animal oils or fats, but including liquid dye and stadis. In any event the Vessel shall be re-delivered to the Owner with last 3 cargoes un-leaded Clean Petroleum Products un-darker than 2,5 NPA.

## 89. Bunkers Clause:
Bunkers remaining on board the Vessel on delivery and redelivery hereunder shall be sufficient, unless otherwise agreed in writing, for minimum 10 maximum 20 days steaming and always enough to reach the nearest main bunkering port. The Charterer, respectively the Owner to pay for the bunkers remaining on board the Vessel on delivery respectively redelivery, at Owner's respectively the Charterers net actual price as evidenced by supporting documents.

## 90. War Risk Clause
Trading to, through and from war risk area(s) is always subject to Owner's prior approval which not to be unreasonably withheld.

Basic war risk insurance is to be for Owner's account. Any extra expenses for additional war risk premium on Hull and machinery and Crew War Bonuses which is reasonably incurred by the Owners as the consequence of Charterer's orders to trade Vessel in areas where the area in question has been declared an additional risk premium area by the Vessel's war risk insurers shall be borne by the Charterers provided that before such expenses are incurred, Charterers are given an opportunity to signify their approval or alternatively order the Vessel to a non additional premium area.

In case the Vessel is requested to proceed into a war and war-likely zone, the Charterer will allow a reasonable deviation to the Vessel to carry out necessary preparation at some convenient port including, but not limited to crew change, extra supply etc. All time used, additional bunker consumption and extra port disbursement occasioned for such preparation to be for the Charterer's account.

At the date of this Charter;
   1) Hull and Machinery value is US$ 18 million
   2) War risk Insurance amount is US$ 18 million

## 91. Letter of Indemnity Clause

The Charterer hereby undertakes to hold harmless and indemnify Master / Owners, their servants and agents against all losses, costs, expenses and liabilities that may arise from the Master / Owners, their servants and agents complying with Charterers' request to deliver cargo at port of destination without production of the original Bills of Lading or delivery of cargo at a port other than the port of destination shown in the Bill(s) of Lading. If Charterers request Owners, in writing, to discharge a quantity of cargo either;

a) Without Bills of Lading, and/or
b) At a discharge place other than named in a Bill of Lading, and/or
c) That is different from the Bill of Lading quantity

The Owner shall discharge such cargo in accordance with Charterer's instruction in consideration of receiving from the Charterer a Letter of Indemnity in accordance with Owners' P&I Club's wording as per Appendix 1 attached hereto.

## 92.ITOPF Clause

The Owner warrants that throughout the term of this Charter the Vessel will be:
1. Owned or demise chartered by a member of the 'International Tanker Owners Pollution Federation Limited', and;
2. Entered in the Protection and Indemnity Club stated in Clause 39.

## 93.Minimum Speed (slow speed - speed up) Clause

The Owner agrees to allow the Charterer to issue orders directly to the Vessel to slow down or speed up the Vessel consistent with safe operation of the Vessel and its machinery on ballast and/or laden passages, but with copy of orders sent to the Owner. During all periods when the Vessel follows Charterers' orders as made under this Clause, the speed and consumption warranty as provided for in Clause 24 does not apply.

## 94.Passenger Indemnity Clause

The Charterer shall indemnify the Owner in respect of any claims brought against the Owner by the representatives of the Charterer or their personal representatives, executors, heirs and assigns in respect of death of, or injury to, or loss of, or damage to personal effects of the said representatives and invitees whilst present as a passenger on board the vessel save that to the extent that such death, injury or loss of effects is due to the negligence of the Owner or their servants or agents. The Owner shall only be liable to the extent of their proportionate fault. Nothing in this Clause shall be construed or held to deprive the Owner of any right to limit their liability under any applicable law, statue or convention.

## 95.Delivery and Redelivery notices Clause

13

The Owner shall give Charterer 15, 10, 7 and 5 days approximate Notice of time and place of Delivery and 3, 2 and 1 days definite Notice of time and place of Delivery. The Charterer shall give Owner 15, 10, 7 and 5 days approximate Notice of time and place of Redelivery and 3, 2 and 1 days definite Notice of time and place of Redelivery.

## 96. Commission Clause
1.25 % brokerage commission payable by Owner to S. A. Chartering on all hire received on receipt of hard copy invoice. 1,25 % commission to Navig8 Asia Pte ltd on all hire received on receipt of hard copy invoice.

## 97. BIMCO ISPS Clause
(a) (i) From the date of coming into force of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of SOLAS (ISPS Code) in relation to the Vessel and thereafter during the term of this Charter, the Owner shall procure that both the Vessel and "the Company" (as defined by the ISPS Code) shall comply with the requirements of the ISPS Code relating to the Vessel and "the Company". Upon request the Owner shall provide a copy of the relevant International Ship Security Certificate (or the Interim International Ship Security Certificate) to the Charterers. The Owner shall provide the Charterer with the full style contact details of the Company Security Officer (CSO).
(ii) Except as otherwise provided in this Charter, loss, damage, expense or delay, excluding consequential loss, caused by failure on the part of the Owner or "the Company" to comply with the requirements of the ISPS Code or this Clause shall be for the Owners' account.

(b) (i) The Charterer shall provide the CSO and the Ship Security Officer (SSO)/Master with their full style contact details and, where sub-letting is permitted under the terms of this Charter Party, shall ensure that the contact details of all sub-charterers are likewise provided to the CSO and the SSO/Master. Furthermore, the Charterer shall ensure that all sub-charter parties they enter into during the term of this Charter contain the following provision:
"The Charterer shall provide the Owner with their full style contact details and, where sub-letting is permitted under the terms of the charter party, shall ensure that the contact details of all sub-charterers are likewise provided to the Owner".
(ii) Except as otherwise provided in this Charter, loss, damage, expense or delay, excluding consequential loss, caused by failure on the part of the Charterer to comply with this Clause shall be for the Charterers' account.

(c) Notwithstanding anything else contained in this Charter Party all delay, costs or expenses whatsoever arising out of or related to security regulations or measures required by the port facility or any relevant authority in accordance with the ISPS Code including, but not limited to, security guards, launch services, tug escorts, port security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result solely from the Owners' negligence. All measures

required by the Owners to comply with the Ship Security Plan shall be for the Owners' account.

(d)    If either party makes any payment that is for the other party's account according to this Clause, the other party shall indemnify the paying party.

## 98. U.S. Customs Advance Notification / AMS Clause

(a) If the Vessel loads or carries cargo destined for the US or passing through US ports in transit, the Charterer shall comply with the current US Customs regulations (19 CFR 4.7) or any subsequent amendments thereto and shall undertake the role of carrier for the purposes of such regulations and shall, in their own name, time and expense:

i) Have in place a SCAC (Standard Carrier Alpha Code);
ii) Have in place an ICB (International Carrier Bond);
iii) Provide the Owners with a timely confirmation of i) and ii) above; and
iv) Submit a cargo declaration by AMS (Automated Manifest System) to the US Customs and provide the Owners at the same time with a copy thereof.

(b) The Charterer assume full liability for and shall indemnify, defend and hold harmless the Owner against any loss and/or damage whatsoever (including consequential loss and/or damage) and/or any expenses, fines, penalties and all other claims of whatsoever nature, including but not limited to legal costs, arising from the Charterers' failure to comply with any of the provisions of sub-clause (a). Should such failure result in any delay then, notwithstanding any provision in this Charter Party to the contrary, the Vessel shall remain on hire.

(c) If the Charterers' ICB is used to meet any penalties, duties, taxes or other charges which are solely the responsibility of the Owner, the Owner shall promptly reimburse the Charterer for those amounts.

(d) The assumption of the role of carrier by the Charterer pursuant to this Clause and for the purpose of the US Customs Regulations (19 CFR 4.7) shall be without prejudice to the identity of carrier under any bill of lading, other contract, law or regulation.

## 99. Bottom Cleaning Clause

In the event the Charterer orders the Vessel to a port or anchorage where the stay of the Vessel is extended for more than 45 consecutive days, whether waiting for cargo operations or as lay-up, the Owner shall arrange – on Charterer's request - for the Vessel's propeller, underwater parts and bottom to be cleaned at Charterer's expense. All time used for this cleaning operation to count as time on-hire. If the Charterer does not request such cleaning operation, Owners' speed and consumption warranties shall be considered null and void effective from vessel's departure from such port or anchorage and until the Vessel's propeller, underwater parts and bottom has been cleaned in accordance with this clause.

| Appendix 1 |
|:---:|

**(A) LETTER OF INDEMNITY FOR NON-PRODUCTION OF ORIGINAL BILL OF LADING ON BOARD**

**(B) LETTER OF INDEMNITY FOR CHANGE OF DESTINATION**

**(C) LETTER OF INDEMNITY FOR ISSUANCE OF NEW BILL OF LADING (WITH SURRENDER OF OLD BILL OF LADING(S))**

## Appendix 1

## (A) LETTER OF INDEMNITY FOR NON-PRODUCTION OF ORIGINAL BILL OF LADING ON BOARD

TO:     THE OWNERS OF THE MT............................ DATE:

DEAR SIRS

CARGO: ...........................

B/L NO:...........................
B/L DATE: .......................
CARGO DESCRIPTION: ..............
QUANTITY (GROSS): ...............
SHIPPER: ........................
CONSIGNEE: ......................
NOTIFY PARTY: ...................
LOADPORT: .......................
DISCHARGE PORT: .................

THE ABOVE CARGO (THE "CARGO") WAS SHIPPED ON THE ABOVE VESSEL (THE "SHIP") BY THE ABOVE SHIPPER AND CONSIGNED TO THE ABOVE CONSIGNEE, FOR DELIVERY AT THE ABOVE DISCHARGE PORT, BUT THE RELEVANT BILLS OF LADING HAVE NOT YET ARRIVED.

WE HEREBY REQUEST YOU TO DELIVER THE CARGO TO ..................... AT ........................... WITHOUT PRODUCTION OF THE ORIGINAL BILLS OF LADING.

IN CONSIDERATION OF YOUR COMPLYING WITH OUR ABOVE REQUEST WE HEREBY AGREE AS FOLLOWS: -

1.      TO INDEMNIFY YOU, YOUR SERVANTS AND AGENTS AND TO HOLD ALL OF YOU HARMLESS IN RESPECT OF ANY LIABILITY, LOSS, DAMAGE OR EXPENSE OF WHATSOEVER NATURE WHICH YOU MAY SUSTAIN BY REASON OF DELIVERING THE CARGO IN ACCORDANCE WITH OUR REQUEST.

2.      IN THE EVENT OF ANY PROCEEDINGS BEING COMMENCED AGAINST YOU OR ANY OF YOUR SERVANTS OR AGENTS IN CONNECTION WITH THE DELIVERY OF THE CARGO AS AFORESAID, TO PROVIDE YOU OR THEM FROM TIME TO TIME ON DEMAND WITH SUFFICIENT FUNDS TO DEFEND THE SAME.

3.      IF THE SHIP OR ANY OTHER SHIP OR PROPERTY IN THE SAME OR ASSOCIATED OWNERSHIP, MANAGEMENT OR CONTROL SHOULD BE ARRESTED OR DETAINED OR SHOULD THE ARREST OR DETENTION THEREOF BE THREATENED, OR SHOULD THERE BE ANY INTERFERENCE IN THE USE OR TRADING OF THE SHIP OR ANY OTHER SUCH SHIP OR PROPERTY (WHETHER BY VIRTUE OF A CAVEAT BEING ENTERED AGAINST ITS REGISTRY OR OTHERWISE HOWSOEVER), TO PROVIDE ON DEMAND SUCH BAIL OR OTHER SECURITY AS MAY BE REQUIRED TO PREVENT SUCH ARREST OR DETENTION OR TO SECURE THE RELEASE OF SUCH SHIP OR PROPERTY OR TO REMOVE SUCH INTERFERENCE, AND TO INDEMNIFY YOU, YOUR SERVANTS AND AGENTS IN RESPECT OF ANY LIABILITY, LOSS, DAMAGE OR EXPENSE CAUSED BY SUCH ARREST OR DETENTION OR THREATENED ARREST OR DETENTION OR INTERFERENCE, WHETHER OR NOT THE SAME MAY BE JUSTIFIED.

4. IF THE PLACE AT WHICH WE HAVE ASKED YOU TO MAKE DELIVERY IS A BULK LIQUID OR GAS TERMINAL OR FACILITY, OR ANOTHER SHIP, LIGHTER OR BARGE, THEN DELIVERY TO SUCH TERMINAL, FACILITY, SHIP, LIGHTER OR BARGE SHALL BE DEEMED TO BE DELIVERY TO THE PARTY TO WHOM WE HAVE REQUESTED YOU TO MAKE SUCH DELIVERY.

5.      AS SOON AS ALL ORIGINAL BILLS OF LADING FOR THE ABOVE CARGO SHALL HAVE ARRIVED AND/OR COME INTO OUR POSSESSION, TO PRODUCE AND DELIVER THE SAME TO YOU, OR TO CAUSE ALL SUCH ORIGINAL BILLS OF LADING TO BE PRODUCED AND DELIVERED TO YOU.

6.      THE LIABILITY OF EACH AND EVERY PERSON UNDER THIS INDEMNITY SHALL BE JOINT AND SEVERAL AND SHALL NOT BE CONDITIONAL UPON YOUR PROCEEDING FIRST AGAINST ANY PERSON, WHETHER OR NOT SUCH PERSON IS PARTY TO OR LIABLE UNDER THIS INDEMNITY.

7.      THIS INDEMNITY SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH ENGLISH LAW AND EACH AND EVERY PERSON LIABLE UNDER THIS INDEMNITY SHALL AT YOUR REQUEST SUBMIT TO THE JURISDICTION OF THE HIGH COURT OF JUSTICE OF ENGLAND AND NOMINATE AN ADDRESS FOR SERVICE IN ENGLAND.

YOURS FAITHFULLY,
FOR AND ON BEHALF OF [INSERT FULL COMPANY NAME]: ................

OF [INSERT FULL COMPANY ADDRESS]: ...............


(S I G N E D)

NAME: ..............
TITLE/DESIGNATION: ................

+ + +

WHERE LOI IS TO BE COUNTERSIGNED BY BANK, ADD:

WE JOIN IN THE ABOVE INDEMNITY AS PRIMARY OBLIGOR.

FOR AND ON BEHALF OF [INSERT FULL BANK NAME]: ......................

OF [INSERT FULL BANK ADDRESS]: ........................

(SIGNED)

NAME:
TITLE/DESIGNATION

+ + +

## (B) LETTER OF INDEMNITY FOR CHANGE OF DESTINATION

OWNER'S LOI WORDING FOR DELIVERY OF CARGO AGAINST PRODUCTION OF BILLS OF LADING BUT AT A PORT OTHER THAN THAT STATED IN THE BILLS OF LADING:

TO:      THE OWNERS OF THE MT ..................... DATE: ..............

DEAR SIRS

CARGO: ......................

B/L NO: .....................
B/L DATE: ...................
CARGO DESCRIPTION: ..........
QUANTITY (GROSS): ...........
SHIPPER: ....................
CONSIGNEE: ..................
NOTIFY PARTY: ...............
LOADPORT: ...................
DISCHARGE PORT: .............

THE ABOVE CARGO (THE "CARGO") WAS SHIPPED ON THE ABOVE VESSEL (THE "SHIP") BY THE ABOVE SHIPPER AND CONSIGNED TO THE ABOVE CONSIGNEE FOR DELIVERY AT THE ABOVE DISCHARGE PORT.

WE HEREBY REQUEST YOU TO ORDER THE SHIP TO PROCEED TO AND DELIVER THE CARGO AT: ....................... AGAINST PRODUCTION OF THE ORIGINAL BILLS OF LADING.

IN CONSIDERATION OF YOUR COMPLYING WITH OUR ABOVE REQUEST WE HEREBY AGREE AS FOLLOWS: -

1.      TO INDEMNIFY YOU, YOUR SERVANTS AND AGENTS AND TO HOLD ALL OF YOU HARMLESS IN RESPECT OF ANY LIABILITY, LOSS, DAMAGE OR EXPENSE OF WHATSOEVER NATURE WHICH YOU MAY SUSTAIN BY REASON OF DELIVERING THE CARGO IN ACCORDANCE WITH OUR REQUEST.

2.      IN THE EVENT OF ANY PROCEEDINGS BEING COMMENCED AGAINST YOU OR ANY OF YOUR SERVANTS OR AGENTS IN CONNECTION WITH THE DELIVERY OF THE CARGO AS AFORESAID, TO PROVIDE YOU OR THEM FROM TIME TO TIME ON DEMAND WITH SUFFICIENT FUNDS TO DEFEND THE SAME.

3.      IF THE SHIP OR ANY OTHER SHIP OR PROPERTY IN THE SAME OR ASSOCIATED OWNERSHIP, MANAGEMENT OR CONTROL SHOULD BE ARRESTED OR DETAINED OR SHOULD THE ARREST OR DETENTION THEREOF BE THREATENED, OR SHOULD THERE BE ANY INTERFERENCE IN THE USE OR TRADING OF THE SHIP OR ANY OTHER SUCH SHIP OR PROPERTY (WHETHER BY VIRTUE OF A CAVEAT BEING ENTERED AGAINST ITS REGISTRY OR OTHERWISE HOWSOEVER), TO PROVIDE ON DEMAND SUCH BAIL OR OTHER SECURITY AS MAY BE REQUIRED TO PREVENT SUCH ARREST OR DETENTION OR TO SECURE THE RELEASE OF SUCH SHIP OR PROPERTY OR TO REMOVE SUCH INTERFERENCE, AND TO INDEMNIFY YOU, YOUR SERVANTS AND AGENTS IN RESPECT OF ANY LIABILITY, LOSS, DAMAGE OR EXPENSE CAUSED BY SUCH ARREST OR DETENTION OR THREATENED ARREST OR DETENTION OR INTERFERENCE, WHETHER OR NOT THE SAME MAY BE JUSTIFIED.

4.      THE LIABILITY OF EACH AND EVERY PERSON UNDER THIS INDEMNITY SHALL BE JOINT AND SEVERAL AND SHALL NOT BE CONDITIONAL UPON YOUR PROCEEDING FIRST AGAINST ANY PERSON, WHETHER OR NOT SUCH PERSON IS PARTY TO OR LIABLE UNDER THIS INDEMNITY.

5.      THIS INDEMNITY SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH ENGLISH LAW AND EACH AND EVERY PERSON LIABLE UNDER THIS INDEMNITY SHALL AT YOUR REQUEST SUBMIT TO THE JURISDICTION OF THE HIGH COURT OF JUSTICE OF ENGLAND AND NOMINATE AN ADDRESS FOR SERVICE IN ENGLAND.

YOURS FAITHFULLY,
FOR AND ON BEHALF OF [INSERT FULL COMPANY NAME]: .................

OF [INSERT FULL COMPANY ADDRESS]: .................

(S I G N E D)

NAME: ..............
TITLE/DESIGNATION: .............

+ + +

WHERE LOI IS TO BE COUNTERSIGNED BY BANK, ADD:

WE JOIN IN THE ABOVE INDEMNITY AS PRIMARY OBLIGOR.

FOR AND ON BEHALF OF
[INSERT FULL BANK NAME]: .....................
OF [INSERT FULL BANK ADDRESS]: ...............

(SIGNED)

NAME: ..............
TITLE/DESIGNATION: ..............

+ + +

## (C) LETTER OF INDEMNITY FOR ISSUANCE OF NEW BILL OF LADING (WITH SURRENDER OF OLD BILL OF LADING(S))

TO: THE OWNERS OF MT ..............          DATE: .............

DEAR SIRS,

| CARGO: | PARCEL 1 | PARCEL 2 |
|---|---|---|
| B/L NO: | | |
| B/L DATE: | | |
| CARGO DESCRIPTION: | | |
| QUANTITY (GROSS): | | |
| SHIPPER: | | |
| CONSIGNEE: | | |
| NOTIFY PARTY: | | |
| LOADPORT: | | |
| DISCHARGE PORT: | | |

THE ABOVE CARGO WAS SHIPPED ON THE ABOVE VESSEL (THE "SHIP") BY THE ABOVE SHIPPER AND CONSIGNED TO THE ABOVE CONSIGNEE.

WE HEREBY UNDERTAKE TO SURRENDER OR PROCURE THE SURRENDER TO YOU OF THE FULL SET OF THE ORIGINAL BILLS OF LADING ISSUED AT THE PLACE AND DATE INDICATED ABOVE (HEREAFTER KNOWN AS THE "EXISTING BILLS OF LADING") AS SOON AS THEY HAVE ARRIVED AT THE DISCHARGE PORT OR COME INTO OUR POSSESSION OR CONTROL.

WE HEREBY REQUEST YOU TO RE-ISSUE ONE COMBINED FULL SET OF ORIGINAL BILLS OF LADING (HEREAFTER KNOWN AS THE "NEW BILLS OF LADING") WITH THE FOLLOWING DETAILS:

CARRIER:
B/L NO:
B/L DATE:
CARGO DESCRIPTION:
SHIPPER:
CONSIGNEE:
NOTIFY PARTY:
LOADPORT:
DISCHARGE PORT:

IN CONSIDERATION OF YOUR COMPLYING WITH OUR ABOVE REQUEST, WE HEREBY AGREE AS FOLLOWS:

1.      TO INDEMNIFY YOU, YOUR SERVANTS AND AGENTS AND TO HOLD ALL OF YOU HARMLESS IN RESPECT OF ANY LIABILITY, LOSS, DAMAGE OR EXPENSE OF WHATSOEVER NATURE WHICH YOU MAY SUSTAIN BY REASON OF ISSUING THE NEW BILLS OF LADING IN ACCORDANCE WITH OUR REQUEST.

2.      IN THE EVENT OF ANY PROCEEDINGS BEING COMMENCED AGAINST YOU OR ANY OF YOUR SERVANTS OR AGENTS IN CONNECTION WITH THE RE-ISSUANCE OF BILLS OF LADING AS AFORESAID, TO PROVIDE YOU OR THEM FROM TIME TO TIME ON DEMAND WITH SUFFICIENT FUNDS TO DEFEND THE SAME.

3.    IF THE SHIP OR ANY OTHER SHIP OR PROPERTY IN THE SAME OR ASSOCIATED OWNERSHIP, MANAGEMENT OR CONTROL SHOULD BE ARRESTED OR DETAINED OR SHOULD THE ARREST OR DETENTION THEREOF BE THREATENED OR SHOULD THERE BE ANY INTERFERENCE IN THE USE OR TRADING OF THE SHIP OR ANY OTHER SUCH SHIP OR PROPERTY (WHETHER BY VIRTUE OF A CAVEAT BEING ENTERED AGAINST ITS REGISTRY OR OTHERWISE HOWSOEVER), TO PROVIDE ON DEMAND SUCH BAIL OR OTHER SECURITY AS MAY BE REQUIRED TO PREVENT SUCH ARREST OR DETENTION OR TO SECURE THE RELEASE OF SUCH VESSEL OR PROPERTY OR TO REMOVE SUCH INTERFERENCE, AND TO INDEMNIFY YOU, YOUR SERVANTS AND AGENTS IN RESPECT OF ANY LIABILITY, LOSS, DAMAGE OR EXPENSE CAUSED BY SUCH ARREST OR DETENTION OR THREATENED ARREST OR DETENTION OR INTERFERENCE, WHETHER OR NOT THE SAME MAY BE JUSTIFIED.

4.    AS SOON AS ALL THE EXISTING BILLS OF LADING FOR THE ABOVE CARGO SHALL HAVE ARRIVED AT THE DISCHARGE PORT OR COME INTO OUR POSSESSION OR CONTROL, TO SURRENDER OR PROCURE THE SURRENDER OF THE SAME TO YOU, WHEREUPON OUR LIABILITY HEREUNDER SHALL CEASE.

5.    THE LIABILITY OF EACH AND EVERY PERSON UNDER THIS INDEMNITY SHALL BE JOINT AND SEVERAL AND SHALL NOT BE CONDITIONAL UPON YOUR PROCEEDING FIRST AGAINST ANY PERSON, WHETHER OR NOT SUCH PERSON IS PARTY TO OR LIABLE UNDER THIS INDEMNITY.

6.    THIS INDEMNITY SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH ENGLISH LAW AND EACH AND EVERY PERSON LIABLE UNDER THIS INDEMNITY SHALL AT YOUR REQUEST SUBMIT TO THE JURISDICTION OF THE HIGH COURT OF JUSTICE OF ENGLAND AND NOMINATE AN ADDRESS FOR SERVICE IN ENGLAND.

YOURS FAITHFULLY,
FOR AND ON BEHALF OF
[INSERT FULL COMPANY NAME]:
OF [INSERT FULL COMPANY ADDRESS]:

( S I G N E D)

NAME:
TITLE/DESIGNATION:

+ + +

WHERE LOI IS TO BE COUNTERSIGNED BY BANK, ADD:

WE JOIN IN THE ABOVE INDEMNITY AS PRIMARY OBLIGOR.

FOR AND ON BEHALF OF
[INSERT FULL BANK NAME]:
OF [INSERT FULL BANK ADDRESS]:

(SIGNED)


NAME:
TITLE/DESIGNATION



# Oil Companies International Marine Forum

## Revised Ship Inspection Report (SIRE) Programme

Cover Sheet for Printed Vessel Particulars Questionnaire for: **HIGHTIDE**
**IMO\LR Number: 8717233**

# 1. GENERAL INFORMATION

## General Information

| | | |
|---|---|---|
| 1.1 | Date this VPQ document completed | 31 May 2007 |
| 1.2 | Name of ship | HIGHTIDE |
| 1.3 | LR/IMO Number | 8717233 |
| 1.4 | Last previous name | N/A |
| 1.4.1 | Date of name change | Not Applicable |
| 1.5 | Second last previous name | Not Applicable |
| 1.5.1 | Date of name change | Not Applicable |
| 1.6 | Third last previous name | Not Applicable |
| 1.6.1 | Date of name change | Not Applicable |
| 1.7 | Fourth last previous name | Not Applicable |
| 1.7.1 | Date of name change | Not Applicable |
| 1.8 | Flag | Liberia |
| 1.9 | Port of Registry | Monrovia |
| 1.10 | If the flag has been changed, what was previous flag? | Not Applicable |
| 1.11 | Call sign | ELII9 |
| 1.12 | INMARSAT number | 363699073, 363699074, 363699075 |
| 1.13 | Ship's fax number | 363699076 |
| 1.14 | Ship's telex number | 463661250/463661150 |
| 1.15 | Mobile Phone Number | |
| 1.16 | Ship's Email address | htde@tpm.amosconnect.com |
| 1.17 | Type of ship | Oil Tanker |
| 1.18 | Vessel's MMSI No. (Maritime Mobile Selective Call Identity Code) | 636008328 |
| 1.19 | Type of Hull | Double Side |

## Ownership And Operation

| | | | | |
|---|---|---|---|---|
| 1.20 | Registered Owner (Name) | Makko Maritime Inc. | Office telephone number | |
| | Full address | 80, Broad Street, Monrovia. Liberia | Office telex number | |
| | | | Office fax number | |
| | | | Office Email address | tpms.ops@tanker.com.sg |
| | | | Contact person | Capt. Anil |
| | | | Contact person after hours tel. no. | +65 96341903 |
| | Number of years ship owned | 5 Years | | |
| | | | | |
| 1.22 | Technical Operator (Name) | Tanker Pacific Management (S) Pte Ltd. | Office telephone number | +65 63365211 |
| | Full Address | 1, Temasek Avenue,#38-01 Millenia Tower, Singapore 039192 | Office telex number | RS 23512 TANKPAC |
| | | | Office fax number | +65 63365311 |
| | | | Office Email address | tpms.ops@tanker.com.sg |
| | | | Contact (Designated Person Ashore) | Capt. Anil |
| | | | Contact person after hours tel. no. | +65 96341903 |
| | Emergency callout number | +65 96341903 | Contact details for person responsible for oil spill response | Capt. Anil +65 96341903 |



|  | Emergency callout pager number |  |  |  |
|---|---|---|---|---|
|  | No. years controlled by technical operator | 5 Years |  |  |
|  | No. of ships operated by this Operator | 80 |  |  |
| 1.25 | Commercial Operator (Name) | SAME AS TECHNICAL OPERATOR | Office telephone number |  |
|  | Full Address |  | Office telex number |  |
|  |  |  | Office fax number |  |
|  |  |  | Office Email address |  |
|  |  |  | Contact person |  |
|  |  |  | Contact person after hours tel. no. |  |

## Builder

| 1.26 | Builder | Daewoo Shipbuilding, Korea |
|---|---|---|
| 1.27 | Date of building contract | 03 Dec 1987 |
| 1.28 | Hull number | 5035 |
| 1.29 | Date keel laid | 26 Dec 1988 |
| 1.30 | Date launched | 01 May 1989 |
| 1.31 | Date delivered | 22 Oct 1989 |
| 1.32 | If applicable, date of completion of major hull changes | Not Applicable |
| 1.33 | List what changes were made. | Not Applicable |

## Classification

| 1.34 | Classification society | American Bureau of Shipping |
|---|---|---|
| 1.35 | Class Notation | +A1, Oil Carrier, AMS, ACCU, VEC |
| 1.36 | If Classification society changed, name of previous society | Registro Italiano Navale (dual with ABS) |
| 1.37 | If Classification society changed, date of change | 15 May 2002 |
| 1.38 | Date of last dry-dock | 30 Aug 2004 |
| 1.39 | Date of second last dry-dock | 20 Oct 2002 |
| 1.40 | Date next dry-dock due | 29 Aug 2007 |
| 1.41 | Date of last special survey | 30 Aug 2004 |
| 1.42 | Was last special survey an enhanced special survey? | Yes |
| 1.43 | Date next special survey due | 31 Jul 2009 |
| 1.44 | If ship has Condition Assessment Programme (CAP) rating, what is the latest rating? | 1 |
| 1.45 | Date of last annual survey | 27 Aug 2006 |
| 1.46 | Date of last boiler survey - Port boiler | 30 Aug 2004 |
| 1.47 | Date of last boiler survey - Starboard boiler | Not Applicable |
| 1.48 | Is the ship subject to Continuous Machinery Survey? | Yes |

## Dimensions

| 1.49 | Length overall (LOA) | 178 Metres |
|---|---|---|
| 1.50 | Length between perpendiculars (LBP) | 168 Metres |
| 1.51 | Extreme breadth | 30.4 Metres |
| 1.52 | Moulded breadth | 30.4 Metres |
| 1.53 | Moulded depth | 19.3 Metres |
| 1.54 | Keel to masthead | 44.8 Metres |
| 1.55 | Distance bow to bridge | 138.48 Metres |
| 1.56 | Distance bridge front - mid point manifold | 47.8 Metres |
| 1.57 | PARALLEL MID-BODY DIAGRAM |  |
| 1.57.1 | Distance bow to mid-point manifold | 90.3 Metres |
| 1.57.2 | Distance stern to mid-point manifold | 87.7 Metres |
| 1.57.3 | Light ship parallel body length | 61.35 Metres |
| 1.57.4 | Light ship parallel body - bow to mid-point manifold | 23.75 Metres |
| 1.57.5 | Light ship parallel body - stern to mid-point manifold | 37.6 Metres |
| 1.57.6 | Normal ballast parallel body length | 78.05 Metres |
| 1.57.7 | Normal ballast parallel body length - bow to mid point manifold | 40.45 Metres |
| 1.57.8 | Normal ballast parallel body length - stern to mid point manifold | 37.6 Metres |

| 1.57.9 | Parallel body length at Summer Deadweight (SDWT) | 88.94 Metres |
|--------|--------------------------------------------------|--------------|
| 1.57.10 | Parallel body length at SDWT - bow to manifold | 49 Metres |
| 1.57.11 | Parallel body length at SDWT - stern to mid point manifold | 39.94 Metres |
| 1.58 | Does ship have a bulbous bow? | Yes |



## Tonnages

| 1.59 | Net Registered Tonnage | 11833 Tonnes |
|------|------------------------|--------------|
| 1.60 | Gross Tonnage | 27450 Tonnes |
| 1.61 | Suez Tonnage | 25609.7 Tonnes |
| 1.62 | Panama Tonnage | 21732 Tonnes |

## Loadline Information

| | | Freeboard | Draft | Deadweight | Displacement |
|------|------------------------------|--------------|--------------|-----------------|------------------|
| 1.63 | Summer | 6.813 Metres | 12.516 Metres | 45091.6 Tonnes | 53963.8 Tonnes |
| 1.64 | Winter | 7.073 Metres | 12.256 Metres | 43844.5 Tonnes | 52716.7 Tonnes |
| 1.65 | Tropical | 6.553 Metres | 12.776 Metres | 46341.4 Tonnes | 55213.6 Tonnes |
| 1.66 | Lightship | 16.799 Metres | 2.53 Metres | 0 Tonnes | 8872.2 Tonnes |
| 1.67 | Normal Ballast Condition | 13.069 Metres | 6.26 Metres | 16233.28 Tonnes | 25105.48 Tonnes |
| 1.68 | Segregated Ballast Condition | 13.272 Metres | 6.057 Metres | 15324.03 Tonnes | 24196.23 Tonnes |

## Loadline Information and Recent Operational History

| | | |
|---|---|---|
| 1.69 | FWA at Summer Draft | 281 Millimetres |
| 1.70 | TPC Immersion at Summer Draft | 48 Tonnes |
| 1.71.1 | Draught Fore at normal ballast conditions | 5.468 Metres |
| 1.71.2 | Draught Aft at normal ballast conditions | 7.051 Metres |
| 1.72 | Does ship have Multiple SDWT ? | Yes |
| 1.73 | If yes, what is maximum assigned Deadweight? | 45018 Tonnes |
| 1.74 | Max. height of mast above waterline (air draft) in normal SBT condition? | 38 Metres |
| 1.75 | Has the ship traded continuously without requirement for repairs since the last dry-dock, except for normal maintenance? | Yes |
| 1.76 | The nature of the repair was: | not applicable |
| 1.77 | Has ship been involved in a pollution incident during the past 12 months? | No |
| 1.78 | Has ship been involved in a grounding incident during the past 12 months? | No |
| 1.79 | Has ship been involved in a collision during the past 12 months? | No |



## 2. CERTIFICATION AND DOCUMENTATION

### Certificates

| | | | Issued | Expires | Last Annual | |
|---|---|---|---|---|---|---|
| 2.1 | Register Number | 223-02-NY | | | | |
| 2.2 | Safety Equipment Certificate | | 30 Aug 2004 | 31 Jul 2009 | 07 Jul 2006 | |
| 2.3 | Safety Radio Certificate | | 30 Aug 2004 | 31 Jul 2009 | 07 Jul 2006 | |
| 2.4 | Safety Construction Certificate | | 30 Aug 2004 | 31 Jul 2009 | 27 Aug 2006 | |
| 2.5 | Loadline Certificate | | 30 Aug 2004 | 31 Jul 2009 | 27 Aug 2006 | |
| 2.6 | International Oil Pollution Prevention Certificate (IOPPC) | | 22 Sep 2006 | 31 Jul 2009 | | |
| 2.7 | Type of Oil Tanker as specified by IOPPC Crude/Product   (If not an oil tanker, specify) | Crude/Product | | | | |
| 2.8 | Safety Management Certificate (SMC) | | 27 Sep 2005 | 26 Sep 2010 | | (Last intermediate) |
| 2.9 | Document of Compliance (DOC) | | 18 Oct 2004 | 07 Sep 2009 | 15 Nov 2006 | (Endorsed) |
| 2.10 | USCG Letter of Compliance (if applicable) | | 12 Sep 2006 | 12 Sep 2008 | | |
| 2.11 | Date of last USCG Tank Vessel Examination Letter (TVEL) | | 12 Sep 2006 | 12 Sep 2008 | | |
| 2.12 | Minimum Safe Manning Certificate | | 04 Oct 2004 | | | |
| 2.13 | Civil Liability Convention Certificate (1969) | | | | | |
| 2.14 | Civil Liability Convention Certificate (1992) | | 20 Feb 2007 | | | |
| 2.15 | U.S. Certificate of Financial Responsibility | | 16 Aug 2005 | | | |
| 2.16 | Certificate of Fitness (Chemicals) | | Not Applicable | | | |
| 2.17 | Certificate of Fitness (Gas) | | Not Applicable | | | |
| 2.18 | Noxious Liquids Certificate | | Not Applicable | | | |
| 2.19 | Unattended Machinery Space Certificate | | 10 Sep 2004 | | | |
| 2.20 | International Tonnage Certificate | | 12 Apr 1994 | | | |

### Documents

| | | |
|---|---|---|
| 2.21 | IMO Safety of Life at Sea Convention (SOLAS 74) | Yes |
| 2.22 | IMO International Code of Signals (SOLAS V-Reg 21) | Yes |
| 2.23 | IMO International Convention for the Prevention of Pollution from Ships (MARPOL 73/78) | Yes |
| 2.24 | IMO Ships Routeing | Yes |
| 2.25 | IMO International Regulations For Preventing Collisions at Sea (COLREGS) | Yes |
| 2.26 | IMO Standards of Training, Certification and Watchkeeping (STCW Convention) | Yes |
| 2.27 | ICS Guide to Helicopter/Ship Operations | Yes |
| 2.28 | OCIMF/ICS/IAPH International Safety Guide for Oil Tankers and Terminals (ISGOTT) | Yes |
| 2.29 | OCIMF/ICS Clean Seas Guide for Oil Tankers | Yes |
| 2.30 | OCIMF/ICS Prevention of Oil Spillages Through Cargo Pumproom Sea Valves | Yes |
| 2.31 | OCIMF/ICS Ship to Ship Transfer Guide (Petroleum) | Yes |
| 2.32 | OCIMF Recommendations for Oil Tanker Manifolds and Associated Equipment | Yes |
| 2.33 | OCIMF Mooring Equipment Guidelines | Yes |
| 2.34 | OCIMF Effective Mooring | Yes |
| 2.35 | USCG Regulations for Tankers (USCG 33 CFR/46 CFR) | Yes |
| 2.36 | Oil Transfer Procedures  (USCG 33 CFR 155-156) | Yes |
| 2.37 | Operator's ISM Manuals | Yes |
| 2.38 | Is the publication IMO-Inert Gas Systems, or Ship Technical Operator's equivalent manual on board? | Yes |
| 2.39 | Is the publication IMO-Cow Systems, or Ship Technical Operator's equivalent manual on board? | Yes |
| 2.40 | ICS Bridge Procedures Guide | Yes |
| 2.41 | IAMSAR Vol.3 | Yes |
| 2.42 | Nautical Institute Bridge Team Management | Yes |
| 2.43 | International Medical Guide for Ships(or equivalent) | Yes |

### For Chemical Tankers Only

| | | |
|---|---|---|
| 2.44 | IMO Code for Construction & Equipment of Ships Carrying Dangerous Chemicals in Bulk (IBC Code) | N/A |
| 2.45 | IMO Index of Dangerous Chemicals Carried in Bulk | N/A |



| 2.46 | ICS Tanker Safety Guide (Chemicals) | N/A |
| 2.47 | IMO Code for Construction & Equipment of Ships Carrying Dangerous Chemicals in Bulk (BCH Code) | N/A |
| 2.48 | Chemical Data Guide (USCG 1990 CIM 16616.6A) | N/A |
| 2.49 | Medical First Aid Guide for Use in Accidents involving Dangerous goods (MFAG) | N/A |
| 2.50 | Procedures and Arrangements (P&A) Manual | N/A |

## For Gas Carriers Only

| 2.51 | IMO Code for Construction & Equipment of Ships Carrying Liquified Gases in Bulk (IGC Code) | N/A |
| 2.52 | ICS Tanker Safety Guide (Liquefied Gas) | N/A |
| 2.53 | SIGTTO Liquified Gas Handling Principles on Ships and in Terminals | N/A |
| 2.54 | SIGTTO Guide to Pressure Relief Valve Maintenance and Testing | N/A |
| 2.55 | ICS Ship to Ship Transfer Guide (Liquefied Gases) | N/A |
| 2.56 | IMO Code for the Construction and Equipment of Ships Carrying Liquefied Gases in Bulk (IGC Code) | N/A |
| 2.57 | IMO Code for Exsisting Ships Carrying Liquified Gases in Bulk (EGC Code) | N/A |
| 2.58 | Life saving Appliances Code | N/A |
| 2.59 | Fire Safety Systems Code | N/A |



## 3. CREW MANAGEMENT
### Crew Management

| 3.1 | Minimum manning required (officers) | 8 | 3.2 | Minimum manning required (ratings) | 8 |
|---|---|---|---|---|---|
| | Actual manning (officers) | 13 | | Actual manning (ratings) | 14 |
| | List Nationality of Officers | Indian Bulgarian Romanian Croatian | | List Nationality of Ratings | Filipino Indian Bulgarian |
| | Master employed by (Vessel Operator) | Yes | | Master employed by (Manning Agent) | No |
| | Officers employed by (Vessel Operator) | Yes | | Officers employed by (Manning Agent) | No |
| | Ratings employed by (Vessel Operator) | Yes | | Ratings employed by (Manning Agent) | No |
| | Common language used (Vessel Operator) | English | | Common language used | English |
| | Full name of Manning agent 1 (Officers) | N/A | | Full name of Manning agent 1 (Ratings) | N/A |
| | Full address | N/A | | Full address | N/A |
| | Office telephone number | N/A | | Office telephone number | N/A |
| | Office telex number | N/A | | Office telex number | N/A |
| | Office fax number | N/A | | Office fax number | N/A |
| | Office Email address | N/A | | Office Email address | N/A |
| | Are manning agent(s) wholly or partially owned by Operator? | N/A | | Does vessel's Operator maintain personnel files on ratings assigned to his vessels? | Yes |
| | If No, does Operator have selection rights? | N/A | | Do ratings regularly return to Operator's vessels? | Yes |
| | Does vessel's Operator maintain personnel files on officers assigned to his vessels? | Yes | | | |
| | Do officers regularly return to Operator's vessels? | Yes | | | |

### Continuity

| 3.3 | Do senior officers return to the same ship on a rotational basis? | Yes |
|---|---|---|
| 3.4 | Are senior officers rotated on ships of similar class within company fleet? | Yes |
| 3.5 | Are junior officers and ratings rotated on ships of similar class within company fleet? | Yes |
| 3.6 | If senior officers do not return to same ship on a rotational basis, are changes of Master, Chief Officer and Second Engineer organised to avoid a full change of officers at same time? | Yes |

### Training

| 3.7 | List Operator-sponsored training courses available to officers (Bridge Management etc.) | Ship Security Officer, Bridge Team Resourse Management, Manned Model Ship Handling, Navigation Skills for Deck Officers, NABCO Course, Hydraulic Workshop, Liquid Cargo Handling simulator, Marine Environment Protection, Engine Simulator Course |
|---|---|---|
| 3.8 | List Operator-sponsored training courses available to ratings (Fire Fighting etc.) | Basic Safety Refresher Course, ABS Certification of Fitters, Hydraulic Course |
| 3.9 | Are Masters and Chief Engineers required to attend company office before and after each tour of duty? | Yes |
| 3.10 | Does operator hold regular training seminars ashore for officers? | Yes |
| 3.11 | Are training seminars provided on board for officers and ratings? | Yes |
| 3.12 | What courses, exceeding statutory requirements, are provided for senior officers? | Manned Model Ship Handling, Navigation skills for deck officers, NABCO Course, Hydraulic Workshop, Liquid Cargo Handling Simulator, Marine Environment Protection, Continuous learning course for Master, Continuous learning course for Chief Engineer, |
| 3.13 | What courses, exceeding statutory requirements, are provided for junior officers? | Navigation Skill for Deck Officers, NABCO Course, Hydraulic Workshop, Liquid Cargo Handling Simulator, Marine Environment Protection, Engine Simulator, Boiler Course for Engineers |
| 3.14 | What courses, exceeding statutory requirements, are provided for ratings? | Basic Safety Refresher Course, Hydraulic Course |



## 4. NAVIGATION

### Navigation

|  |  | Installed | Type | Number of units |
|---|---|---|---|---|
| 4.1 | Magnetic compass | Yes | TOKYO KEIKI, HB165A | 1 |
| 4.2 | Gyro compass | Yes | TOKYO KEIKI TG5000 TOKIMEC TG6000 | 2 |
| 4.3 | Gyro Autopilot | Yes | TOKYO KEIKI, PALPHA PR-4000 | 1 |
| 4.4.1 | Radar 1 | Yes | JRC, JMA 9833-SA | 1 |
| 4.4.2 | Radar 2 | Yes | JRC, JMA 9823-9XA | 1 |
| 4.4.3 | Are radars gyro stabilised? | Yes |  |  |
| 4.5 | Is there at least one radar operating in the 9 Ghz frequency band (3cm/x band)? |  |  | Yes |
| 4.6 | Are the 3 GHz (10cm/S band) and 9Ghz (3cm / X band) radars fitted with an electronic switching unit? |  |  | Yes |
| 4.7 | Radar plotting equipment | Yes | JRC, JMA 9800 SERIES | 2 |
| 4.8 | ARPA (Installed) | Yes | JRC, JMA 9800 SERIES | 2 |
| 4.9 | Depth sounder with recorder | Yes | JRC, JFE570S | 1 |
| 4.10 | Speed/distance indicator | Yes | YOKOGAWA, EML, 201 | 1 |
| 4.11 | Doppler log | No |  |  |
| 4.12 | Docking approach doppler | No |  |  |
| 4.13 | Rudder angle indicator | Yes | DAEYANG, DYE3C-500R/DYE CL-2 | 3 |
| 4.14 | RPM indicator | Yes | NOR CONTROL | 4 |
| 4.15 | Controllable pitch propeller indicator | N/A |  |  |
| 4.16 | Bow thruster indicator | N/A |  |  |
| 4.17 | Stern Thrust indicator | N/A |  |  |
| 4.18 | Rate of turn indicator | No |  |  |
| 4.19 | Radio direction finder | No |  |  |

### Navigation (continued)

|  |  | Installed? | Type | No. of units |
|---|---|---|---|---|
| 4.20 | Navtex receiver | Yes | MARAC NAVTEX TEL100 | 1 |
| 4.21 | Satellite navigation receiver | No |  |  |
| 4.22 | GPS (Installed) | Yes | FURUNO, GPS NAVIGATOR GP-80 | 2 |
| 4.23 | Differential GPS (Installed) | Yes | FURUNO, GPS NAVIGATOR GP-80 | 2 |
| 4.24 | Is there an Electronic Chart Display? | No |  |  |
| 4.25 | Is the Electronic Chart Display incorporated into an approved ECDIS ? | No |  |  |
| 4.26 | Integrated Navigation System (INS) | No |  |  |
| 4.27 | Decca navigator | No |  |  |
| 4.28 | Omega receiver | No |  |  |
| 4.29 | Loran C receiver | No |  |  |
| 4.30 | Course recorder | Yes | TOKYO KEIKI, CR-1 | 1 |
| 4.31.1 | Off - course alarm - gyro | Yes | TOKYO KEIKI | 1 |
| 4.31.2 | Off - course alarm - magnetic | Yes | TOKYO KEIKI | 1 |
| 4.32 | Engine order printer | No |  |  |
| 4.33 | Anemometer | Yes | DAEYANG | 1 |
| 4.34 | Weather fax | Yes | FURUNO FAX 207 | 1 |
| 4.35 | Does ship carry sextant(s)? | Yes |  |  |
| 4.36 | Does ship carry a signal lamp? | Yes |  |  |
| 4.37 | Is each bridge wing fitted with a rudder angle indicator? | Yes |  |  |
| 4.38.1 | Is each bridge wing fitted with a RPM indicator? | Yes |  |  |
| 4.38.2 | Is each bridge wing fitted with a gyro repeater? | Yes |  |  |
| 4.39 | Are there Controllable pitch propeller indicators on the bridge wings? | N/A |  |  |
| 4.40 | Are steering motor controls and engine controls fitted on bridge wings? | No |  |  |
| 4.41 | Is bridge equipped with a 'Dead-Man' alarm or equipment? | Yes |  |  |



## 5. SAFETY MANAGEMENT

### Safety Management

| | | |
|---|---|---|
| 5.1 | Is the vessel operated under a Quality Management System? | Yes |
| 5.1.1 | If Yes, what type of system? (ISO9002 or IMO Resolution A.741(18))? | IMO Resolution A.741 (18) |
| 5.1.2 | If Yes, who is the certifying body? | American Bureau of Shipping |
| 5.1.3 | Date of vessel certification | 27 Sep 2005 |

### Helicopters

| | | |
|---|---|---|
| 5.2 | Can the ship comply with the ICS Helicopter Guidelines? | Yes |
| 5.2.1 | If Yes, state whether winching or landing area provided | Winching |
| 5.2.2 | What is diameter of circle provided? | 5 Metres |

### Fire Fighting Equipment & Life Saving Equipment

| | | |
|---|---|---|
| 5.3 | Is a fixed foam firefighting system installed for the cargo area? | Yes |
| 5.4 | Type of foam on board | Protein Based Foam |
| 5.5 | Date of foam supply or last analysis certificate | 17 Jul 2006 |
| 5.6 | What fixed fire fighting system is provided for the paint locker? | WATER SPRINKLER |
| 5.7 | What type of fire fighting system is fitted in pumproom(s)? | $CO_2$ |
| 5.8 | What type of fire fighting system is fitted in engine room(s)? | $CO_2$ |
| 5.9 | What type of fire fighting system is fitted in void spaces(s)? | None |
| 5.10 | Is a fixed dry powder firefighting system installed for the cargo area? | No |
| 5.11 | Is a fixed water spray firefighting system installed for the cargo area? | No |
| 5.12 | Is vessel equipped with recharging compressor for breathing apparatus? | Yes |
| 5.13 | What type of lifeboat(s) is/are fitted | Conventional |
| 5.14 | Is a dedicated rescue boat carried? | No |
| 5.15 | The type of rescue boat is:  Rigid/inflated/ rigid-inflated | Rigid |



# 6. POLLUTION PREVENTION

## Pollution Prevention

| | | |
|---|---|---|
| 6.1 | Is ship fitted with a continuous deck edge fishplate enclosing the deck area? | Yes |
| 6.1.1 | If Yes, what is its minimum vertical height above the deck plating? | 150 Millimetres |
| 6.1.2 | What is maximum vertical height above deck plating at aft thwartships coaming? | 200 Millimetres |
| 6.1.3 | How far forward of the thwartships coaming is this height maintained? | 2.29 Metres |
| 6.2 | Is an athwartship deck coaming fitted adjacent to accommodation and service areas? | Yes |
| 6.3 | What is the height of the coaming? | 200 Millimetres |
| 6.4 | Is spill containment fitted under the cargo manifold? | Yes |
| 6.5 | Is spill containment fitted under all bunker manifolds? | Yes |
| 6.6 | Is containment fitted under the bunker tank vents? | Yes |
| 6.7 | Is containment fitted around the deck machinery? | Yes |
| 6.8 | Specify type of scupper plugs | EXPANSION |
| 6.9 | Are means provided for draining or removing oil from deck area /containment? | Yes |
| 6.10.1 | What type of sorbents are provided? | Yes |
| 6.10.2 | Are non-sparking hand scoops and shovels provided? | Yes |
| 6.10.3 | Disposal Containers | Yes |
| 6.10.4 | Are emulsifiers provided? | Yes |
| 6.10.5 | Non-sparking pumps | Yes |
| 6.11 | Is there two valve segregation between cargo system and sea chest ? | Yes |
| 6.12 | What types of valves are fitted to sea chest? | Butterfly |
| 6.13 | Is a cargo sea chest valve testing arrangement fitted which meets OCIMF recommendations? | Yes |
| 6.14 | Are dump valves fitted that will effectively drain spillage from the deck to designated tanks when tanks are inerted to normal working pressures? | No |
| 6.15 | Are overboard discharges fitted with blanks or alternatively, is there a testing arrangement for the overboard valves? | Yes |
| 6.16 | Is there a discharge below the waterline for Annex II substances | No |
| 6.17 | Is there a discharge above the waterline for Annex I oily mixtures | Yes |
| 6.18 | Does Operator have policy to pressure test cargo piping at intervals no greater than 12 months? | Yes |
| 6.18.1 | If Yes, specify pressure | 12.5 bar |
| 6.19 | Is incinerator fitted? | Yes |

## Opa 90 Requirements

| | | |
|---|---|---|
| 6.20 | Has the vessel Operator submitted a Vessel Spill Response Plan to the US Coast Guard which has been approved by official USCG letter? | Yes |
| 6.21 | Has a Geographic Specific Appendix been filed with the Captain of the Port for each Port Zone the vessel expects to enter or transit? | Yes |
| 6.22 | Has the vessel Operator deposited a letter with the US Coast Guard confirming that the Operator has signed a service contract with an oil spill removal organisation for responding to a 'worst case scenario'? | Yes |



## 7. STRUCTURAL CONDITION

### Structural Condition

| | | |
|---|---|---|
| 7.1 | Are cargo tanks coated? | Yes |
| 7.1.1 | If Yes, specify type of coating | PureEpoxy |
| 7.1.2 | If partially coated, specify which tanks are coated | Not Applicable |
| 7.1.3 | If cargo tanks are coated, specify to what extent | Whole Tank |
| 7.2 | What is the condition of coating as determined by the criteria listed below? | Good |
| 7.3 | Are ballast tanks coated? | Yes |
| 7.3.1 | If ballast tanks are coated, specify to what extent | Whole Tank |
| 7.3.2 | What is the condition of cargo/ballast tank coating? | Good |
| 7.4 | Are there anodes in the cargo tanks? | No |
| 7.5 | Are there anodes in the ballast tanks? | Yes |
| 7.6 | What type of anodes are used? | ZINC |
| 7.7 | What is the overall percentage of wastage of the anodes? | 10 % |
| 7.8 | If anodes are aluminum, what is the height above tank bottom? | Millimetres |
| 7.9 | Is a formal programme in place for regular inspection of void spaces, cargo and ballast tanks? | Yes |
| 7.10 | Does ship have planned prevention maintenance programme (PPM)? | Yes |
| 7.10.1 | Is PPM manual (card system) or computerised? | Computerised |
| 7.10.2 | What areas of vessel does PPM cover? | All Ship |
| 7.10.3 | Is PPM Class approved? | Yes |



## 8. CARGO AND BALLAST SYSTEMS

## Cargo And Ballast Handling



Tank

Transverse          Elevation

### Double Hull Vessels

| 8.2 | Is vessel fitted with centreline bulkhead in all cargo tanks? | Not Applicable |
|-----|--------------------------------------------------------------|----------------|
| 8.2.1 | If Yes, is bulkhead solid or perforated? | Not applicable |
| 8.2.2 | Is vessel fitted with any full breadth ballast tanks? | N/A |
| 8.2.3 | If Yes, how many ballast tanks are full breadth? | 0 |
| 8.2.4 | Does vessel meet the IMO definition of 'double hull'? | N/A |

### Cargo Tank Capacities

| 8.3 | Cargo Tank Capacities At 98% Full (M3) | | | | | |
|-----|------------|-------------------|--------|-----------------------------|-------------|
| | Centre | | | | Wings (P & S combined) | |
| | Tank No. | | | | Tank No. | |
| 8.3.1 | 1 | 4809.3 Cu. Metres | 8.3.16 | | 1 | Cu. Metres |
| 8.3.2 | 2 | 5689.1 Cu. Metres | 8.3.17 | | 2 | Cu. Metres |
| 8.3.3 | 3 | 6238 Cu. Metres | 8.3.18 | | 3 | Cu. Metres |
| 8.3.4 | 4 | Cu. Metres | 8.3.19 | | 4 | 4678.6 Cu. Metres |
| 8.3.5 | 5 | Cu. Metres | 8.3.20 | | 5 | 4678.6 Cu. Metres |
| 8.3.6 | 6 | 6238 Cu. Metres | 8.3.21 | | 6 | Cu. Metres |
| 8.3.7 | 7 | 6238 Cu. Metres | 8.3.22 | | 7 | Cu. Metres |
| 8.3.8 | 8 | 6237.3 Cu. Metres | 8.3.23 | | 8 | Cu. Metres |
| 8.3.9 | 9 | Cu. Metres | 8.3.24 | | 9 | 6204.2 Cu. Metres |
| 8.3.10 | 10 | Cu. Metres | 8.3.25 | | 10 | Cu. Metres |
| 8.3.11 | 11 | Cu. Metres | 8.3.26 | | 11 | Cu. Metres |
| 8.3.12 | 12 | Cu. Metres | 8.3.27 | | 12 | Cu. Metres |
| 8.3.13 | 13 | Cu. Metres | 8.3.28 | | 13 | Cu. Metres |



| 8.3.14 | 14 | Cu. Metres | 8.3.29 | 14 | Cu. Metres |
|---|---|---|---|---|---|
| 8.3.15 | 15 | Cu. Metres | 8.3.30 | 15 | Cu. Metres |
| 8.4 | Total | 35449.7 Cu. Metres | 8.6 | Total | 15561.4 Cu. Metres |
| 8.5 | Slops 1st Tank | 763.1 Cu. Metres | 8.7 | Slops 3rd tank | Cu. Metres |
| 8.5.1 | Slops 2nd Tank | 763.1 Cu. Metres | 8.7.1 | Slops 4th tank | Cu. Metres |
| 8.8 | Total | 36975.9 Cu. Metres | 8.9 | Total | 15561.4 Cu. Metres |
| 8.10 | | | Grand Total Capacity (98%) | | 52537.3 Cu. Metres |

## Ballast Tank Capacities

| 8.11 | Ballast Capacities At 100% Full (M3) | |
|---|---|---|
| | Tank Identity | Capacity |
| 8.11.1 | 1P | 1246.3 Cu. Metres |
| 8.11.2 | 1S | 1246.3 Cu. Metres |
| 8.11.3 | 2P | 1571.9 Cu. Metres |
| 8.11.4 | 2S | 1571.9 Cu. Metres |
| 8.11.5 | 3P | 1885.4 Cu. Metres |
| 8.11.6 | 3S | 1885.4 Cu. Metres |
| 8.11.7 | 4P | 1506 Cu. Metres |
| 8.11.8 | 4S | 1506 Cu. Metres |
| 8.11.9 | 5P | 890.6 Cu. Metres |
| 8.11.10 | 5S | 890.6 Cu. Metres |
| 8.11.11 | FORE PEAK | 1526.3 Cu. Metres |
| 8.11.12 | AFT PEAK | 749.9 Cu. Metres |
| 8.11.13 | | Cu. Metres |
| 8.11.14 | Total Ballast Tank Capacities at 100% full | 16476.6 Cu. Metres |

## Ballast Handling

| 8.12.1 | If vessel is a Pre-MARPOL tanker, indicate by tank number, tanks usually designated for departure ballast. | Not Applicable |
|---|---|---|
| 8.12.1.1 | Tank Location | Not Applicable |
| 8.12.2 | If vessel is a Pre-MARPOL tanker, indicate by tank number, tanks usually designated for arrival ballast. | Not Applicable |
| 8.12.2.1 | Tank Location | Not Applicable |
| 8.12.3 | Can vessel handle cargo and non-segregated ballast concurrently maintaining two valve segregation? | N/A |
| 8.12.4 | Can dirty ballast be safely loaded with gas transfer method? (simultaneous cargo discharge and loading of ballast into empty tanks) | N/A |

## If Vessel Is Cbt Tanker With Manual

| 8.13 | If the vessel is a CBT Tanker with Approved Manual: | |
|---|---|---|
| 8.13.1 | Which cargo tanks are indicated as CBT in the IOPP Certificate? | Not Applicable |
| 8.13.2 | What is total capacity of CBT tanks? | Cu. Metres |
| 8.13.3 | Is the piping for CBT common with cargo piping or independent? | Not Applicable |

## If Vessel Is Sbt Tanker

| 8.14.1 | What is total capacity of SBT? | 16476.6 Cu. Metres |
|---|---|---|
| 8.14.2 | What percentage of summer deadweight can vessel maintain with SBT only? | 36.6 % |
| 8.14.3 | Does vessel meet the requirements of MARPOL Reg 13 (2)? | Yes |
| 8.14.4 | Can segregated ballast be discharged through vessel's manifold? | No |
| 8.14.5 | Is vessel equipped with spool piece designed to connect ballast system to cargo system? | Yes |
| 8.14.6 | Do cargo lines pass through any dedicated or segregated ballast tanks? | No |
| 8.14.7 | If Yes, what type of expansion is fitted? | Not Applicable |
| 8.14.8 | Do ballast lines pass through any cargo tanks? | No |



| 8.14.9 | If Yes, what type of expansion is fitted? | Not Applicable |
| 8.14.10 | Can vessel pump water ashore for line clearing? | Yes |
| 8.14.11 | If Yes, what is maximum attainable discharge rate? | 1000 Cu. Metres/Hour |
| 8.14.12 | If Yes, what is maximum acceptable back pressure? | 12.5 bar |
| 8.14.13 | Which cargo tanks are designated for heavy weather ballast as per IMO? | 6C |
| 8.14.13.1 | Tank Location | Centre |

## Cargo Handling

| 8.15 | How many grades/products can vessel load/discharge with double valve segregation? | 4 |
| 8.15.1 | How many grades can vessel load/discharge using blank flanges? | 4 |
| 8.15.2 | If vessel is fitted with deepwell pumps and heat exchangers, can pumps and heat exchangers be by-passed during loading? | N/A |
| 8.15.3 | Is there Oil Discharge Monitoring Equipment (ODME) fitted? | Yes |
| 8.15.4 | Is an Oil Discharge Monitoring System connected to the above waterline discharge? | Yes |
| 8.15.5 | If yes, is the Oil Discharge Monitoring System designed to automatically stop the discharge of effluent when its oil content exceeds permitted levels? | Yes |
| 8.16 | Is vessel equipped with class approved or certificated stability computer? | Yes |
| 8.16.1 | Does this stability programme consider damage stabilty conditions? | No |
| 8.17 | Is computer integrated with cargo system and equipped with alarm to monitor loading and discharging operations? | No |

## Cargo And Ballast Pumping Systems

| | | ID | No. | Type | Prime Mover | Self Priming / Draining | Capacity | Normal back pressure | At what head? (Metres) | RPM | Max RPM |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 8.18 | Main Pump 1 | 1 | 1 | Centrifugal | Steam | | 1000 Cu. M/Hr | 12.5 bar | 125 M | | 1770 |
| 8.19 | Main Pump 2 | 2 | 1 | Centrifugal | Steam | | 1000 Cu. M/Hr | 12.5 bar | 125 M | | 1770 |
| 8.20 | Main Pump 3 | 3 | 1 | Screw | Steam | | 1000 Cu. M/Hr | 12.5 bar | 125 M | | 1200 |
| 8.21 | Main Pump 4 | 4 | 1 | Screw | Steam | | 1000 Cu. M/Hr | 12.5 bar | 125 M | | 1200 |
| 8.22 | Main Pump 5 | | | | | | Cu. M/Hr | bar | M | | |
| 8.23 | Main Pump 6 | | | | | | Cu. M/Hr | bar | M | | |
| 8.24 | Main Pump 7 | | | | | | Cu. M/Hr | bar | M | | |
| 8.25 | Main Pump 8 | | | | | | Cu. M/Hr | bar | M | | |
| 8.26 | Booster Pumps | | | | | | Cu. M/Hr | bar | M | | |
| 8.27 | Stripping | | 1 | Reciprocating | Steam | | 150 Cu. M/Hr | 12.5 bar | 125 M | | 0 |
| 8.28 | Eductors | | 2 | Other | LIQUID | | 250 Cu. M/Hr | bar | M | | |
| 8.29 | Ballast Handling Main Pump | | 2 | Centrifugal | Electric | | 600 Cu. M/Hr | 2.5 bar | 25 M | | 1800 |
| 8.30 | Ballast Stripping | | | | | | Cu. M/Hr | | M | | |
| 8.31 | Ballast Eductors | | 1 | | | | 100 Cu. M/Hr | | M | | |
| 8.32 | Is vessel fitted with dedicated stripping lines and pumps? | No | | | | | | | | | |

## Cargo And Ballast Pumping Systems and Control Room

| | State location of cargo pump emergency stops | |
|---|---|---|
| 8.33 | (i) | CARGO CONTROL ROOM |
| 8.34 | (ii) | ENGINE ROOM |
| 8.35 | (iii) | MANIFOLDS Port and Stbd |



| 8.36 | (iv) | PUMPROOM ENTRANCE |
|---|---|---|
| 8.37 | (v) | PUMPROOM BOTTOM |
| 8.38.1 | Are bearings of cargo pumps fitted with high temperature alarms? | Yes |
| 8.38.2 | Are bearings of cargo pumps fitted with high temperature trips? | Yes |
| 8.39.1 | Are bearings of ballast pumps fitted with high temperature alarms? | Yes |
| 8.39.2 | Are bearings of ballast pumps fitted with high temperature trips? | Yes |
| 8.40.1 | Are casings of cargo pumps fitted with high temperature alarms? | Yes |
| 8.40.2 | Are casings of cargo pumps fitted with high temperature trips? | Yes |
| 8.41.1 | Are casings of ballast pumps fitted with high temperature alarms? | Yes |
| 8.41.2 | Are casings of ballast pumps fitted with high temperature trips? | Yes |
| 8.42.1 | Are pumproom shaft glands through bulkheads fitted with high temperature alarms? | Yes |
| 8.42.2 | Are pumproom shaft glands through bulkheads fitted with high temperature trips? | Yes |
| 8.43 | What is the principal type of cargo valve? | Butterfly |
| 8.44 | What type of cargo valve actuator is fitted? | Hydraulic |
| 8.45 | Is ship fitted with a Cargo Control Room? (CCR) | Yes |
| 8.46 | Can cargo and ballast pumps be controlled from the CCR? | Yes |
| 8.47 | Can all valves be controlled from the CCR? | No |
| 8.48 | Can tank innage/ullage be read from the CCR? | Yes |
| 8.49 | Is ODME readout fitted in the CCR? | Yes |
| 8.50 | Can the IGS be controlled from the CCR? | Yes |

## Gauging And Sampling

| 8.51 | Can vessel operate under closed loading conditions in accordance with Section 7.6.3 of ISGOTT? | Yes |
|---|---|---|
| 8.51.1 | What type of fixed closed tankgauging system is fitted? | Other (Specify) Pressure Sensor |
| 8.52 | Does tank gauging system have local reading? | No |
| 8.52.1 | Is gauging system certified and calibrated? | Yes |
| 8.52.2 | If it is a portable system does the sounding pipe extend to full tank depth? | N/A |
| 8.53 | Are bunker tanks fitted with a full depth gauging system? | Yes |
| 8.54 | Are high level alarms fitted to cargo tanks? | Yes |
| 8.54.1 | If Yes, indicate whether to all tanks or partial? | All |
| 8.54.2 | Are high level alarms independent of the gauging system? | Yes |
| 8.55 | Are bunker tanks fitted with high level alarms? | Yes |
| 8.56 | If Yes, are bunker tank high level alarms part of the primary tank gauging system? | No |
| 8.57 | Are closed sampling devices on board? | Yes |
| 8.58 | Are cargo tanks fitted with dipping points as per IMO Res 497 4.4.4? | Yes |
| 8.59 | If portable equipment for gauging uses vapour locks, are vapour locks calibrated? | Yes |
| 8.59.1 | If Yes, by whom are vapour locks calibrated? | DAEWOO SHIPYARD |
| 8.59.2 | If Yes, by whom are vapour locks certified? | DNV |
| 8.60 | If portable equipment used for gauging who is manufacturer? | N/A |
| 8.60.1 | If portable equipment used for gauging how many units are supplied? | 4 |
| 8.61 | What is size of vapour lock? | 50 Millimetres |
| 8.61.1 | Can vapour lock be used for ullaging? | Yes |
| 8.61.2 | Can vapour lock be used for temperature? | Yes |



| 8.61.3 | Can vapour lock be used for interface? | Yes |
| 8.61.4 | Can vapour lock be used for cargo sampling? | Yes |
| 8.62 | Specify portable equipment for checking oil/water interface | MMC |
| 8.63 | Can cargo samples be taken at the manifold? | Yes |
| 8.64 | What is the means of taking cargo temperatures? | REMOTE READOUT IN CCR / MMC |

## Vapour Emission Control

| 8.65 | Is a vapour return system fitted? | Yes |
| 8.65.6 | If fitted, is vapour line return manifold in compliance with OCIMF Guidelines? | No |
| 8.66 | Is vessel certified for vapour transfer? | Yes |
| 8.66.1 | If yes, by which organisation? | American Bureau of Shipping |

## Venting

| 8.67 | State what type of venting system is fitted | INDIVIDUAL HIGH VELOCITY VENTS |
| 8.68 | State maximum venting capacity | 1580 Cu. Metres/Hour/Tank |
| 8.69 | State P/V valve opening pressure | 1400 mm/wg |
| 8.70 | State P/V valve vacuum setting | -350 mm/wg |
| 8.71 | Does each tank have isolating valve? | Yes |
| 8.72 | Are cargo tanks fitted with full flow P/V valves without isolating valves between the P/V valve and tank? | Yes |
| 8.73 | Is there a means of measuring the pressure in the vapour space in each cargo tank? | Yes |
| 8.74 | Is venting through a mast riser? | No |
| 8.75 | Are mast risers fitted with high velocity vents? | N/A |
| 8.76 | If Yes, state opening pressure | mm/wg |
| 8.77 | State vacuum setting of mast riser | mm/wg |
| 8.78 | State throughput capacity of mast riser. | Cu. Metres/Hour |
| 8.79 | What is the maximum loading rate for homogenous cargo? | 3750 Cu. Metres/Hour |

## Cargo Manifolds

| 8.80 | Does vessel comply with the latest edition of the OCIMF 'Recommendations for Oil Tanker Manifolds and Associated Equipment'? | Yes |
| 8.81 | What type of valves are fitted at manifold? | Butterfly |
| 8.82 | If hydraulic valves fitted, what are closing times? | 0 seconds |
| 8.83 | What is the number of cargo connections per side? | 4 |
| 8.84 | What is the size of cargo connections? | 300 Millimetres |
| 8.85 | Are pressure gauges fitted outboard of manifold valves? | Yes |
| 8.86 | What is the material of the manifold? | STEEL  STPG 38E SCH40 |
| 8.87 | Is the vessel fitted with a crossover at the manifold? | No |
| 8.88 | Are manifold cross-connections made by hard or flexible piping? (chemical carriers) | Not Applicable |

## Bunker Manifolds

| 8.89 | What is the number of bunker connections per side? | 2 |
| 8.90 | What is the size of the bunker connection? | 150 Millimetres |

## Manifold Arrangement

| 8.91 | Manifold Arrangement Diagram | |
| 8.92 | Distance A bunker manifold to cargo manifold | 2000 Millimetres |
| 8.93 | Distance B cargo manifold to cargo manifold | 2000 Millimetres |
| 8.94 | Distance C cargo manifold to vapour return manifold | 2000 Millimetres |
| 8.95 | Distance D manifolds to ship's rail | 4400 Millimetres |
| 8.96 | Distance E spill tank grating to centre of manifold | 900 Millimetres |
| 8.97 | Distance F main deck to centre of manifold | 2100 Millimetres |
| 8.98 | Distance G maindeck to top of rail | 1320 Millimetres |
| 8.99 | Distance H top of rail to centre of manifold | 760 Millimetres |
| 8.100 | Distance J manifold to ship side | 4600 Millimetres |





## Manifold Arrangement - continued

| 8.101 | What is the height of the manifold connections above the waterline at loaded (Summer Deadweight) condition? | 8.913 Metres |
|---|---|---|
| 8.102 | What is the height of the manifold connections above the waterline in normal ballast? | 15.17 Metres |
| 8.103 | What is the distance between the keel and centre of manifold? | 21.429 Metres |
| 8.104 | Is vessel fitted with a stern manifold? | No |
| 8.104.1 | If stern manifold fitted, state size | Millimetres |
| 8.105 | Is vessel fitted with a bow manifold? | No |
| 8.105.1 | If bow manifold fitted, state size | Millimetres |

## Reducers

| 8.106 | Number of Reducers carried | 8 | from | 300 Millimetres | to | 400 Millimetres | (diameter) |
|---|---|---|---|---|---|---|---|
| 8.107 | Number of Reducers carried | 4 | from | 300 Millimetres | to | 250 Millimetres | (diameter) |
| 8.108 | Number of Reducers carried | 4 | from | 300 Millimetres | to | 200 Millimetres | (diameter) |
| 8.109 | Number of Reducers carried | 2 | from | 300 Millimetres | to | 150 Millimetres | (diameter) |
| 8.110 | Number of Reducers carried | | from | Millimetres | to | Millimetres | (diameter) |
| 8.111 | To what standard are manifold reducers manufactured? | ANSI | | | | | |

## Gas monitoring

| 8.112 | Is the vessel fitted with a fixed system to continuously monitor for flammable atmospheres? | Yes |
|---|---|---|
| 8.112.1 | What spaces are monitored? | PUMPROOM, Accommodation Air Condition Intake |
| 8.113 | Where are sensors/sampling points located in pumproom? | Bottom Port / Bottom Stbd & Pumprrom Top |
| 8.113.1 | Are sensors/sampling points calibrated/tested? | Yes |
| 8.113.2 | Who is responsible for testing sensors/sampling points? | CHIEF OFFICER |




| | Portable and Personal gas detection equipment carried | Number of units |
|---|---|---|
| 8.114 | COMBINATION GAS METER RIKEN KEIKI GX-7 | 2 |
| 8.115 | OXYGEN ANALYSER - RIKEN KEIKI OX-1 | 2 |
| 8.116 | HC DETECTOR (TANKSCOPE) RIKEN KEIKI NP237H | 2 |
| 8.117 | RIKEN KEIKI TANKSCOPE | 2 |
| 8.118 | DRAGER TOXIC GAS METER | 1 |
| 8.119 | MULTIGAS DETECTOR - INDUSTRIAL SCIENTIFIC - TMX412 & LTX312 | 2 |
| 8.120 | PERSONAL MULTIGAS METER | 4 |

## Cargo Heating

| | | |
|---|---|---|
| 8.120 | Are cargo tanks fitted with heating coils? | Yes |
| 8.121 | State the Number of independent sets of coils per tank | 1C, 2C, 3C, 6C, 7C & 8C - 4 EACH  4P, 4S, 5P, 5S, 9P, 9S, SLOP P - 2 EACH, SLOP S - 1, |
| 8.122 | Are all tanks coiled? | Yes |
| 8.123 | What is the Height of coils above tank bottom? | 125 Millimetres |
| 8.124.1 | Heating surface per tank | 1C-74.2 Sq.M, 2C-77.2 Sq.M; 3C,6C,7C,8C-83.7 Sq.M ; 4P,4S,5P, 5S-31.4 Sq.M; 9P,9S-41.7 Sq.M; Slop(P)-39.91 Sq.M;Slop(S)- 8.55 Sq.M |
| 8.124.2 | Heating surface per tank volume ratio (X:Y) | 1C-0.01543, 2C-0.01357; 3C,4W,5W,6C,7C,8C,9W - 0.0134;Slop(P)-0.0523;Slop(S)-0.0112 |
| 8.125 | Are heating coils welded or coupled? | Welded |
| 8.126 | Are heat exchangers external to cargo tanks? | No |
| 8.127 | Are there external ducts? | No |
| 8.128 | What is the Material of heating coils? | Stainless Steel |
| 8.129 | Inlet heating medium to coils... | Steam |
| 8.130.1 | ...with Sea temperature | Degrees C |
| 8.130.2 | ...with air temperature | Degrees C |
| 8.131 | Heating agent | Steam |
| 8.132 | Number of heaters | |
| 8.133.1 | Able to raise temperature from | 44 Degrees C |
| 8.133.2 | Able to raise temperature to | 66 Degrees C |
| 8.133.3 | Time taken to raise temperature | 96 Hours |
| 8.134 | Total capacity of boilers | 30 Kcal |



## 9. INERT GAS AND CRUDE OIL WASHING SYSTEMS

### Inert Gas And Crude Oil Washing

| | | |
|---|---|---|
| 9.1 | Is an inert gas system (IGS) fitted? (If No, ignore remainder of this section) | Yes |
| 9.2 | Is a P/V breaker fitted? | Yes |
| 9.3 | Is IGS supplied by flue gas, inert gas (IG) generator and/or nitrogen? | IG Generator |
| 9.4 | Are fixed O2 alarms fitted in inert gas generating spaces? | Yes |
| 9.5 | What is the capacity of the IGS? | 5000 Cu. Metres/Hour |
| 9.6 | How many fans does it have? | 2 |
| 9.7 | What is the total combined fan capacity? | 5000 Cu. Metres/Hour |
| 9.8 | Is a top-up IG generator fitted? | No |
| 9.8.1 | If Yes, what is its capacity? | Cu. Metres/Hour |
| 9.9 | Is an IGS operating manual on board? | Yes |
| 9.10 | What type of deck seal is fitted? | Wet |
| 9.11 | How many segregations does the IGS have? | 1 |
| 9.12 | What method is used to isolate individual tanks? | BLANK/ BUTTERFLY VALVE |
| 9.13 | What type of non-return valve is fitted? | SWING TYPE |
| 9.14 | What means of protection is fitted, other than minimum thermal variation P/V valves, if tanks can be individually isolated from the IG ? | REMOTE PRESSURE READOUT |
| 9.15 | If ship has double hull or sides, are facilities available to inert ballast tanks and other void spaces? | Yes |
| 9.15.1 | Can these tanks/spaces be purged with air? | Yes |
| 9.16 | Where is the location of the emergency IGS connection? | After Deck Seal |
| 9.16.1 | What is the size of the emergency IGS connection? | 300 Millimetres |
| 9.17 | Is a Crude Oil Washing (COW) installation fitted? (If No, ignore remainder of this section) | Yes |
| 9.18 | Are COW drive units fixed or portable? | Fixed |
| 9.19 | Are COW drive units programmable? | No |
| 9.20 | Is vessel capable of performing COW at the same time as cargo discharge? | Yes |
| 9.21 | Is there an approved COW Manual on board? | Yes |
| 9.22 | What is the working pressure of the COW lines? | 9 bar |



## 10. MOORING



## Mooring Wires (on Drums)

| 10.1 | Does the vessel comply with the latest edition of OCIMF Mooring Equipment Guidelines? | Yes | | | | |
|------|------|------|------|------|------|------|
| | | | | | | |
| | Mooring Wires (On Drums) | Number | Diameter | Material | Length | Breaking Strength |
| 10.2 | Forecastle | | mm | | Metres | Tonnes |
| 10.3 | Forward Main Deck | | mm | | Metres | Tonnes |
| 10.4 | Aft Main Deck | | mm | | Metres | Tonnes |
| 10.5 | Poop | | mm | | Metres | Tonnes |
| | | | | | | |
| | Mooring Wire Tails | Number | Diameter | Material | Length | Breaking strength |
| 10.7 | Forecastle | | mm | | Metres | Tonnes |
| 10.8 | Forward Main Deck | | mm | | Metres | Tonnes |
| 10.9 | Aft Main Deck | | mm | | Metres | Tonnes |
| 10.10 | Poop | | mm | | Metres | Tonnes |
| 10.6 | Type of shackle | | | | | |
| | | | | | | |
| | Mooring Ropes (On Drums) | Number | Diameter | Material | Length | Breaking Strength |
| 10.11 | Forecastle | 2 | 52 mm | BEXCOFLEX | 220 Metres | 50.6 Tonnes |
| 10.12 | Forward Main Deck | 1 | 52 mm | BEXCOFLEX | 220 Metres | 50.6 Tonnes |
| 10.13 | Aft Main Deck | 1 | 52 mm | BEXCOFLEX | 220 Metres | 50.6 Tonnes |
| 10.14 | Poop | 2 | 52 mm | BEXCOFLEX | 220 Metres | 50.6 Tonnes |
| | | | | | | |
| | Other Mooring Lines | Number | Diameter | Material | Length | Breaking Strength |
| 10.15 | Forecastle | 5 | 48 mm | BEXCOFLEX | 220 Metres | 50.6 Tonnes |
| 10.16 | Forward Main Deck | 2 | 52 mm | MAGNARO HYBRID | 220 Metres | 51.6 Tonnes |
| 10.17 | Aft Main Deck | 2 | 52 mm | MARINA MAXI | 220 Metres | 51.5 Tonnes |
| 10.18 | Poop | 5 | 60 mm | ESTALON | 220 Metres | 66.1 Tonnes |




## Spare Mooring Wires

|  | Spare Mooring Wires | Number | Diameter | Material | Length | Breaking strength |
|---|---|---|---|---|---|---|
|  |  |  | Millimetres |  | Metres | Tonnes |
| 10.19 |  |  | Millimetres |  | Metres | Tonnes |
| 10.19.1 |  |  | Millimetres |  | Metres | Tonnes |

|  | Spare Mooring Ropes | Number | Diameter | Material | Length | Breaking strength |
|---|---|---|---|---|---|---|
| 10.20 | Forecastle store | 1 | 52 Millimetres | MARINA MAXI | 220 Metres | 57.8 Tonnes |
| 10.20.1 | Aft Store | 1 | 52 Millimetres | MARINA MAXI | 220 Metres | 57.5 Tonnes |

|  | Spare Mooring Tails | Number | Diameter | Material | Length | Breaking strength |
|---|---|---|---|---|---|---|
| 10.21 |  |  | Millimetres |  | Metres | Tonnes |
| 10.21.1 |  |  | Millimetres |  | Metres | Tonnes |

## Mooring Winches

|  |  | Number | Single/Double Drums | Split Drums | Motive Power | Heaving Power | Brake Capacity | Hauling Speed |
|---|---|---|---|---|---|---|---|---|
| 10.22 | Forecastle | 2 | Single Drum | No | Hydraulic | 15 Tonnes | 32.8 Tonnes | 15 Mtrs/Min |
| 10.23 | Forward Main Deck | 1 | Single Drum | No | Hydraulic | 15 Tonnes | 32.8 Tonnes | 15 Mtrs/Min |
| 10.24 | Aft Main Deck | 1 | Single Drum | No | Hydraulic | 15 Tonnes | 32.8 Tonnes | 15 Mtrs/Min |
| 10.25 | Poop | 2 | Single Drum | No | Hydraulic | 15 Tonnes | 32.8 Tonnes | 15 Mtrs/Min |
| 10.26 | What type of winch brakes are fitted? | MANUAL/ LINER |  |  |  |  |  |  |
| 10.27 | Is brake testing equipment on board? | Yes |  |  |  |  |  |  |
| 10.28 | When were the brakes last tested? | 15 Jun 2006 |  |  |  |  |  |  |

## Mooring Bits

| 10.29 | How many sets of mooring bits are fitted on forecastle? | 6 |
|---|---|---|
| 10.29.1 | What is their Safe Working Load? | 64 Tonnes |
| 10.30 | How many sets of mooring bits are fitted on forward main deck? | 4 |
| 10.30.1 | What is their Safe Working Load? | 64 Tonnes |
| 10.31 | How many sets of mooring bits are fitted on aft main deck? | 2 |
| 10.31.1 | What is their Safe Working Load? | 64 Tonnes |
| 10.32 | How many sets of mooring bits are fitted on poop deck? | 8 |
| 10.32.1 | What is their Safe Working Load? | 64 Tonnes |
| 10.33 | Distance of mooring chock for breast/spring lines forward of center of manifold | 49.5 Metres |
| 10.34 | Distance of mooring chock for breast/spring lines aft of center of manifold | 35.6 Metres |

## Anchors And Windlass

| 10.35 | What is the motive power of the windlass? | Hydraulic |
|---|---|---|
| 10.36 | What is the cable diameter? | 70 Millimetres |
| 10.37 | Number of shackles - port cable? | 11 |
| 10.38 | Number of shackles - starboard cable? | 12 |
| 10.39 | Are bitter end connections to both cables capable of being slipped? | Yes |

## Emergency Towing Arrangemnts

| 10.40 | Is the vessel fitted with an Emergency Towing Arrangement? | Yes | |
|---|---|---|---|
|  | (if "No" then ignore the remainder of this section) |  |  |
|  |  | Forward | Aft |
| 10.41 | Type of system | ETS 100 BOW | ETS 100 STERN |
| 10.42 | Safe Working Load (SWL) of system | 100 Tonnes | 100 Tonnes |
| 10.43 | Is pick-up gear provided? | N/A | Yes |
| 10.44 | Towing pennant length | Metres | 100 Metres |
| 10.45 | Towing pennant diameter | Millimetres | 80 Millimetres |
| 10.46 | Type of strong point (Smit bracket etc) | SMIT BRACKET | SMIT BRACKET |
| 10.47 | Chafing chain size | 54 Millimetres | 54 Millimetres dia , 8 Mtrs |
| 10.48 | Fairlead size (in format ABCmm x XYZmm) | 600 mm X 450 mm | 600 mm X 450 mm |
| 10.49 | Is pedestal roller fitted? | No | No |
| 10.50 | Is vessel provided with towing wire? | No | No |



| 10.50.1 | If Yes, what is the diameter of towing wire? | Millimetres | Millimetres |
|---------|----------------------------------------------|-------------|-------------|
| 10.50.2 | If Yes, what is the length of towing wire? | Metres | Metres |
| | | | |
| 10.52 | What is the number of bitts in the bow area? | 4 | |
| 10.53 | What is the height of the bitts in the bow area? | 770 Millimetres | |
| 10.54 | What is the safe working load of the bitts in the bow area? | 64 Tonnes | |
| 10.55 | What is the distance between bow fairleads and nearest bitts? | 3000 Millimetres | |
| 10.56 | Is the bow area clear of any obstructions which would hamper towing connections? | Yes | |

### Escort Tug

| 10.57 | SWL of closed chock on stern | 100 Tonnes |
|-------|------------------------------|------------|
| 10.58 | SWL of bollard on poopdeck suitable for escort tug | 64 Tonnes |
| 10.59 | Are stern chock and bollard capable of towing astern to 90 degrees? | Yes |

### Single Point Mooring (spm) Equipment

| 10.60 | Does vessel comply with the latest edition of OCIMF 'Recommendations for Equipment Employed in the Mooring of Vessels at Single Point Moorings (SPM)'? | Yes |
|-------|---------|------|
| 10.61 | Is vessel fitted with chain stopper(s)? | Yes |
| 10.61.1 | If Yes, how many? | 1 |
| 10.61.2 | If Yes, state type | TONGUE TYPE |
| 10.61.3 | If Yes, what is the Safe Working Load (SWL)? | 200 Tonnes |
| 10.62 | What is the maximum size chain diameter the bow stopper(s) can handle? | 76 Millimetres |
| 10.63 | Are closed fairleads of OCIMF recommended size (600mm x 450mm)? | Yes |
| 10.63.1 | If not, give details of size (in format ABCmm x XYZmm) | Millimetres |
| 10.64 | If two forward bow fairleads are fitted give distance between them | Millimetres |
| 10.65 | What is the distance between the bow fairlead and stopper/bracket? | 3400 Millimetres |
| 10.66 | What is the distance from the stopper bracket to roller lead/winch drum? | 5.4 Metres |
| 10.67 | Is there a direct lead from the bow stopper to the winch drum (not the warping end)? | No |
| 10.68 | Is the winch storage drum capable of safely accommodating 150m X 80mm fibre pick up rope? | Yes |
| 10.69 | Is the winch storage drum capable of accommodating 200m x 80mm fibre pick-up rope? | Yes |





## Manifold Arrangement

| 10.71 | Manifold Arrangement Diagram | |
|-------|------------------------------|--|
| 10.72 | Distance K end of drip tray to center line of deck cleat | 1500 Millimetres |
| 10.73 | Distance L spill tray to centre line of bollard | 300 Millimetres |
| 10.74 | Distance M length of bollard | 400 Millimetres |



## Lifting Equipment

| 10.75 | How many derricks does the vessel have? | 0 |
|-------|------------------------------------------|---|
| 10.75.1 | What is their safe working load (SWL)? | Tonnes |
| 10.75.2 | Date last tested | |
| 10.76 | If cranes are fitted, how many? | 2 |
| 10.76.1 | What is their safe working load (SWL)? | 10 Tonnes |
| 10.76.2 | Date last tested | 30 Aug 2004 |
| 10.77 | Is Safe Working Load (SWL) clearly marked on all lifting equipment? | Yes |
| 10.78 | Do the vessel's derricks or cranes reach at least 1 metre outboard of rail? | Yes |
| 10.79 | How many bitts are there on each side of the manifold for tying off submarine hoses? | 3 |

## Other Equipment

| 10.80 | Are accommodation ladders arranged to face aft when rigged? | Yes |
|-------|-------------------------------------------------------------|-----|
| 10.81 | Does vessel have Suez Canal boat davits? | No |
| 10.82 | Does vessel have Suez Canal projector? | Yes |

# 11. COMMUNICATIONS AND ELECTRONICS

## Communications And Electronics

| | | |
|------|-------------------------------------------------------------------------|--------------------------------|
| 11.1 | Is vessel certified for GMDSS? | Yes |
| 11.2 | What GMDSS areas is the vessel classed for? | A3 |
| 11.3 | Transponder (SART) | Yes |
| 11.4 | EPIRB | Yes |
| 11.5 | How many VHF radios are fitted on the bridge? | 4 |
| 11.6 | Is vessel fitted with VHF in the cargo control room (CCR)? | Yes |
| 11.7 | Is the CCR connected to the vessel's internal communication system? | Yes |
| 11.8 | How many intrinsically safe walkie talkies are provided for cargo handling? | 6 |
| 11.9 | Is vessel fitted with an INMARSAT satellite communications system? | Yes |
| 11.10 | Does vessel carry at least three survival craft two-way radio telephones? | Yes |
| 11.11 | List any other communications equipment carried: | SAT B TELEPHONE/ E-MAIL/ FAX |
| 11.12 | Can vessel transmit the helicopter homing signal on 410 KHz? | No |

## 12. ENGINE ROOM AND STEERING GEAR

### Main Propulsion

| | | |
|---|---|---|
| 12.1 | Means of main propulsion | Motor |
| 12.1.1 | If motor state whether two stroke or four stroke | 2 Stroke |
| 12.1.2 | If four stroke, state how many engines fitted | |
| 12.2 | Does vessel have single or twin propellers? | Single |
| 12.3 | Is vessel fitted with fixed or controllable pitch propeller(s)? | Fixed Pitch |
| 12.4 | How many boilers are fitted? | 1 |
| 12.4.1 | What is rated output of boilers? | 30 Tonnes/Hour |
| 12.5 | What type of fuel is used for main propulsion? | F.O. 380 cst |
| 12.6 | Are pressurised fuel pipes double sheathed? | Yes |
| 12.7 | When moored at SBM, is main engine capable of being run astern at low revolutions for extended periods (up to 24 hours continuously)? | No |
| 12.8 | Is vessel capable of maintaining speed below 5 Knots? | Yes |
| 12.9 | Is vessel fitted for Unmanned Machinery Space (UMS) operation? | Yes |
| 12.9.1 | Is vessel operated in UMS mode? | No |

### Thrusters

| | | |
|---|---|---|
| 12.10 | Is vessel fitted with a bow thruster? | No |
| 12.10.1 | If Yes, give Brake Horse Power | bhp |
| 12.11 | Is vessel fitted with a stern thruster? | No |
| 12.11.1 | If Yes, give Brake Horse Power | bhp |
| 12.12 | Is vessel fitted with high angle rudder? | No |
| 12.12.1 | If yes, what type | |

### Generators

| | | |
|---|---|---|
| 12.13 | How many power generators are fitted? | 3 |
| 12.13.1 | Indicate type of power generator(s) | Diesel Engine driven Generator |
| 12.14 | What type of fuel is used in the generating plant? | DIESEL |
| 12.15 | Is vessel fitted with emergency generator or batteries? | Emergency Generator |

### Main Engine Air Start Compressors

| | | |
|---|---|---|
| 12.16 | Number of main engine start compressors | 2 |
| 12.17 | Operating pressure | 30 bar |
| 12.18 | Motive power of emergency compressor | ELECTRIC |

### Bunkers

| | Fuel Oil | | Diesel Oil | | Gas Oil | |
|---|---|---|---|---|---|---|
| | Tank name | Capacity | Tank name | Capacity | Tank name | Capacity |
| 12.19 | BUNKER P | 972.6 Cu. Metres | STOR. TK P | 117.9 Cu. Metres | | Cu. Metres |
| 12.20 | BUNKER S | 864.1 Cu. Metres | STOR. TK S | 120.4 Cu. Metres | | Cu. Metres |
| 12.21 | SETTL. TK | 51.5 Cu. Metres | SETTL. TK | 15.7 Cu. Metres | | Cu. Metres |
| 12.22 | SERVICE TK | 57.6 Cu. Metres | SERVICE TK | 11.7 Cu. Metres | | Cu. Metres |
| 12.23 | | Cu. Metres | | Cu. Metres | | Cu. Metres |
| 12.24 | | Cu. Metres | | Cu. Metres | | Cu. Metres |
| 12.25 | | Cu. Metres | | Cu. Metres | | Cu. Metres |

### Steering Gear

| | | |
|---|---|---|
| 12.26 | What type of steering gear fitted? | Cylinder |
| 12.27 | How many motorised hydraulic pumps or motors fitted? | 2 |
| 12.28 | How many telemotors fitted? | 2 |
| 12.29 | Is an emergency rudder arrest/rudder control fitted? | Yes |

### Anti-pollution

| | | |
|---|---|---|
| 12.30 | Is an engine-room bilge high level alarm fitted? | Yes |
| 12.31 | Is a pump room bilge high level alarm fitted? | Yes |
| 12.32 | Is there a permanantly installed system for the disposal of residues from the machinery space sludge tank to shore? | Yes |
| 12.33 | Are there facilities on board to incinerate machinery space sludge? | Yes |

## 13. SHIP TO SHIP TRANSFER SUPPLEMENT

### Ship To Ship Transfer

| | | |
|---|---|---|
| 13.1 | Does vessel comply with recommendations contained in OCIMF/ICS Ship To Ship Transfer Guide (Petroleum)? | Yes |
| 13.2 | Are at least 7 ratings available to assist with mooring operations? | Yes |
| 13.3 | What is Safe Working Load (SWL) of bitts in the manifold area? | 22 Tonnes |
| 13.4 | Are manifold bitts at least 35 metres away from the breastlines leading fore and aft? | Yes |
| 13.5 | What is maximum outreach of vessel's cranes or derricks outboard of the ship's side? | 5 Metres |
| 13.6 | Are four (4) 200m x 40mm messenger lines available for Ship-To-Ship (STS) mooring operations? | Yes |
| 13.7 | Are there two (2) closed chocks with associated bollards and leads to winches located within 35 metres forward and aft of the centre of the cargo manifold? | Yes |



Code word for this Charter Party
**"SHELLTIME 4"**
*Issued December 1984*

# ORIGINAL

# Time Charter Party

SINGAPORE, 29 May 2007

| | |
|---|---|
| IT IS THIS DAY AGREED between  Darr Maritime Inc. | 1 |
| Of        80 Broad Street, Monrovia,Liberia                              (hereinafter referred to as "Owners"), being owners of the | 2 |
| Good motor tanker                              ~~vessel~~ called HIGHSEAS (TBR PACIFIC TURQUOISE) | 3 |
| (hereinafter referred to as "the vessel") described as per Clause 1 hereof and Navig8 Pte Ltd | 4 |
| of Singapore                              (hereinafter referred to as "Charterers") :, | 5 |

**Description and Condition of Vessel**

1. At the date of delivery of the vessel under this charter — 6
she shall be classed : ABS — 7
    (b) she shall be in every way fit to carry (see Clause 88 – Cargo Clause) ~~crude petroleum and/or its products :~~ — 8
    (c) she shall be tight, staunch, strong, in good order and condition, and in every way fit for the — 9
service, with her machinery, boilers, hull and other equipment (including but not limited to hull stress calculator — 10
and radar) in a good and efficient state : — 11
    (d) her tanks, valves and pipelines shall be oil-tight; — 12
    (e) she shall be in every way fitted for burning — 13
~~at sea - fueloil with a viscosity of ---- Centistokes at 50 degrees Centigrade/any~~ — 14
~~commercial grade of fueloil ("ACGFO") for main propulsion, Gasoil marine diesel oil/ACGFO~~ — 15
~~for auxiliaries~~ — 16
    ~~in port  gasoil marine diesel oil/ACGFO for auxiliaries :~~ see Clause 96 - Bunker Specification Clause. — 17
    (f) she shall comply with the regulations in force so as to enable her to pass through the Suez and Panama Canals — 18
by day and night without delay : — 19
    (g) she shall have on board all certificates, documents and equipment required from time to time by — 20
any applicable law to enable her to perform the charter service without delay : — 21
    (h) she  shall comply with  the  description in ~~Form B~~ OCIMF Questionnaire to be appended hereto, — 22
provided however that if there — 
is any conflict between the provisions of ~~Form B~~ OCIMF Questionnaire and any other provision, including this — 23
Clause 1, of this charter  such other provision shall govern. — 24

**Shipboard Personnel and their Duties**

2. (a) At the date of delivery of the vessel under this charter — 25
    (i) she  shall have a full and efficient complement  of master, officers and crew  for  a vessel  of her — 26
tonnage, who shall in any event be not less than the number required by the laws of the flag state and who shall be — 27
trained to operate the vessel and her equipment competently and safely ; — 28
    (ii) all shipboard personnel shall hold valid certificates of competence in accordance with the — 29
requirements of the law of the flag state : — 30
    (iii) all shipboard personnel shall be trained in accordance with the relevant provisions of the International — 31
Convention on Standards of Training. Certification and Watchkeeping for Seafarers, 1978 — 32
    (iv) there  shall  be  on  board  sufficient  personnel  with  a  good  working knowledge  of the  English — 33
language to enable cargo operations at loading and discharging places to be carried out efficiently and safely and    to — 34
enable communications between the vessel and those loading the vessel or accepting discharge therefrom to be carried — 35
out quickly and efficiently. — 36

    (b) Owners guarantee that throughout the charter service the master shall with the vessel's officers and crew, — 37
unless otherwise ordered by Charterers, — 38
    (i) prosecute all voyages with the utmost despatch ; — 39
    (ii) render all customary assistance ; and — 40
    (iii) load and discharge cargo as rapidly as possible when required by Charterers or their agents — 41
to do so, by night or by day, but always in accordance with the laws of the place of loading or discharging (as the  case — 42
may be) and in each case in accordance with any applicable laws of the flag state. — 43

**Duty to Maintain**

3.     (i) Throughout  the charter  service Owners shall, whenever  the passage of time, wear and  tear or any — 44
event (whether  or not coming  within Clause 27 hereof) requires steps to be taken to  maintain or restore the — 45
conditions stipulated in Clauses 1 and 2(a), exercise due diligence so to maintain or restore the vessel. — 46
    (ii) If at any time whilst the vessel is on hire under this charter the vessel fails to comply with the — 47
requirements of Clauses 1, 2(a) or 10, then hire shall be reduced to the extent necessary to indemnify Charterers for — 48
such failure. If and to the extent that such failure affects the time taken by the vessel to perform any services under this — 49
charter, hire shall be reduced by an amount equal to the value, calculated at the rate of hire, of the time so lost. — 50
— 51
    Any reduction of hire under this sub-clause (ii) shall be without prejudice to any to other remedy available — 52
to Charterers, but where such reduction of hire is in  respect to time lost; such time shall be excluded from any — 53
calculation under Clause 24. — 54
    (iii) If Owners are in breach of their obligation under Clause 3(i) Charterers may so notify Owners in — 55
writing; and if, after the expiry of 30 days following the receipt by Owners of any such notice, Owners have failed to — 56
demonstrate to Charterers' reasonable satisfaction the exercise of due diligence as required in Clause 3(i), the vessel — 57
shall be off-hire, and no further hire payments shall be due, until Owners have so demonstrated that they are exercising — 58
such due diligence. — 59
    ~~Furthermore, at any time while the vessel is off-hire under this Clause 3 Charterers  have the option to~~ — 60
~~terminate this charter by giving notice in writing with effect from  the date on which such notice of termination is~~ — 61
~~received by Owners or from any later date stated in such notice.~~ This sub-Clause (iii) is without prejudice to any rights — 62
of Charterers or obligations of Owners under this charter or otherwise (including without limitation Charterers' rights — 63
under Clause 21 hereof). — 64

**Period Trading**

4. Owners agree to let and Charterers agree to hire the vessel for a period of 24 months with up to 30 days more or — 65

| | less in Charterers' option | |
|---|---|---|
| Limits | commencing from the time and date of delivery of the vessel, for the purpose of carrying (see Clause 88 – Cargo | 66 |
| | Clause) all lawful merchandise | |
| | (subject always to Clause 28) including in particular | 67 |
| | in any part of the world as Charterers shall direct within the ranges defined in Clause 87 – Trading Limits Clause, | 68 |
| | subject to the limits of the current British Institute Warranties Institute Warranties Limits and any subsequent | |
| | amendments thereof. Notwithstanding the foregoing, but subject to Clause 75, Charterers may order the vessel to ice- | 69 |
| | bound waters or to any part of the world outside such limits provided that Owners consent thereto (such consent not to | 70 |
| | be unreasonably withheld) and that Charterers pay for any insurance premium required by the vessel's underwriters | 71 |
| | as a consequence of such order. | 72 |

Charterers shall use due diligence to ensure that the vessel is only employed between and at safe places 73
(which expression when used in this charter shall include ports, berths, wharves, docks, anchorages, submarine lines, 74
alongside vessels or lighters, and other locations including locations at sea) where she can safely lie always afloat. 75
Notwithstanding anything contained in this or any other clause of this charter. Charterers do not warrant the safety of 76
any place to which they order the vessel and shall be under no liability in respect thereof except for loss or damage 77
caused by their failure to exercise due diligence as aforesaid. Subject as above, the vessel shall be loaded and 78
discharged at any places as Charterers may direct, provided that Charterers shall exercise due diligence to ensure that 79
any ship-to-ship transfer operations shall conform to standards not less than those set out in the latest published edition 80
of the ICS/OCIMF Ship-to-Ship Transfer Guide. 81
The vessel shall be delivered by Owners at a port in dropping last outgoing seapilot one safe port within East 82
Coast UK/Continent (Bordeaux-Hamburg) range or European Mediterranean range (from Gibraltar and not east of but
including Greece) or US Gulf/Caribbean/USAC range (not north of but including New York) or Fujairah-Singapore-
Japan range or Mombasa or Dar-Es-Salam or Red Sea with port in Owner's option.

At Owners' option and redelivered to Owners at a port in dropping last outgoing seapilot one safe port within East 83
Coast UK/Continent (Bordeaux-Hamburg) range or European Mediterranean range (from Gibraltar and not east of but
including Greece) or US Gulf/Caribbean/USAC range (not north of but including New York) or Fujairah-Singapore-
Japan range or Mombasa or Dar-Es-Salam or Red Sea with port
at Charterers' option. 84

| Laydays/ | 5. The vessel shall not be delivered to Charterers before 30 August 2007 and Charterers shall | 85 |
|---|---|---|
| Cancelling | have the option of cancelling this charter if the vessel is not ready and at their disposal on or before 15 October 2007. | 86 |

| Owners to | 6. Except as otherwise provided for in this Charter Party including its additional clauses Owners undertake to | 87 |
|---|---|---|
| Provide | provide and to pay for all provisions including lubricating oils, wages, and shipping and discharging fees and all other | 88 |
| | expenses of the master, officers and crew; also, except as provided in Clause 4 and 34 hereof, for all insurance on the | 89 |
| | vessel, for all deck, cabin and engine-room stores, and for water except for water purchased for Charterers' purposes; | 90 |
| | for all drydocking, overhaul, maintenance and repairs to the vessel ; and for all fumigation expenses and de-rat | 91 |
| | certificates. Owners'    obligations under this Clause 6 extend to all liabilities for customs or import duties arising at | 92 |
| | any time during the performance of this charter in relation to the personal effects of the master, officers and crew, and | 93 |
| | in relation to    the stores, provisions and other matters aforesaid which Owners are to provide and pay for and | 94 |
| | Owners shall    refund to Charterers any sums Charterers or their agents may have paid or been compelled to pay in | 95 |
| | respect of    any such liability. Any amounts allowable in general average for wages and provisions and stores shall | 96 |
| | be credited   to Charterers insofar as such amounts are in respect of a period when the vessel is on-hire. | |

| Charterers to | 7. Charterers shall provide and pay for all fuel (except fuel used for domestic services), towage and pilotage and | 97 |
|---|---|---|
| Provide | shall pay agency fees (see Clause 71), port charges, commissions, expenses of loading and unloading cargoes, canal | 98 |
| | dues and all charges other than those payable by Owners in accordance with Clause 6 hereof, provided that all charges, | 99 |
| | for the said items shall be for Owners' account when such items are consumed, employed or incurred for Owner's | 100 |
| | purposes or while the vessel is off-hire (unless such items reasonably relate to any service given or    distance made | 101 |
| | good and taken into account under Clause 21 or 22) ; and provided further that any fuel used in connection with a | 102 |
| | general average sacrifice or expenditure shall be paid for by Owners. | 103 |

| Rate of | 8. Subject as herein provided, Charterers shall pay for the use and hire of the vessel at the rate of US$ 19.500 per | 104 |
|---|---|---|
| Hire | day, and pro rata for any part of a day, Charterers to pay additional lump sum of US$2,000 per month pro rata for | 105 |
| | communication on Charterers' behalf from the time and date of her delivery (local    time) until the time and date of | 106 |
| | her redelivery (local time) to Owners. | |

| Payment of Hire | 9. Subject to Clause 3(iii), payment of hire shall be made in immediately available funds to : | 107 |
|---|---|---|

Hongkong Shanghai Banking Corp., USA
452 Fifth Avenue New York, NY 10018, USA
Swift: MRMDUS33, Chips: 108
ABA No. 021001088
In Favour of: Tatiana Maritime Inc.,
USD A/c No. 000135275
Ref: Pacific Turquoise / Navig8 TCP

| | Account | 108 |
|---|---|---|
| in | US Dollars    per calendar month in advance, less : | 109 |
| | (i) any hire paid which Charterers reasonably estimate to relate to off-hire periods, and | 110 |
| | (ii) any amounts disbursed on Owners' behalf, any advances and commission thereon, and    charges | 111 |
| | which are for Owners' account pursuant to any provision hereof, and | 112 |
| | (iii) any amounts due or reasonably estimated to become due to Charterers under Clause 3 (ii) or  24 | 113 |
| | hereof, | 114 |
| | any such adjustments to be made at the due date for the next monthly payment after the facts have been ascertained. | 115 |

Charterers shall not be responsible for any delay or error by Owners' bank in crediting Owners' account provided that Charterers have made proper and timely payment. 116 117

In default of such proper and timely payment. 118

(a) Owners shall notify Charterers of such default and Charterers shall within seven days of receipt of such notice pay to Owners the amount due including interest, failing which Owners may withdraw the vessel from the service of Charterers without prejudice to any other rights Owners may have under this charter or otherwise ; and 119 120 121

122

(b) Interest on any amount due but not paid on the due date shall accrue from the day after that date up to and including the day when payment is made, at a rate per annum which shall be 1 % above the U.S. Prime Interest Rate as published by the Chase Manhattan Bank in New York at 12.00 New York time on the due date, or, if no such interest rate is published on that day, the interest rate published on the next preceding day on which such a rate was so published, computed on the basis of a 360 day year of twelve 30-day months, compounded semi-annually. 123 124 125 126 127

128

| Space Available to Charterers | 10. The whole reach, burthen and decks of the vessel and any passenger accommodation (including Owners' suite) shall be at Charterers' disposal, reserving only proper and sufficient space for the vessel's master, officers, crew, tackle, apparel, furniture, provisions and stores, provided that the weight of stores on board shall not, unless specially agreed, exceed 500 metric tonnes excluding bunkers and fresh watertonnes, at any time during the charter period. | 129 130 131 132 |

| Overtime | 11. Overtime pay of the master, officers and crew in accordance with ship's articles shall be for Charterers' when incurred, as a result of complying with the request of Charterers or their agents, for loading, discharging, heating of cargo, bunkering or tank cleaning. | 133 134 135 |

| Instructions and Logs | 12. Charterers shall from time to time give the master all requisite instructions and sailing directions, and he shall keep a full and correct log of the voyage or voyages, which Charterers or their agents may inspect as required. The master shall when required furnish Charterers or their agents with a true copy of such log and with properly completed loading and discharging ports sheets and voyage reports for each voyage and other returns as Charterers may require. Charterers shall be entitled to take copies at Owners' expense of any such documents which are not provided by the master. | 136 137 138 139 140 141 |

| Bills of Lading | 13. (a) The master (although appointed by Owners) shall be under the orders and direction of Charterers as regards employment of the vessel, agency and other arrangements, and shall sign bills of lading as Charterers or their agents may direct (subject always to Clause 35(a) and 40) without prejudice to this charter. Charterers hereby indemnify Owners against all consequences or liabilities that may arise. | 142 143 144 145 |

(i) from signing bills of lading in accordance with the directions of Charterers or their agents, to the extent that the terms of such bills of lading fail to conform to the requirements of this charter, or (except as provided in Clause 13(b)) from the master otherwise complying with Charterers' or their agents' orders : 146 147 148

(ii) from any irregularities in papers supplied by Charterers or their agents. 149

(b) Notwithstanding the foregoing, Owners shall not be obliged to comply with any orders from Charterers to discharge all or part of the cargo. 150 151

(i) at any place other than that shown on the bill of lading and/or 152

(ii) without presentation of an original bill of lading 153

unless they have received from Charterers both written confirmation of such orders and an indemnity in a form acceptable to Owners. 154 155

| Conduct of Vessel's Personnel | 14. If Charterers complain of the conduct of the master or any of the officers or crew, Owner shall immediately investigate the complaint. If the Complaint proves to be well founded, Owners shall, without delay, make a change in the appointments and Owners shall in any event communicate the result of their investigations to Charterers as soon as possible. | 156 157 158 159 |

| Bunkers at Delivery and Redelivery | ~~15. Charterers shall accept and pay for all bunkers on board at time of delivery, and Owners shall on redelivery (whether it occurs at the end of the charter period or on the earlier termination of this charter) accept and pay for all bunkers remaining on board, at the then current market prices at the port of delivery or redelivery, as the case may be, or if such prices are not available payment shall be at the then current market prices at the nearest port at which such prices are available ; provided that if delivery or redelivery does not take place in a port payment shall be at the price paid at the vessel's last port of bunkering before delivery or redelivery, as the case may be. Owners shall give Charterers the use and benefit of any fuel contracts they may have in force from time to time, if so required by Charterers, provided suppliers agree.~~ | 160 161 162 163 164 165 166 167 |

(see Clause 89 – Bunkers Clause)

| Stevedores, Pilots, Tugs | . 16. Stevedores when required shall be employed and paid by Charterers, but this shall not relieve Owners from responsibility at all times for proper stowage, which must be controlled by the master who shall keep a strict account of all cargo loaded and discharged. Owners hereby indemnify Charterers, their servants and agents against all losses, claims, responsibilities and liabilities arising in any way whatsoever from the employment of pilots, tugboats or stevedores, who although employed by Charterers shall be deemed to be the servants of and in the service of Owners and under their instructions (even if such pilots, tugboat personnel or stevedores are in fact the servants of Charterers their agents or any affiliated company) ; provided, however, that | 168 169 170 171 172 173 174 |

(i) the foregoing indemnity shall not exceed the amount to which Owners would have been entitled to limit their liability if they had themselves employed such pilots, tugboats or stevedores, and 175 176

(ii) Charterers shall be liable for any damage to the vessel caused by or arising out of the use of stevedores, fair wear and tear excepted, to the extent that Owners are unable by the exercise of due diligence to obtain redress therefore from stevedores. 177 178 179

| Supernumeraries | 17. Charterers may send maximum two representatives at any time in the vessel's available accommodation upon any voyage made under this charter, Owners finding provisions and all requisites as supplied to officers, except liquors, Charterers paying at the rate of USD 20 per day for each representative while on board the vessel, subject to Clause 95 – Passenger Indemnity Clause. | 180 181 182 |

| Sub-letting | 18. Charterers may sub-let the vessel, but shall always remain responsible to Owners for due fulfilment of this | 183 |

charter. 184

**Final Voyage**  19. If when a payment of hire is due hereunder Charterers reasonably except to redeliver the vessel before the next 185
payment of hire would fall due, the hire to be paid shall be assessed on Charterers' reasonable estimate of the time 186
necessary to complete Charterers' programme up to redelivery, and from which estimate Charterers may deduct 187
amounts due or reasonably expected to become due for 188

(i) disbursements on Owners' behalf or charges for Owners' account pursuant to any provision hereof, ~~and~~ 189

For all Owners' expenses effected on behalf of the Vessel and at the request of the Master, Charterers will present the
proper claim(s) fully documented and Owners will pay immediately. Claim will not be deducted from hire.

(ii) bunkers on board at redelivery pursuant to Clause 15. 190
191

Promptly after redelivery any overpayment shall be refunded by Owners or any underpayment made good by 192
Charterers. 193

If at the time this charter would otherwise terminate in accordance with Clause 4 the vessel is on a 194
ballast voyage to a port of redelivery or is upon a laden voyage, Charterers shall continue to have the use of the vessel 195
at the same rate and conditions as stand herein for as long as necessary to complete such ballast voyage, or to complete 196
such laden voyage and return to a port of redelivery as provided by this charter, as the case may be. 197

**Loss of**  20. Should the vessel be lost, this charter shall terminate and hire shall cease at noon on the day of her loss; should 198
**Vessel**  the vessel be a constructive total loss, this charter shall terminate and hire shall cease at noon on the day on which the 199
vessel's underwriters agree that the vessel is a constructive total loss; should the vessel be missing, this charter shall 200
terminate and hire shall cease at noon on the day on which she was last heard of. Any hire paid in advance and not 201
earned shall be returned to Charterers and Owners shall reimburse Charterers for the value of the estimated quantity of 202
bunkers on board at the time of termination, at the price paid by Charterers at the last bunkering port. 203
204

**Off-hire**  21.  (a) On each and every occasion that there is loss of time (whether by way of interruption in the vessel's service 205
of, from reduction in the vessel's performance, or in any other manner). 206

(i) due to deficiency of personnel or stores ; repairs ; gas-freeing for repairs ; time in and waiting to enter 207
dry dock for repairs ; breakdown (whether partial or total) of machinery, boilers or other parts of the vessel or her 208
equipment (including without limitation tank coatings) ; overhaul, maintenance or survey; collision, stranding, 209
accident or damage to the vessel ; or any other similar cause preventing the efficient working of the vessel ; and such 210
loss continues for more than, three consecutive hours or if the accumulation of such losses under 3 hours totals in 211
excess of 36 hours per annum (if resulting from interruption in the vessel's service) or cumulates to more than three 212
hours (if resulting from partial loss of service) ; or 213

(ii) due to industrial action, refusal to sail, breach of orders or neglect of duty on the part of the 213
master, officers or crew ; or 214

(iii) for the purpose of obtaining medical advice or treatment for or landing any sick or injured 215
person (other than a Charterers' representative carried under Clause 17 hereof) or for the purpose of landing the body 216
of any person (other than a Charterers' representative), and such loss continues for more than three consecutive hours : 217
or 218

(iv) due to any delay in quarantine arising from the master, officers or crew having had communication 219
with the shore at any infected area without the written consent or instructions of Charterers or their agents, or to any 220
detention by customs or other authorities caused by smuggling or other infraction of local law on the part of the 221
master, officers, or crew ; or 222

(v) due to detention of the vessel by authorities at home or abroad attributable to legal action 223
against or breach of regulations by the vessel, the vessel's owners, or Owners (unless brought about by the act or 224
neglect of Charterers) ; then 225

without prejudice to Charterers' rights under Clause 3 or to any other rights of Charterers hereunder or 226
otherwise the vessel shall be off-hire from the commencement of such loss of time until she is again ready and in an 227
efficient state to resume her service from a position not less favourable to Charterers than that at which such loss of 228
time commenced ; provided, however, that any service given or distance made good by the vessel whilst off-hire 229
shall be taken into account in assessing the amount to be deducted from hire. 230

(b) If the vessel fails to proceed at any guaranteed speed pursuant to Clause 24, and such failure arises wholly or 231
partly from any of the causes set out in Clause 21(a) above, then the period for which the vessel shall be off-hire under 232
this Clause 21 shall be the difference between 233

(i) the time the vessel would have required to perform the relevant service at such guaranteed 234
speed, and 235

(ii) the time actually taken to perform such service (including any loss of time arising from 236
interruption in the performance of such service). 237

For the avoidance of doubt, all time included under (ii) above shall be excluded from any 238
computation under Clause 24. 239

(c) Further and without prejudice to the foregoing, in the event of the vessel deviating (which expression includes 240
without limitation putting back, or putting into any port other than that to which she is bound under the instructions of 241
Charterers) for any cause or purpose mentioned in Clause 21(a), the vessel shall be off-hire from the commencement of 242
such deviation until the time when she is again ready and in an efficient state to resume her service from a position 243
not less favourable to Charterers than that at which the deviation commenced, provided, however, that any service 244
given or distance made good by the vessel whilst off-hire shall be taken into account in assessing the amount to be 245
deducted from hire. If the vessel, for any cause or purpose mentioned in Clause 21(a), puts into any port other than 246
the port to which she is bound on the instructions of Charterers, the port charges, pilotage and other expenses at such 247
port shall be borne by Owners. Should the vessel be driven into any port or anchorage by stress of weather hire shall 248
continue to be due and payable during any time lost thereby. 249

(d) If the vessel's flag state becomes engaged in hostilities, and Charterers in consequence of such hostilities find it 250
commercially impracticable to employ the vessel and have given Owners written notice thereof then from the date of 251
receipt by Owners of such notice until the termination of such commercial impracticability the vessel shall be off-hire 252
and Owners shall have the right to employ the vessel on their own account, for the purpose of avoiding such off-hire, 253
Owners shall have the option to transfer the Vessel to another flag. New flag shall always be subject to Clause 45 – 254
Ownership Flag Clause. 255

(e) Time during which the vessel is off-hire under this charter shall count as part of the charter period. 256

Periodical Drydocking

22. (a) Owners have the right and obligation to drydock the vessel at regular intervals as required by technical management and/or class. of However, Owners shall endeavour to drydock vessel with maximum 30-months intervals. On each occasion Owners shall propose to Charterers a date on which they wish to drydock the vessel, not less than 45 days before such date, and Charterers shall offer a port for such periodical drydocking within the trading limits (see Clause 87 – Trading Limits Clause) and shall take all reasonable steps to make the vessel available as near to such date as practicable.

Owners shall put the vessel in drydock at their expense as soon as practicable after Charterers place the vessel at Owners' disposal clear of cargo other than tank washings and residues. Owners shall be responsible for and pay for the disposal into reception facilities of such tank washings and residues and shall have the right to retain any monies received therefore, without prejudice to any claim for loss of cargo under any bill of lading or this charter.

(b) If a periodical drydocking is carried out in the port offered by Charterers (which must have suitable accommodation for the purpose and reception facilities for tank washings and residues), the vessel shall be off-hire from the time she arrives at such port until drydocking is completed and she is in every way ready to resume Charterers' service and is at the position at which she went off-hire or a position no less favourable to Charterers, whichever she first attains. However,

(i) provided that Owners exercise due diligence in gas-freeing, any time lost in gas-freeing to the standard required for entry into drydock for cleaning and painting the hull shall not count as off-hire, whether lost on passage to the drydocking port or after arrival there (notwithstanding Clause 21), and

(ii) any additional time lost in further gas-freeing to meet the standard required for hot work or entry to cargo tanks shall count as off-hire, whether lost on passage to the drydocking port or after arrival there.

Any time which, but for sub-Clause (i) above, would be off-hire, shall not be included in any calculation under Clause 24.

The expenses of gas-freeing, including without limitation the cost of bunkers, shall be for Owners' account.

(c) If Owners require the vessel, instead of proceeding to the offered port, to carry out periodical drydocking at a special port selected by them, the vessel shall be off-hire from the time when she is released to proceed to the special port until she next presents for loading in accordance with Charterers' instructions, provided, however, that Charterers shall credit Owners with the time which would have been taken on passage at the service speed had the vessel not proceeded to drydock. All fuel consumed shall be paid for by Owners but Charterers shall credit Owners with the value of the fuel which would have been used on such notional passage calculated at the guaranteed daily consumption for the service speed. , and shall further credit Owners with any benefit they may gain in purchasing bunkers at the special port.

(d) Charterers shall, insofar as cleaning for periodical drydocking may have reduced the amount of tank cleaning necessary to meet Charterers' requirements, credit Owners with the value of any bunkers which Charterers calculate to have been saved thereby, whether the vessel drydocks at an offered or a special port.

Ship Inspection

23. Charterers shall have the right at any time during the charter period to make such inspection of the vessel as they may consider necessary. This right may be exercised as often and at such intervals as Charterers in their absolute discretion may determine and whether the vessel is in port or on passage. Owners affording all necessary co-operation and accommodation on board provided, however,

(i) that neither the exercise nor the non-exercise, nor anything done or not done in the exercise or non-exercise, by Charterers of such right shall in any way reduce the master's or Owner's authority over, or responsibility to Charterers or third parties for, the vessel and every aspect of her operation, nor increase Charterers' responsibilities to Owners or third parties for the same ; and

(ii) that Charterers shall not be liable for any act, neglect or default by themselves, their servants or agents in the exercise or non-exercise of the aforesaid right.

Detailed Description and Performance

24. (a) Owners guarantee that the speed and consumption of the vessel at sea shall be as follows :

| Average speed in knots | | Maximum average bunker consumption | | |
|---|---|---|---|---|
| | | main propulsion   -   auxiliaries | | |
| | | fuel oil/diesel oil | fuel oil/ marine diesel oil | |
| | | metric tonnes per day | metric tonnes per day | |
| Laden     14.0 knots | on | 35.0 | +     2.5 | |
| Ballast     14.5 knots | on | 35.0 | +     2.5 | |

Owners give indicative non-warranted in-port consumptions as follows:

| | |
|---|---|
| Maneuvering: | 1 mt/hr IFO + 0.2 mt/hr MDO |
| Idle (standby condition): | 3.0 mt/day IFO + 2.5 mt/day MDO |
| Loading | 3.0 mt/day IFO + 3.0 mt/day MDO |
| Discharging | 10 mt/per pump/day IFO + 3.3 mt/day MDO |
| Inerting all tanks | 11 mt/day MDO |
| Ballasting/Deballasting | 4 mt/day MDO |
| Tank cleaning | 11 mt IFO  + 3.0 mt/day MDO (+5 mt IFO if heat) |

* 3.5 MT MDO per month to be allowed for miscellaneous purposes

The foregoing bunker consumptions are for propulsion only except cargo heating, re-inerting, ballasting and deballasting, cargo operation and tank cleaning and shall be pro-rated between the speeds shown.

The service speed of the vessel is      … knots laden and      … knots in ballast and in the absence of Charterers' orders to the contrary the vessel shall proceed at the service speed. However if more than one laden and one ballast speed are shown in the table above Charterers shall have the right to order the vessel to steam at any speed within the range set out in the table (the "ordered speed").

257
258
259
260
261
262
263
264
265
266
267
268
269
270
271
272
273
274
275
276
277
278
279
280
281
282
283
284
285
286
287
288
289
290
291

292
293
294
295
296
297
298
299
300
301

302

303
304

306

307

308
309
310
311
312
313

~~If the vessel is ordered to proceed at any speed other than the highest speed shown in the table, and the average~~ 314
~~speed actually attained by the vessel during the currency of such order exceeds such ordered speed plus 0.5 knots (the~~ 315
~~"maximum recognised speed"), then for the purpose of calculating any increase or   decrease of hire under this Clause~~ 316
~~24 the maximum recognised speed shall be used in place of the average speed actually attained.~~ 317
~~For the purposes of this charter the "guaranteed speed" at any time shall be the then current   ordered speed~~ 318
~~or the service speed, as the case may be.~~ 319

The average speeds and bunker consumptions shall for the purposes of this Clause 24 be calculated by 320
reference to the observed distance from pilot station to pilot station on all sea passages during each period stipulated in 321
Clause 24 (c), but excluding any time during which the vessel is (or but for Clause 22(b) would be) off-hire and also 322
excluding "Adverse Weather Periods", being (i) any periods during which reduction  of speed is necessary for safety in 323
congested waters or in poor visibility (ii) any days, noon to noon, when winds exceed force <u>8</u> ~~5~~ on the Beaufort Scale 324
for more than <u>6</u> ~~12~~ hours<u>.</u> 325
326

(b) If during any year from the date on which the vessel enters service (anniversary to anniversary) the vessel falls 327
below or exceeds the performance guaranteed in Clause 24(a) <u>by 5 percent</u> then if such shortfall or excess    results. 328
329

(i) from a reduction or an increase in the average speed of the vessel, compared to the speed  guaranteed in 330
Clause 24(a), then an amount equal to the value at the hire rate of the time so lost or gained, as the   case may be, shall 331
be deducted from or added to the hire paid; 332
(ii) from an increase or a decrease in the total bunkers consumed, compared to the total bunkers which 333
would have been consumed had the vessel performed as guaranteed in Clause 24(a), an amount equivalent to the value 334
of the additional bunkers consumed or the bunkers saved, as the case may be, based on the average price paid by 335
Charterers for the vessel's bunkers in such period, shall be deducted from or added to the hire paid. 336
The addition to or deduction from hire so calculated for laden and ballast mileage respectively  shall be 337
adjusted to take into account the mileage steamed in each such condition during Adverse Weather Periods, by dividing 338
such addition or deduction by the number of miles over which the performance has been calculated and multiplying by 339
the same number of miles plus the miles steamed during the Adverse Weather  Periods, in order to establish the total 340
addition to or deduction from hire to be made for such period. 341
Reduction of hire under the foregoing sub-Clause (b) shall be without prejudice to any other remedy 342
available to Charterers. 343
(c) Calculations under this Clause 24 shall be made for the yearly periods terminating on each successive 344
anniversary of the date on which the vessel enters service, and for the period between the last such anniversary and the 345
date of termination of this charter if less than a year. Claims in respect of reduction of hire arising under this Clause 346
during the final year or part year of the charter period shall in the first instance be settled in accordance with 347
Charterers' estimate made two months before the end of the charter period. Any necessary adjustment after this charter 348
terminates shall be made by payment by Owners to Charterers or by Charterers to  Owners as the case may require. 349
350

Payments in respect of increase of hire arising under this Clause shall be made promptly after receipt by Charterers 351
of all the information necessary to calculate such increase<u>. Both parties may claim against the other for over-</u> 352
<u>performance respectively under-performance, but the right to claim only occurs if and to the extent the cumulative</u>
<u>positive or negative variance from the warranted figures be it the aggregated speed and consumption performance</u>
<u>exceeds 5%. Same to be calculated on a 12-months basis. See Clause 94 – Minimum Speed (Slow Speed – Speed Up</u>
<u>Clause).</u>

**Salvage**    25. Subject to the provisions of Clause 21 hereof, all loss of time and all expenses (excluding any damage to or loss 353
of the vessel or tortious liabilities to third parties) incurred in saving or attempting to save life or in  successful or 354
unsuccessful attempts at salvage shall be borne equally by Owners and Charterers provided that Charterers shall not be 355
liable to contribute towards any salvage payable by Owners arising in any way out of  services rendered under this 356
Clause 25. 357
All salvage and all proceeds from derelicts shall be divided equally between Owners and Charterers after 358
deducting the master's, officers' and crew's share. 359

**Lien**    26. Owners shall have a lien upon all cargoes and all freights, sub-freights and demurrage for any amounts due 360
under this charter; and Charterers shall have a lien on the vessel for all monies paid in advance and not earned, and for 361
all claims for damages arising from any breach by Owners of this charter. 362

**Exceptions**    27. (a) The vessel, her master and Owners shall not, unless otherwise in this charter expressly provided,  be liable for 363
any loss or damage or delay or failure arising or resulting from any act, neglect or default of the master, pilots, 364
mariners or other servants of Owners in the navigation or management of the vessel ; fire, unless caused by the actual 365
fault or privity of Owners ; collision or stranding ; dangers and accidents of the sea ; explosion, bursting of boilers, 366
breakage of shafts or any latent defect in hull, equipment or machinery ; provided, however, that Clauses 1, 2, 3 and 24 367
hereof shall be unaffected by the foregoing. Further, neither the vessel, her master or Owners, nor Charterers shall, 368
unless otherwise in this charter expressly provided, be liable for any loss or damage or delay or failure in performance 369
hereunder arising or resulting from act of God, act of war, seizure under legal process, quarantine restrictions, strikes, 370
lock-outs, riots, restraints of labour, civil commotions or arrest or restraint of princes, rulers or people. 371
372

(b) The vessel shall have liberty to sail with or without pilots, to tow or go to the assistance of vessels in distress 373
and to deviate for the purpose of saving life or property. 374
(c) Clause 27(a) shall not apply to or affect any liability of Owners or the vessel or any other relevant person in 375
respect of 376
(i) loss or damage caused to any berth, jetty, docks, dolphin, buoy, mooring line, pipe or crane  or other 377
works or equipment whatsoever at or near any place to which the vessel may proceed under this charter, whether or not 378
such works or equipment belong to Charterers, or 379
(ii) any claim (whether  brought by Charterers or any other person) arising out of any loss of or  damage to 380
or in connection with cargo. Any ~~All~~ such claims shall be subject to the Hague Rules or the Hague-Visby Rules <u>or the</u> 381
<u>Hamburg rules</u>, as the case may be, which ought pursuant to Clause 38 hereof to have been incorporated in the relevant 382
bill of lading (whether or not such Rules were so incorporated) or, if no such bill of lading is issued, to the Hague- 383
Visby Rules <u>unless the Hamburg rules compulsorily apply in which case to the Hamburg rules.</u> 384

(d) In particular and without limitation, the foregoing subsections (a) and (b) of this Clause shall not apply to or in 385
any way affect any provision in this charter relating to off-hire or to reduction of hire. 386

**Injurious Cargoes**  28. No acids, explosives or cargoes injurious to the vessel shall be shipped and without prejudice to the foregoing 387
any damage to the vessel caused by the shipment of any such cargo, and the time taken to repair such damage, shall be 388
for Charterers' account. No voyage shall be undertaken, nor any goods or cargoes loaded, that would expose the vessel 389
to capture or seizure by rulers or governments. 390

**Grade of Bunkers**  29. Charterers shall supply ~~marine diesel oil/fuel oil with a maximum viscosity of 380 Centistokes RMG 35 as per~~ 391
~~ISO 8217/96 at 50 degrees Centigrade/ACGFO for main propulsion and DMX or DMA diesel oil/ACGFO for the~~ 392
~~auxiliaries. If Owners require the vessel to be supplied with more expensive bunkers they shall be liable for the extra~~ 393
~~cost thereof. In case of emergency, vessel shall have the possibility to burn marine diesel oil DMA as per ISO 8217/96.~~ 394
~~Provided situation permits, vessel not to burn DMA without Charterers' prior agreement. In any case, situation and~~ 395
~~consumptions to be duly documented and explained.~~ 396
Fuel Oil
- RMG380 as per ISO 8217 (2005). Viscosity minimum 300cst, Sulphur between 1.5 - 4.5%
Diesel Oil
- DMC as per ISO 8217 (2005)
Gas Oil
Marine Gas O il to be supplied as per ISO 8217 2005 DMA Grade.
~~Charterers warrant that all bunkers provided by them in accordance herewith shall be of a quality complying~~
~~with the International Marine Bunker Supply Terms and Conditions of Shell International Trading Company and with~~
~~its specification for marine fuels as amended from time to time.~~

**Disbursements**  ~~30. Should the master require advances for ordinary disbursements at any port, Charterers or their agents shall make~~ 397
~~such advances to him, in consideration of which Owners shall pay a commission of two and a half per cent, and all~~ 398
~~such advances and commission shall be deducted from hire.~~ 399

**Laying-up**  31. Charterers shall have the option, after consultation with Owners, of requiring Owners to lay up the vessel always 400
afloat at a safe place nominated by Charterers, in which case the hire provided for under this charter shall be adjusted 401
to reflect any net increases in expenditure reasonably incurred or any net saving which should reasonably be made 402
by Owners as a result of such lay-up. Charterers may exercise the said option any number of times during the charter 403
period. 404

**Requisition**  32. Should the vessel be requisitioned by any government, de facto or de jure, during the period of this charter, the 405
vessel shall be off-hire during the period of such requisition, and any hire paid by such government in respect of such 406
requisition period shall be for Owners' account. Any such requisition period shall count as part of the charter period. 407
408

**Outbreak of War**  33. If war or hostilities break out between any two or more of the following countries: <u>Singapore and USA</u> ~~UK,~~ 409
~~Netherlands~~ both Owners and Charterers shall have the right to cancel this charter. <u>Should the Vessel's flag state be at</u> 410
<u>war with any of the countries above, Owners should change the flag of the Vessel as per the flag clause – see Clause 45.</u>

**Additional War Expenses**  34. If the vessel is ordered to trade in areas where there is war (de facto or de jure) or threat of war, Charterers shall 411
reimburse Owners for any additional insurance premia <u>for hull and machinery,</u> crew bonuses and other expenses which 412
are reasonably incurred by Owners as a consequence of such orders, provided that Charterers are given notice of such 413
expenses as soon as practicable and in any event before such expenses are incurred, and provided further that Owners 414
obtain from their insurers a waiver of any subrogated rights against Charterers in respect of any claims by Owners 415
under their war risk insurance arising out of compliance with such orders. 416

**War Risks**  35. (a) The master shall not be required or bound to sign bills of lading for any place which in his or Owners' 417
reasonable opinion is dangerous or impossible for the vessel to enter or reach owing to any blockade, war, hostilities, 418
warlike operations, civil war, civil commotions or revolutions. 419
(b) If in the reasonable opinion of the master or Owners it becomes, for any of the reasons set out in 420
Clause 35(a) or by the operation of international law, dangerous, impossible or prohibited for the vessel to reach or 421
enter, or to load or discharge cargo at, any place to which the vessel has been ordered pursuant to this charter (a "place 422
of peril"), then Charterers or their agents shall be immediately notified by telex or radio messages, and Charterers shall 423
thereupon have the right to order the cargo, or such part of it as may be affected, to be loaded or discharged, as the case 424
may be, at any other place within the trading limits of this charter (provided such other place is not itself a place of 425
peril). If any place of discharge is or becomes a place of peril, and no orders have been received from Charterers or 426
their agents within 48 hours after dispatch of such messages, then Owners shall be at liberty to discharge the cargo or 427
such part of it as may be affected at any place which they or the master may in their or his discretion select within the 428
trading limits of this charter and such discharge shall be deemed to be due fulfilment of Owners' obligations under this 429
charter so far as cargo so discharged is concerned. 430
(c) The vessel shall have liberty to comply with any directions or recommendations as to departure, arrival, 431
routes, ports of call, stoppages, destinations, zones, waters, delivery or in any other wise whatsoever given by the 432
government of the state under whose flag the vessel sails or any other government or local authority or by any person 433
or body acting or purporting to act as or with the authority of any such government or local authority including any de 434
facto government or local authority or by any person or body acting or purporting to act as or with the authority of any 435
such government or local authority or by any committee or person having under the terms of the war risks insurance 436
on the vessel the right to give any such directions or recommendations. If by reason of or in compliance with any such 437
directions or recommendations anything is done or is not done, such shall not be deemed a deviation. 438
If by reason of or in compliance with any such direction or recommendation the vessel does not proceed to any 439
place of discharge to which she has been ordered pursuant to this charter, the vessel may proceed to any place which 440
the master or Owners in his or their discretion select and there discharge the cargo or such part of it as may be affected. 441
Such discharge shall be deemed to be due fulfilment of Owners' obligations under this charter so far as cargo so 442
discharged is concerned. 443
Charterers shall <u>use best efforts to ensure</u> ~~procure~~ that all bills of lading issued under this charter shall contain 444
the Chamber of Shipping War Risks Clause 1952. 445
446

**Both to Blame**  36. If the liability for any collision in which the vessel is involved while performing this charter falls to be 447

| Collision Clause | determined in accordance with the laws of the United States of America, the following provision shall apply : | 448 |

Collision Clause

determined in accordance with the laws of the United States of America, the following provision shall apply :

"If the ship comes into collision with another ships as a result of the negligence of the other ship and any act, neglect or default of the master, mariner, pilot or the servants of the carrier in the navigation or in the management of the ship, the owners of the cargo carried hereunder will indemnify the carrier against all loss, or liability to the other or non-carrying ship or her owners in so far as such loss or liability represents loss of, or damage to, or any claim whatsoever of the owners of the said cargo, paid or payable by the other or non-carrying ship or her owners to the owners of the said cargo and set off, recouped or recovered by the other or non-carrying ship or her owners as part of their claim against the carrying ship or carrier".

"The foregoing provisions shall also apply where the owners, operators or those in charge of any ship or ships or objects other than, or in addition to, the colliding ships or objects are at fault in respect of a collision or contact."

Charterers shall procure that all bills of lading issued under this charter shall contain a provision in the foregoing terms to be applicable where the liability for any collision in which the vessel is involved falls to be determined in accordance with the laws of the United States of America.

(lines 448–461)

New Jason Clause

37. General average contributions shall be payable according to the York/Antwerp Rules, 1974, as amended 1994, and shall be adjusted in London in accordance with English law and practice but should adjustment be made in accordance with the law and practice of the United States of America, the following provision shall apply :

"In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible by statute, contract or otherwise, the cargo, shippers, consignees or owners of the cargo shall contribute with the carrier in general average to the payment of any sacrifices, losses or expenses of a general average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the cargo."

If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully as if the said salving ship or ships belonged to strangers. Such deposit as the carrier or his agents may deem sufficient to cover the estimated contribution of the cargo and any salvage and special charges thereon shall, if required, be made by the cargo, shippers, consignees or owners of the cargo to the carrier before delivery."

Charterers shall procure that all bills of lading issued under this charter shall contain a provision in the foregoing terms, to be applicable where adjustment of general average is made in accordance with the laws and practice of the United States of America.

(lines 462–477)

Clause Paramount

38. Charterers shall procure that all bills of lading issued pursuant to this charter shall contain the following clause :

"(1) Subject to sub-clause (2) or (3) hereof, this bill of lading shall be governed by, and have effect subject to, the rules contained in the International Convention for the Unification of Certain Rules relating to Bills of Lading signed at Brussels on 25th August 1924 (hereafter the "Hagues Rules") as amended by the Protocol signed at Brussels on 23rd February 1968 (hereafter the "Hague-Visby Rules"). Nothing contained herein shall be deemed to be either a surrender by the carrier of any of his rights or immunities or any increase of any of his responsibilities or liabilities under the Hague-Visby Rules."

"(2) If there is governing legislation which applies the Hague-Rules Compulsorily to this bill of lading, to the exclusion of the Hague-Visby Rules, then this bill of lading shall have effect subject to the Hague-Rules. Nothing herein contained shall be deemed to be either a surrender by the carrier of any of his rights or immunities or an increase of any of his responsibilities or liabilities under the Hague-Rules.

"3) If there is governing legislation which applies the Hamburg Rules compulsorily to this Bill of Lading, to the exclusion of the Hague Visby rules, then this Bill-of-Lading shall have effect to the Hamburg rules. Nothing herein contained shall be either a surrender of any of his rights or immunities or an increase of any of his responsibilities or liabilities under the Hamburg rules.

"(3) (4) If any term of this bill of lading is repugnant to the Hague-Visby Rules, or Hague Rules or Hamburg rules if applicable, such term shall be void to that extent but not further."

"(4) (5) Nothing in this bill of lading shall be construed as in any way restricting, excluding or waiving the right of any relevant party or person to limit his liability under any available legislation and/or law".

(see Clause 52 – Paramount Clause)

(lines 478–493)

TOVALOP

39. Owners warrant that the vessel is :
(i) a tanker in ITOPF and
(ii) properly entered in North of England                                    P & I Club

and will so remain during the currency of this charter.

When an escape or discharge of Oil occurs from the vessel and causes or threatens to cause Pollution Damage, or when there is the threat of an escape or discharge of Oil (i.e. a grave and imminent danger of the escape or discharge of Oil which, if it occurred, would create a serious danger of Pollution Damage, whether or not an escape or discharge in fact subsequently occurs), then Charterers may, at their option, upon notice to Owners or master, undertake such measures as are reasonably necessary to prevent or minimise such Pollution Damage or to remove the Threat, unless Owners promptly undertake the same. Charterers shall keep Owners advised of the nature and result of any such measures taken by them and, if time permits, the nature of the measures intended to be taken by them. Any of the aforementioned measures taken by Charterers shall be deemed taken on Owners' authority as Owners' agent, and shall be at Owners' expense except to the extent that :

(1) any such escape or discharge or Threat was caused or contributed to by Charterers, or

(2) by reason of the exceptions set out in Article III, paragraph 2, of the 1969 International Convention on Civil Liability for Oil Pollution Damage, Owners are or, had the said Convention applied to such escape or discharge or to the Threat, would have been exempt from liability for the same, or

(3) the cost of such measures together with all other liabilities, costs and expenses of Owners arising out of or in connection with such escape or discharge or Threat exceeds one hundred and sixty United States Dollars (US $160) per don of the vessel's Tonnage or sixteen million eight hundred thousand United States Dollars (US $16,800,000), whichever is the lesser, save and insofar as Owners shall be entitled to recover such excess under either the 1971 International Convention on the Establishment of an International Fund for Compensation for Oil Pollution Damage or under CRISTAL ;

PROVIDED ALWAYS that if Owners in their absolute discretion consider said measures should be

(lines 494–517)

discontinued, Owners shall so notify Charterers and thereafter Charterers shall have no right to continue said 518
measures under the provisions of this Clause 39 and all further liability to Charterers under this Clause 39 shall 519
thereupon cease. 520
    The above provisions are not in derogation of such other rights as Charterers or Owners may have under this charter 521
or may otherwise have or acquire by law or any International Convention or TOVALOP. 522
    The term "TOVALOP" means the Tanker Owners' Voluntary Agreement Concerning Liability for Oil Pollution 523
dated 7th January 1969, as amended from time to time, and the term "CRISTAL" means the Contract Regarding an 524
Interim Supplement to Tanker Liability for Oil Pollution dated 14th January 1971, as amended from time to time. The 525
terms "Oil", "Pollution Damage", and "Tonnage" shall for the purposes of this Clause 39 have the meanings ascribed 526
to them in TOVALOP. (see additional clause 49 and 55) 527

**Export Restrictions**

40. The master shall not be required or bound to sign bills of lading for the carriage of cargo to any place to which 528
export of such cargo is prohibited under the laws, rules or regulations of the country in which the cargo was produced 529
and/or shipped. 530
    Charterers shall procure that all bills of lading issued under this charter shall contain the following clause : 531
532
    "If any laws rules or regulation applied by the government of the country in which the cargo was produced 533
and/or shipped, or any relevant agency thereof, impose a prohibition on export of the cargo to the place 534
of discharge designated in or ordered under this bill of lading, carriers shall be entitled to require cargo 535
owners forthwith to nominate an alternative discharge place for the discharge of the cargo, or such part 536
of it as may be affected, which alternative place shall not be subject to the prohibition, and carriers shall 537
be entitled to accept orders from cargo owners to proceed to and discharge at such alternative place. If 538
cargo owners fail to nominate an alternative place within 72 hours after they or their agents have 539
received from carriers notice of such prohibition, carriers shall be at liberty to discharge the cargo or 540
such part of it as may be affected by the prohibition at any safe place on which they or the master may in 541
their or his absolute discretion decide and which is not subject to the prohibition, and such discharge constitute 542
due performance of the contract contained in this bill of lading so far as the cargo so discharged 543
is concerned". 544
    The foregoing provision shall apply mutatis mutandis to this charter, the references to a bill of lading being 545
deemed to be references to this charter. 546

**Law and Litigation**

41. (a) This charter shall be construed and the relations between the parties determined in accordance 547
with the laws of England. 548
    (b) Any dispute arising under this charter shall be decided by the English High Courts in London to whose 549
jurisdiction the parties hereby agree. 550
    (c) Notwithstanding the foregoing, but without prejudice to any party's right to arrest or maintain the 551
arrest of any maritime property, either party may, by giving written notice of election to the other party, elect to 552
have any such dispute referred to the arbitration of a single arbitrator in London in accordance with the provisions of 553
the Arbitration Act 1950, or any statutory modification or re-enactment thereof for the time being in force. 554
555
    (i) A party shall lose its right to make such an election only if : 556
      (a) it receives from the other party a written notice of dispute which - 557
        (1) states expressly that a dispute has arisen out of this charter ; 558
        (2) specifies the nature of the dispute ; and 559
        (3) refers expressly to this clause 41(c) 560
      and 561
      (b) it fails to give notice of election to have the dispute referred to arbitration not later than 562
        30 days from the date of receipt of such notice of dispute. 563
    (ii) The parties hereby agree that either party may - 564
      (a) appeal to the High Court on any question of law arising out of an award ; 565
      (b) apply to the High Court for an order that the arbitrator state the reasons for his award ; 566
      (c) give notice to the arbitrator that a reasoned award is required ; and 567
      (d) apply to the High Court to determine any question of law arising in the course of the 568
        reference 568
    (d) It shall be a condition precedent to the right of any party to a stay of any legal proceedings in which 570
maritime property has been, or may be, arrested in connection with a dispute under this charter, that that party 571
furnishes to the other party security to which that other party would have been entitled in such legal proceedings in the 572
absence of a stay. For smaller disputes upto US$ 50 000 the small claim procedure laid down by the London Maritime 573
Arbitrations' Association and any subsequent amendment thereto shall apply. 573

<u>See Clause 47 – LMAA Arbitration Clause</u>

**Construction**

42. The side headings have been included in this charter for convenience of reference and shall in no way affect 574
the construction hereof. 575

<u>Additional clauses 43 to 99 and also the OCIMF Questionnaire, as herewith attached are
deemed to be incorporated in the Charter Party and to form an integral part of this Charter Party.</u>

*THE OWNERS*

*THE CHARTERERS*

ATTORNEY-IN-FACT

Peder J Moller
Director

ORIGINAL

---

**Additional Clauses 43 - 99 to M.T. Hightide to be re-named Pacific Tourmaline/Navig8 Time Charter Party dated 29 May 2007**

---

**43. Private and Confidential Clause**

**44. Unique Bills of Lading Clause**

**45. Ownership - Flag Clause**

**46. Taxes Clause**

**47. LMAA Arbitration Clause**

**48. Third-Party Arrest Clause**

**49. Civil Liability Convention Clause**

**50. Detention Clause**

**51. Excess Berth Occupancy Clause**

**52. Clause Paramount**

**53. Drugs and Alcohol Policy Clause**

**54. Oil Major Approval's Clause**

**55. International Transport Workers Federation Clause**

**56. United States Coast Guard Clause**

**57. I.S.M. Clause**

**58. United States Oil Pollution Act of 1990 (OPA90) Clause**

**59. Protocols and Certificates Clause**

**60. Boycott Clause**

**61. Arab Boycott / League Clause**

**62. Eligibility Clause**

**63. Traffic Separation Clause**

**64. UK Water Traffic Routeing Clause**

**65. Oil Pollution Clause**

**66. Blocking and Trapping Clause**

**67. Delivery and Redelivery Survey Clause**

**68. Inert Gas System Clause**

**69. Cast Iron Clause**

**70. Vaccination Clause**

**71. Agents Clause**

**72. Loading Rate / Pumping Capacity Clause**

**73. Hoses Clause**

**74. De-ballast Clause**

**75. Cargo Retention Clause**

**76. Ship-to-Ship Transfer Clause**

**77. Cleaning Clause**

**78. Watchmen Clause**

**79. Re-measurement Clause**

**80. Blending Clause**

**81. Operational Compliance Clause**

**82. In Transit Loss Clause**

**83. Sea Terminal Clause**

**84. Smuggling Clause**

**85. Notice Of Readiness Clause**

**86. Pumping Logs Clause**

**87. Trading Limits Clause**

**88. Cargo Clause**

**89. Bunkers Clause:**

**90. War Risk Clause**

**91. Letter of Indemnity Clause**

**92.ITOPF Clause**

**93.Minimum Speed (slow speed - speed up) Clause**

**94.Passenger Indemnity Clause**

**95.Delivery and Redelivery notices Clause**

**96. Commission Clause**

**97. BIMCO ISPS Clause**

**98. U.S. Customs Advance Notification / AMS Clause**

**99. Bottom Cleaning Clause**

**Highseas to be re-named Pacific Turquoise / Navig8 Pte. Ltd.**

**Charter Party dated May 29th 2007**

**Additional Clauses 43 – 99 both inclusive**

## 43. Private and Confidential Clause
Both parties hereof shall keep this fixture and any details private and confidential.

## 44. Unique Bills of Lading Clause
Owners warrant that they are registered for the use of Unique Bills of Lading Identifiers and will apply a suitable code to all Bills of Lading issued for trading into the United States of America.

## 45. Ownership - Flag Clause
Owners have the option to change Vessel's flag to Panama or Singapore at any time during the term of this Charter without first obtaining Charterers consent, but Owner will inform Charterers of their intention to change the flag at least 45 days in advance. If Owners wish to change Vessel's flag to another registry than Panama and Singapore, then Charterers written consent shall first be obtained, which shall, however, not be unreasonably withheld.

## 46. Taxes Clause
All taxes, withholding taxes and/or dues and/or charges on the Vessel and/or cargo and/or stores and/or bunkers and on freight and/or charter hire (except income tax of charter hire payable by original Owners in country of residency of registration) and and/or crew wages and/or tax or voyage related expenses arising out of cargoes carried under this Charter Party, including cost/duty etc. payable for coastal conversion shall be for Charterer's account and be settled by them directly.

## 47. LMAA Arbitration Clause
This contract shall be governed by and construed in accordance with English law.

Any dispute arising out of or in connection with this contract shall be referred to Arbitration in London under the latest version of the London Maritime Arbitrators' Association ("LMAA") Terms (or, if the amount in dispute does not exceed US$ 50,000, the LMAA Small Claims Procedure) then in force, before a sole Arbitrator who shall be an LMAA full member appointed either

(a)     By agreement between the parties, or

(b)     Failing agreement within 30 days after one party serves on the other notice referring the matter to arbitration and proposing one or more candidates for arbitrator, appointed on the application of either party by the President for the time being of the London Maritime Arbitrators' Association.

1

The language of the arbitration shall be English. The arbitration award shall be final and binding on the parties and may be enforced by any court having jurisdiction.

## 48. Third-Party Arrest Clause
In the event of arrest (by party other than authorities at home or abroad - refer to Clause 21 (a)(v)) or other sanction levied against the Vessel or time-Charterers arising out of Owners' breach or any fault of the Owner, the Owner agrees to assume full responsibility for all penalties and the Vessel shall be considered off-hire during any delay or detention arising there from.

## 49. Civil Liability Convention Clause
The Owner warrant that the Vessel has onboard a valid certificate as required by Article 7 of the International Convention of Civil Liability for Oil Pollution Damage of 1969 as amended 1976 and 1992.

Owner further warrants that the said certificate will be maintained in effect throughout the duration of performance under this charter. Any delay or consequences due to Owner's failure to have or to maintain said certificate, to be for Owners' account.

## 50. Detention Clause
Should the Vessel be seized or detained by any authority, or arrested at the suit of any party having or purporting to have a claim against any interest in the Vessel, hire shall not be payable in respect of any period during which the Vessel is not fully at Charterers' use and all extra expenses shall be for the Owners' account, unless such seizure or detention is occasioned by any personal act or omission or default of the Charterers or their agents, or by reason of cargo carried.

## 51. Excess Berth Occupancy Clause
If after disconnection of hoses Vessel remains alongside the berth exclusively for Vessel's purposes, the Owner shall be responsible for direct and/or indirect costs charged to the Charterer by terminal/suppliers/receivers/port authority.

## 52. Clause Paramount
The Charterer shall use best efforts to ensure that all Bills of Lading issued pursuant to this charter shall contain a Clause Paramount in the following form: -

"(1) Subject to sub-clauses (2) or (3) hereof, this Bill of Lading shall be governed by, and have effect subject to, the rules contained in the International Convention for the Unification of Certain Rules relating to Bills of Lading signed at Brussels on 25th August 1924 (hereafter the "Hague Rules") as amended by the Protocol signed at Brussels on 23rd February 1968 (hereafter the "Hague-Visby Rules"). Nothing contained herein shall be deemed to be either a surrender by the carrier of any of his rights or immunities or any increase of any of his responsibilities or liabilities under the Hague-Visby Rules".

"(2) If there is governing legislation which applies the Hague Rules compulsorily to this Bill Of Lading, to the exclusion of the Hague and Hague-Visby Rules, then this Bill of Lading shall have effect subject to the Hague

2

Rules. Nothing herein contained shall be deemed to be either a surrender by the carrier of any of his rights or immunities or an increase of any of his responsibilities or liabilities under the Hague Rules."

"(3) If there is governing legislation which applies the Hamburg Rules compulsorily to this Bill Of Lading to the exclusion of the Hague-Visby Rules, then this Bill of Lading shall have effect subject to the Hamburg Rules. Nothing herein contained shall be deemed to be either a surrender by the carrier of any of his rights or immunities or an increase of any of his responsibilities or liabilities under the Hamburg Rules."

"(4) If any term of this Bill of Lading is repugnant to the Hague-Visby Rules, or Hague Rules or Hamburg Rules, if applicable, such term shall be void to that extent but no further."

"(5) Nothing in this Bill of Lading shall be construed as in any way restricting, excluding or waiving the right of any party or person to limit his liability under any available legislation and/or law."

## 53. Drugs and Alcohol Policy Clause
Owners warrant that it has a policy on drug and alcohol abuse ("Policy") applicable to the vessel that meets or exceeds the standards in the Oil Companies International Marine Forum (OCIMF) guidelines for the control of drugs and alcohol. Under the Policy, alcohol impairment shall be defined as a blood alcohol content of 40-mg/100 ml or greater; the appropriate seafarers to be tested shall be all vessel officers and the drug/alcohol testing and screening shall include unannounced testing in addition to routine medical examinations. An objective of the policy should be that the frequency of the unannounced testing be adequate to act as an effective abuse deterrent, and that all officers be tested at least once a year through a combined program of unannounced testing and routine medical examinations.

Owners further warrant that the policy will remain in effect during the term of this charter and that Owners shall exercise due diligence to ensure that the policy is complied with. It is understood that an actual impairment or any test findings of impairment shall not in and of itself mean that Owners has failed to exercise due diligence.

Owners confirm that they have signed and sent to Exxon a blanket declaration confirming that the vessel is included in Owners' policy concerning drugs and alcohol, and that this policy includes unannounced testing according to OCIMF/ EXXON guidelines.

## 54. Oil Major Approval's Clause
The Owner will arrange for regular vetting inspections by major oil companies to ensure that as many vetting approvals as possible are obtained and maintained.

Subject to Charterer's directing the Vessel to ports and places where such vetting inspections can take place, the Owner will warrant that a S.I.R.E. report, not more than 6 months old, will at all times be available in the system.

Owner also warrant that any two (2) of the following oil majors will be maintained provided the Charterer directs the Vessel to ports and places where such vetting inspections can take place; Exxon-Mobil, Chevron-Texaco and Shell.

Should the Vessel become blacklisted and/or boycotted by oil companies and thereby hindering the Vessel's ability to trade freely under this Charter Party, Owners shall immediately take steps to rectify the deficiencies. Time and expenses for vetting inspections shall be borne by the Owner.

After delivery of the Vessel, if any new requirements of major oil companies, and/or international rules and regulations and/or class requirements become essential during the currency of this Charter, the Owner and the Charterer will discuss together how to best implement the requirements and apportion the costs thereof.

### 55. International Transport Workers Federation Clause
During the term of this Charter the officers and crew will fully comply with ITF or equivalent.

### 56. United States Coast Guard Clause
The Owner warrant that during the term of this Charter the Vessel will comply, and if not in compliance will hold necessary waivers, with all applicable United States Coast Guard (USCG) Regulations in effect including, but not limited to, pollution and safety regulations of the Code of Federal Regulations, as amended, and all other applicable state pollution and safety laws, rules and regulations as may be promulgated and subsequent amendment thereto. Any delay penalties, costs and consequences resulting from Vessel's non-compliance shall be treated as off-hire. However, the Charterer shall not place the Vessel off-hire during the first inspection by the USCG in order to obtain the TVEL/LOC.

The Vessel to have valid certificate complying with the regulations at all times during the term of this Charter Party.

### 57. I.S.M. Clause
The Owner warrants that a Safety Management System (SMS) in accordance with the ISM Code will be in operation throughout the term of this charter. It is a condition of this Charter Party that the Owners' or "the Company" (as defined by the ISM Code) shall have a valid Document Of Compliance (DOC) and the Vessel shall have a valid Safety Management Certificate (SMC). Upon request the Owners' shall provide a copy of the relevant DOC and SMC to the Charterers. Without limitation to Charterers' remedies under this clause, any loss, damages or expenses attributed to vessel's non-compliance with the ISM code and/or to Owners' failure to respond (or delay in responding) to Charterers request for the foregoing certificates, shall be for Owners' account and any time lost to the extent arising from such non-compliance or failure/delay in responding, shall be off hire.

### 58. United States Oil Pollution Act of 1990 (OPA90) Clause
Owners warrant:
a) That they and/or the Vessel operator has submitted to the United States

Coast Guard for approval a response plan for the vessel (VRP) which meets in full the requirements of the United States Oil Pollution Act of 1990, the Government Regulations issued there under and any change, rule or regulation in substitution of, or supplementary to, such Circular (collectively 'VRP Requirements').
b) That the VRP is approved and the vessel is operated in compliance therewith, when and as required by the VRP requirements.
c) That the Owners or operator of the vessel, and the vessel, fully meets all other requirements of OPA and any Governments Regulations or guidelines issued there under.

This clause does not in any way lessen the overall effect of the Owners of any State obligation in respect of Vessel Response Plans or other pollution requirements.

## 59. Protocols and Certificates Clause
The Owner warrant that throughout the period of this Charter the Vessel shall comply with the requirements of SOLAS (IMO Protocol of 1978 relating to the International Convention for the Safety of Life at Sea, 1974) and MARPOL (IMO Protocol of 1978 relating to the International Convention for the Prevention of Pollution from Ships 1983 and subsequent updates. The Owner further warrant that with particular reference to these protocols and any further amendments or successors to these protocols, the Vessel shall have on board necessary certification of compliance to enable the Vessel to trade without restriction.

The Owner further warrants that the Vessel has on board a valid certificate as required by Article VII of the International Convention on Civil Liability for oil pollution of 1992 as amended.

In no case shall the Charterer be liable for loss of time and/or other expenses as a result of Owners' failure to obtain or maintain the aforementioned certificates.

The Vessel shall have on board valid certificates at all times during the term of this Charter.

## 60. Boycott Clause
In the event the Vessel is being subject to boycott, being delayed, or rendered inoperative by strikes, labour stoppages, or any other difficulties arising from Vessel's flag, ownership, crew, or terms of employment of crew (see Clause 55), or of chartered vessel or any other vessel under the same Ownership, operation or control, such time lost is to be considered as off-hire and all expenses incurred thereby, including fuel consumed during such periods, to be for Owners' account.

## 61. Arab Boycott / League Clause
The Owner warrants that to the best of their knowledge, at the time of signing this Charter Party, the Vessel is not blacklisted by any Arab League country.

## 62. Eligibility Clause
The Owner warrants that the Vessel is in all respects eligible under applicable laws and regulations for trading to the areas, ports and places specified in Clause 4, and that at all necessary times she shall have on board all certificates

(including International Tonnage Certificate 1969) records and other documents required for such service. Any delay incurred because of the Vessel's failure to comply with the above shall be considered as off-hire.

## 63. Traffic Separation Clause
In the interest of safety, the Owner will recommend the Master to observe the recommendation as to traffic separation and routing as issued from time to time by the Intergovernmental Maritime Consultive Organization or as promulgated by the state of the flag of the Vessel or the state in which the effective management of the Vessel is exercised.

Sea Pilots, whether the use of these are compulsory, recommended or optional are always to be engaged at Owners' / Master's discretion (except when compulsory) and the cost of engaging them shall always be for Charterers account.

## 64. UK Water Traffic Routeing Clause
The Owner shall observe, and shall instruct the Master to observe, the code of practice relating (inter alia) to recommendations as to routes to be taken by tankers in certain sensitive locations in UK Waters, as drawn up by the British Chamber of Shipping in March 1993.

Sea Pilots, whether the use of these are compulsory, recommended or optional are always to be engaged at Owners' / Master's discretion (except when compulsory) and the cost of engaging them shall always be for Charterers account.

## 65. Oil Pollution Clause
The Owner warrants that throughout the term of this Charter the Vessel shall be entered for standard oil pollution liability cover with a P & I Club belonging to the International Group of P & I Clubs in compliance with the clause.

Owners shall promptly furnish evidence of the Vessel's entry into a P & I Club and the limits of oil pollution liability cover afforded thereby.

Owners warrant that they have and will maintain throughout the period of this charter:

a) The Standard Oil Pollution Insurance Covers (currently US$ 1,000 Million), available from their P+I Club; and

b) Any additional Oil Pollution Cover (Currently 0), which becomes mandatory via their P+I Club or through acceptable Underwriters providing First Class Security.

Upfront fees and non-voyage related costs of entering and maintaining compliance with the requirement of the US Oil Pollution Act of 1990 for the entire term of this charter are the responsibility of the Owners. The entering of a scheme shall be required for the duration of this Charter Party. The choice of scheme shall be with Owners.

All voyage related costs including port specific charges, fees for transit and for

6

port spill response coverage, shall be for Charterers account and shall be paid by them immediately upon presentation of Owners invoice including supporting documentation.

1. Owners warrant that throughout the currency of this charter they will provide the Vessel with the following certificates:
   a) Certificate issued pursuant to the Civil Liability Convention 1992 ("CLC"), as and when in force.
   b) Certificate of Financial Responsibility (COFR) issued pursuant to section 1016 (a) of the Oil Pollution Act 1990, and section 108 (a) of the Comprehensive Environmental Response, Compensation and Liability Act 1980, as amended in accordance with Part 138 of Coasts Guard Regulation 33 CFR, so long as these can be obtained by the Owners from or by the United States Coast Guard.

2. Notwithstanding anything whether printed or typed herein to the contrary,
   a) Save as required for compliance with paragraph (1) hereof, the Owner shall not be required to establish or maintain financial security or responsibility in respect of oil or other pollution damage to enable the Vessel lawfully to enter, remain or leave any port, place, territorial or contiguous water of any country state or territory in performance of this charter;
   b) The Charterer shall indemnify the Owner and hold them harmless in respect of any loss, damage liability or expense (including but not limited to costs or delay incurred by the Vessel as a result of any failure by the Charterer to promptly give voyage orders) whatsoever and howsoever arising which the Owner may sustain by reason of any requirement to establish or maintain financial security or responsibility in order to enter, remain in or leave any port, place or waters other than to the extent provided in paragraph 1 hereof.
   c) The Owner shall not be liable for any loss, damage, liability or expense whatsoever and howsoever arising which the Charterer and/or holders of any bill of lading issued pursuant to this Charter may sustain by reason of any requirements to establish or maintain financial security or responsibility in order to enter, remain in or leave any port, place or waters, other than to the extent provided in paragraph 1 hereof.
   d) In the event that legislation, other than as set out in paragraph (1) hereof, comes into effect which has the effect of requiring the Owner to establish or maintain financial security or responsibility in respect of oil or other pollution damage to enable the Vessel lawfully to enter, remain or leave any port, place, territorial or contiguous waters of any country, state or territory in performance of this Charter, the costs of complying with such requirements to the extent required in connection with any then current voyage will be for the account of the Charterer. Thereafter, all such costs will in the future be for the Charterers' account unless the Charterer serves notice on the Owner rejecting liability of such costs in the future. In the event that the Charterer rejects liability for such future costs it will cease to have liability from the end of any voyage current at the time when such notice is served. The Owner will have the option of (i) accepting that such costs will be for its own account or (ii) terminating this Charter forthwith at the end of the then current voyage and accepting the immediate redelivery of the Vessel or (iii) notifying the Charterer that the

trading limits under this Charter shall, with effect from the date of the Owner's notice, be amended to exclude any jurisdiction in which such new legislation applies.

3. The Charterer shall endeavour that the terms of this clause will be incorporated effectively into any Bill of Lading issued pursuant to this Charter.

## 66. Blocking and Trapping Clause
Expenses for blocking and trapping insurance is for Owner's account. The Vessel shall be considered off-hire whilst blocked or trapped.

## 67. Delivery and Redelivery Survey Clause
No delivery survey shall be carried out. One surveyor, acceptable to both parties, shall carry out a redelivery survey, the cost of which to be for Charterer's account.

## 68. Inert Gas System Clause
The Owner warrants that the Vessel is equipped with a fully functional and efficient inert gas system, which is in use on the date hereof and shall remain so during the term of this Charter and that the officers and crew are properly qualified by way of certification for, and experienced in, the operation of such system. Any time loss due to a deficient or improper operation of the inert gas system shall be considered as off-hire.

The vessel's inert gas system shall fully comply with regulation 62, chapter 11-2 of the SOLAS Convention 1974 as modified by its protocol of 1978 and the Owner undertake that such system shall be operated by the officers and crew in accordance with the operational procedures set out in the IMO publication entitled "Inert Gas System 1983" as may, from time to time, be amended.

If the Charterer so require, the Owner shall arrange for the Vessel's tanks to be de-inerted to facilitate inspection, gauging and sampling. Any time taken in de-inerting, inspecting, gauging, sampling, and re-inerting thereafter shall count as time on-hire.

## 69. Cast Iron Clause
The Owner warrants that all riser valves and fittings, outboard of the last fixed rigid support to the Vessel's deck that are used in the transfer of cargo or ballast, will be made of steel or nodular iron and that only steel reducer or spacer will be used between the ship's valve and the loading arm. The fixed rigid support must be designed to prevent both lateral and vertical movement of the transfer manifold.

## 70. Vaccination Clause
The Owner to arrange at their expense that the Master, Officer and Crew of the Vessel, are to hold valid vaccination certificates against yellow fever, cholera, as per International Health Regulations 1969 and subsequent amendments, upon delivery of the vessel and throughout the time charter period. Any other vaccination requirement, which may come up from time to time throughout the world and are relevant to the Vessel's trading, shall be carried out at Owners'

expense.

## 71. Agents Clause
The Owner to appoint their own Agents when and if there is major Owners' business such as extensive repairs, docking and other extended off-hire etc. However, Charterers' Agents to attend to Owners' minor matters such as postage, cash advanced to Master, crew transportation, medical expenses, telexes etc. on Owners' behalf (See Clause 30) free of charge unless Agents bill the Charterer additionally for providing such services.

## 72. Loading Rate / Pumping Capacity Clause
The Owner warrants that throughout the term of this Charter the Vessel can discharge an entire homogenous cargo within 24 hours excluding time for stripping, or maintain an average backpressure of 100 PSI at ship's manifold provided that shore facilities permit. Should the Vessel fail to perform in accordance with the above warranties, the Owner shall compensate the Charterer at the rate of 1/24 of the daily hire per hour for any proven loss suffered by the Charterer. Should it become necessary to withdraw the Vessel from the berth because of her failure to maintain the discharge rate, all time and expenses incurred are to be for Owner's account.

## 73. Hoses Clause
If required by the Charterer, the Vessel's crew is to connect and disconnect hoses, without charge to Charterers' for any time or overtime involved.

## 74. De-ballast Clause
The Owner warrants that the Vessel shall be able to discharge ballast and load back cargo simultaneously with double valve segregation, while maintaining minimum thirty percent (30%) deadweight. Any delay due to non-compliance with this clause to be for Owners' account.

## 75. Cargo Retention Clause
In the event that any cargo remains on board upon completion of discharge, the Charterer has the right to claim from Owner an amount equal to the FOB port of loading value of such undisputed cargo plus freight with respect thereto, provided that the volume of cargo remaining on board is liquid, reachable and pumpable by Vessel's normal discharge equipment as determined by an independent surveyor.

Any action or lack of action in accordance with this provision shall be without prejudice to any rights or obligations of the parties.

In making claim for cargo retention, Charterer agrees to indemnify Owner against any claim(s) brought forward by any third parties.

## 76. Ship-to-Ship Transfer Clause
The Charterer has the option to load or discharge the Vessel via ship to ship transfer, weather permitted and subject to Master's approval which is not to be unreasonably withheld, at anchor, underway, or adrift.
The Charterer is to provide adequate fenders, hoses, supervisory personnel and equipment necessary to perform the lightering operation. Owner agrees to allow

Charterers' supervisory personnel on board, including mooring master to assist in the performance of the lightering operation.

Any lighterage operation shall always take place in accordance with the OCIMF Ship to Ship Transfer Guide (Petroleum).

## 77. Cleaning Clause
The Owner / Master shall clean tanks for intended cargoes to Charterers' Inspector's satisfaction using the Vessel's cleaning equipment. Additional cleaning materials, if needed, to be for Charterers' account.

## 78. Watchmen Clause
Gangway and fire watchmen arranged by the Owner to be for Owner's account, however the cost of watchmen, including compulsory watchmen, shall always be for Charterers account.

## 79. Re-measurement Clause
The Charterer has the option to re-measure the Vessel up or down, as the case may be, for the purpose of satisfying certain port/terminal regulations. All cost for certification and time to be for Charterers' account and the Charterer shall be liable to re-measure the Vessel back to the original deadweight at their time and expenses prior to redelivery.

## 80. Blending Clause
The Owner agrees if requested to commingle, re-circulate or transfer cargo between tanks in accordance with Charterers' instructions in order to obtain a homogenous blend subject only to the Vessel's safety and stability and pumping arrangement and the Charterer shall on each occasion indemnify the Owner for any cargo claims and for re-documentation as consequences of such operations.

## 81. Operational Compliance Clause
The Master shall communicate his noon position, plus average speed, distance steamed, weather conditions and bunker ROB, every day during this Charter. Furthermore the Master to keep Charterers fully advised of Vessel's ETA at all times and any change in ETA of more than 6 hours immediately be notified to the Charterer. The Owner further agrees that, unless thee Charterer require otherwise, the Master will follow voyage orders issued by the Charterer.

The Owner shall be responsible for any consequences or additional expenses arising as a result of non-compliance with this Clause.

If a conflict arises between terminal orders and Charterers' voyage instructions, the Master shall stop cargo operations and contact the Charterer immediately. Terminal orders shall never supersede Charterers' voyage instructions and any conflict shall be resolved prior to resumption of cargo operations. The Vessel is not to resume cargo operations until the Charterer have directed the Vessel to do so.

## 82. In Transit Loss Clause
Vessel is to be allowed maximum 0,5 % of in-transit loss, which shall be the difference between the ships figures of net standard volume after loading at the load port and before discharge at the discharge port. Calculation is to be based on 60 Degrees Fahrenheit.

Any loss exceeding the said 0,5% is to be reimbursed by Owners to Charterers at an amount equal to the FOB port of loading value of such cargo plus freight due with respect thereto.

In making claim for in-transit loss, Charterers agree to indemnify Owner against any claim(s) brought forward by 3rd parties.

## 83. Sea Terminal Clause
The Owner warrants that the Vessel, when calling at sea terminal will maintain her engines in stand-by and will be loaded and discharged in such manner that she at any stage of loading or discharging operations is able, if necessary for any reason, to immediately shut down cargo operations, and promptly disconnect hoses and mooring lines and proceed to another anchorage at sea.

## 84. Smuggling Clause
Any delay, expenses and/or fines incurred on account of smuggling, to be for Owners' account, if caused by the Master, Officers, Crew or Owners' servant.

## 85. Notice Of Readiness Clause
At every load port and discharge port, throughout the term of this Charter, the Vessel shall tender her Notice of Readiness immediately on arrival in the customary way. Until such time as the Vessel is all fast at the berth/jetty, the Master shall re-tender Vessel's Notice of Readiness daily, at 09:00 hours local time, to all parties as instructed in the Charterers' load and discharge orders. The text of subsequent daily NOR's, as above, to be: "Without prejudice to original Notice of Readiness tendered ................ Hrs on..............20.... (To be completed as appropriate), on Vessel's arrival, please be advised that my vessel is and remains ready in all respects to commence loading/discharging (delete as appropriate) of the cargo of .............. (complete as appropriate)".

## 86. Pumping Logs Clause
At each port of discharge, the Vessel is to maintain a proper and accurate discharge pumping record. As a Minimum this log will be signed by the Vessel's Master who will also endeavour to obtain countersignature on this log by the discharge port inspector and an authorised representative of the receiving terminal. If such signatures are not obtainable, Master to issue a letter of protest to relevant parties.

## 87. Trading Limits Clause
Always world wide within Institute Warranty Limits, always safely afloat and always excluding Cuba, Eritrea, Haiti, Orinoco River, Turkish occupied Cyprus, Syria, Libya, Lebanon, Israel, Iraq, North Korea, Alaska (except only within the period from 1st May to 31st October by Charterers' payment of extra insurance and costs (including Owners' appointed Qualified Individual (QI)/Owners superintendent attendance), subject to weather forecasts and ICG conditions

provided by competent authorities at the time Charterers requesting Alaska calls) and any U.N. sanctioned area or country and any country which from time to time may be prohibited by the Vessel's flag state or any competent authority. Sea Pilots employed to be for the Charterer's account.

Vessel not to force ice, trade in icebound waters or follow icebreakers in channels opened up. No direct trade between PRC and Taiwan or vice versa. Trading to, through and from war zone areas always subject to Owner's prior approval which is not to be unreasonably withheld.'

In case U.N. sanctions against Iraq is lifted during the term of this charter party and Iraqi ports are deemed safe and accessible, the Vessel shall be allowed to call at Iraqi ports subject to Owners' prior written approval which shall not unreasonably withheld.

## 88. Cargo Clause
Always lawful cargoes that is not injurious to the Vessel, her Crew, pumps, cargo valves and any other part of her cargo system; always Clean Petroleum Products and clean condensates. Always maximum 4 grades within vessel's natural segregation and always excluding casing head, lubricating oils and additives, chemicals, MTBE, solvents, pygas, vegetable and/or animal oils or fats, but including liquid dye and stadis. In any event the Vessel shall be re-delivered to the Owner with last 3 cargoes un-leaded Clean Petroleum Products un-darker than 2,5 NPA.

## 89. Bunkers Clause:
Bunkers remaining on board the Vessel on delivery and redelivery hereunder shall be sufficient, unless otherwise agreed in writing, for minimum 10 maximum 20 days steaming and always enough to reach the nearest main bunkering port. The Charterer, respectively the Owner to pay for the bunkers remaining on board the Vessel on delivery respectively redelivery, at Owner's respectively the Charterers net actual price as evidenced by supporting documents.

## 90. War Risk Clause
Trading to, through and from war risk area(s) is always subject to Owner's prior approval which not to be unreasonably withheld.

Basic war risk insurance is to be for Owner's account. Any extra expenses for additional war risk premium on Hull and machinery and Crew War Bonuses which is reasonably incurred by the Owners as the consequence of Charterer's orders to trade Vessel in areas where the area in question has been declared an additional risk premium area by the Vessel's war risk insurers shall be borne by the Charterers provided that before such expenses are incurred, Charterers are given an opportunity to signify their approval or alternatively order the Vessel to a non additional premium area.

In case the Vessel is requested to proceed into a war and war-likely zone, the Charterer will allow a reasonable deviation to the Vessel to carry out necessary preparation at some convenient port including, but not limited to crew change, extra supply etc. All time used, additional bunker consumption and extra port disbursement occasioned for such preparation to be for the Charterer's account.

At the date of this Charter;
      1) Hull and Machinery value is US$ 18 million
      2) War risk Insurance amount is US$ 18 million

## 91. Letter of Indemnity Clause

The Charterer hereby undertakes to hold harmless and indemnify Master / Owners, their servants and agents against all losses, costs, expenses and liabilities that may arise from the Master / Owners, their servants and agents complying with Charterers' request to deliver cargo at port of destination without production of the original Bills of Lading or delivery of cargo at a port other than the port of destination shown in the Bill(s) of Lading. If Charterers request Owners, in writing, to discharge a quantity of cargo either;

a) Without Bills of Lading, and/or
b) At a discharge place other than named in a Bill of Lading, and/or
c) That is different from the Bill of Lading quantity

The Owner shall discharge such cargo in accordance with Charterer's instruction in consideration of receiving from the Charterer a Letter of Indemnity in accordance with Owners' P&I Club's wording as per Appendix 1 attached hereto.

## 92.ITOPF Clause

The Owner warrants that throughout the term of this Charter the Vessel will be:
1.     Owned or demise chartered by a member of the 'International Tanker Owners Pollution Federation Limited', and;
2.     Entered in the Protection and Indemnity Club stated in Clause 39.

## 93.Minimum Speed (slow speed - speed up) Clause

The Owner agrees to allow the Charterer to issue orders directly to the Vessel to slow down or speed up the Vessel consistent with safe operation of the Vessel and its machinery on ballast and/or laden passages, but with copy of orders sent to the Owner. During all periods when the Vessel follows Charterers' orders as made under this Clause, the speed and consumption warranty as provided for in Clause 24 does not apply.

## 94.Passenger Indemnity Clause

The Charterer shall indemnify the Owner in respect of any claims brought against the Owner by the representatives of the Charterer or their personal representatives, executors, heirs and assigns in respect of death of, or injury to, or loss of, or damage to personal effects of the said representatives and invitees whilst present as a passenger on board the vessel save that to the extent that such death, injury or loss of effects is due to the negligence of the Owner or their servants or agents. The Owner shall only be liable to the extent of their proportionate fault. Nothing in this Clause shall be construed or held to deprive the Owner of any right to limit their liability under any applicable law, statue or convention.

## 95.Delivery and Redelivery notices Clause

The Owner shall give Charterer 15, 10, 7 and 5 days approximate Notice of time and place of Delivery and 3, 2 and 1 days definite Notice of time and place of Delivery. The Charterer shall give Owner 15, 10, 7 and 5 days approximate Notice of time and place of Redelivery and 3, 2 and 1 days definite Notice of time and place of Redelivery.

## 96. Commission Clause

1.25 % brokerage commission payable by Owner to S. A. Chartering on all hire received on receipt of hard copy invoice. 1,25 % commission to Navig8 Asia Pte ltd on all hire received on receipt of hard copy invoice.

## 97. BIMCO ISPS Clause

(a) (i) From the date of coming into force of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of SOLAS (ISPS Code) in relation to the Vessel and thereafter during the term of this Charter, the Owner shall procure that both the Vessel and "the Company" (as defined by the ISPS Code) shall comply with the requirements of the ISPS Code relating to the Vessel and "the Company". Upon request the Owner shall provide a copy of the relevant International Ship Security Certificate (or the Interim International Ship Security Certificate) to the Charterers. The Owner shall provide the Charterer with the full style contact details of the Company Security Officer (CSO).

(ii) Except as otherwise provided in this Charter, loss, damage, expense or delay, excluding consequential loss, caused by failure on the part of the Owner or "the Company" to comply with the requirements of the ISPS Code or this Clause shall be for the Owners' account.

(b) (i) The Charterer shall provide the CSO and the Ship Security Officer (SSO)/Master with their full style contact details and, where sub-letting is permitted under the terms of this Charter Party, shall ensure that the contact details of all sub-charterers are likewise provided to the CSO and the SSO/Master. Furthermore, the Charterer shall ensure that all sub-charter parties they enter into during the term of this Charter contain the following provision:

"The Charterer shall provide the Owner with their full style contact details and, where sub-letting is permitted under the terms of the charter party, shall ensure that the contact details of all sub-charterers are likewise provided to the Owner".

(ii) Except as otherwise provided in this Charter, loss, damage, expense or delay, excluding consequential loss, caused by failure on the part of the Charterer to comply with this Clause shall be for the Charterers' account.

(c) Notwithstanding anything else contained in this Charter Party all delay, costs or expenses whatsoever arising out of or related to security regulations or measures required by the port facility or any relevant authority in accordance with the ISPS Code including, but not limited to, security guards, launch services, tug escorts, port security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result solely from the Owners' negligence. All measures

required by the Owners to comply with the Ship Security Plan shall be for the Owners' account.

(d)     If either party makes any payment that is for the other party's account according to this Clause, the other party shall indemnify the paying party.

## 98. U.S. Customs Advance Notification / AMS Clause

(a) If the Vessel loads or carries cargo destined for the US or passing through US ports in transit, the Charterer shall comply with the current US Customs regulations (19 CFR 4.7) or any subsequent amendments thereto and shall undertake the role of carrier for the purposes of such regulations and shall, in their own name, time and expense:

i) Have in place a SCAC (Standard Carrier Alpha Code);
ii) Have in place an ICB (International Carrier Bond);
iii) Provide the Owners with a timely confirmation of i) and ii) above; and
iv) Submit a cargo declaration by AMS (Automated Manifest System) to the US Customs and provide the Owners at the same time with a copy thereof.

(b) The Charterer assume full liability for and shall indemnify, defend and hold harmless the Owner against any loss and/or damage whatsoever (including consequential loss and/or damage) and/or any expenses, fines, penalties and all other claims of whatsoever nature, including but not limited to legal costs, arising from the Charterers' failure to comply with any of the provisions of sub-clause (a). Should such failure result in any delay then, notwithstanding any provision in this Charter Party to the contrary, the Vessel shall remain on hire.

(c) If the Charterers' ICB is used to meet any penalties, duties, taxes or other charges which are solely the responsibility of the Owner, the Owner shall promptly reimburse the Charterer for those amounts.

(d) The assumption of the role of carrier by the Charterer pursuant to this Clause and for the purpose of the US Customs Regulations (19 CFR 4.7) shall be without prejudice to the identity of carrier under any bill of lading, other contract, law or regulation.

## 99. Bottom Cleaning Clause

In the event the Charterer orders the Vessel to a port or anchorage where the stay of the Vessel is extended for more than 45 consecutive days, whether waiting for cargo operations or as lay-up, the Owner shall arrange – on Charterer's request - for the Vessel's propeller, underwater parts and bottom to be cleaned at Charterer's expense. All time used for this cleaning operation to count as time on-hire. If the Charterer does not request such cleaning operation, Owners' speed and consumption warranties shall be considered null and void effective from vessel's departure from such port or anchorage and until the Vessel's propeller, underwater parts and bottom has been cleaned in accordance with this clause.

| Appendix 1 |
|---|

**(A) LETTER OF INDEMNITY FOR NON-PRODUCTION OF ORIGINAL BILL OF LADING ON BOARD**

**(B) LETTER OF INDEMNITY FOR CHANGE OF DESTINATION**

**(C) LETTER OF INDEMNITY FOR ISSUANCE OF NEW BILL OF LADING (WITH SURRENDER OF OLD BILL OF LADING(S))**

## Appendix 1

## (A) LETTER OF INDEMNITY FOR NON-PRODUCTION OF ORIGINAL BILL OF LADING ON BOARD

TO:      THE OWNERS OF THE MT............................ DATE:

DEAR SIRS

CARGO: ...........................

B/L NO:...........................
B/L DATE: .......................
CARGO DESCRIPTION: ..............
QUANTITY (GROSS): ...............
SHIPPER: ........................
CONSIGNEE: ......................
NOTIFY PARTY: ...................
LOADPORT: .......................
DISCHARGE PORT: .................

THE ABOVE CARGO (THE "CARGO") WAS SHIPPED ON THE ABOVE VESSEL (THE "SHIP") BY THE ABOVE SHIPPER AND CONSIGNED TO THE ABOVE CONSIGNEE, FOR DELIVERY AT THE ABOVE DISCHARGE PORT, BUT THE RELEVANT BILLS OF LADING HAVE NOT YET ARRIVED.

WE HEREBY REQUEST YOU TO DELIVER THE CARGO TO ..................... AT ........................... WITHOUT PRODUCTION OF THE ORIGINAL BILLS OF LADING.

IN CONSIDERATION OF YOUR COMPLYING WITH OUR ABOVE REQUEST WE HEREBY AGREE AS FOLLOWS: -

1.      TO INDEMNIFY YOU, YOUR SERVANTS AND AGENTS AND TO HOLD ALL OF YOU HARMLESS IN RESPECT OF ANY LIABILITY, LOSS, DAMAGE OR EXPENSE OF WHATSOEVER NATURE WHICH YOU MAY SUSTAIN BY REASON OF DELIVERING THE CARGO IN ACCORDANCE WITH OUR REQUEST.

2.      IN THE EVENT OF ANY PROCEEDINGS BEING COMMENCED AGAINST YOU OR ANY OF YOUR SERVANTS OR AGENTS IN CONNECTION WITH THE DELIVERY OF THE CARGO AS AFORESAID, TO PROVIDE YOU OR THEM FROM TIME TO TIME ON DEMAND WITH SUFFICIENT FUNDS TO DEFEND THE SAME.

3.      IF THE SHIP OR ANY OTHER SHIP OR PROPERTY IN THE SAME OR ASSOCIATED OWNERSHIP, MANAGEMENT OR CONTROL SHOULD BE ARRESTED OR DETAINED OR SHOULD THE ARREST OR DETENTION THEREOF BE THREATENED, OR SHOULD THERE BE ANY INTERFERENCE IN THE USE OR TRADING OF THE SHIP OR ANY OTHER SUCH SHIP OR PROPERTY (WHETHER BY VIRTUE OF A CAVEAT BEING ENTERED AGAINST ITS REGISTRY OR OTHERWISE HOWSOEVER), TO PROVIDE ON DEMAND SUCH BAIL OR OTHER SECURITY AS MAY BE REQUIRED TO PREVENT SUCH ARREST OR DETENTION OR TO SECURE THE RELEASE OF SUCH SHIP OR PROPERTY OR TO REMOVE SUCH INTERFERENCE, AND TO INDEMNIFY YOU, YOUR SERVANTS AND AGENTS IN RESPECT OF ANY LIABILITY, LOSS, DAMAGE OR EXPENSE CAUSED BY SUCH ARREST OR DETENTION OR THREATENED ARREST OR DETENTION OR INTERFERENCE, WHETHER OR NOT THE SAME MAY BE JUSTIFIED.

4. IF THE PLACE AT WHICH WE HAVE ASKED YOU TO MAKE DELIVERY IS A BULK LIQUID OR GAS TERMINAL OR FACILITY, OR ANOTHER SHIP, LIGHTER OR BARGE, THEN DELIVERY TO SUCH TERMINAL, FACILITY, SHIP, LIGHTER OR BARGE SHALL BE DEEMED TO BE DELIVERY TO THE PARTY TO WHOM WE HAVE REQUESTED YOU TO MAKE SUCH DELIVERY.

5.      AS SOON AS ALL ORIGINAL BILLS OF LADING FOR THE ABOVE CARGO SHALL HAVE ARRIVED AND/OR COME INTO OUR POSSESSION, TO PRODUCE AND DELIVER THE SAME TO YOU, OR TO CAUSE ALL SUCH ORIGINAL BILLS OF LADING TO BE PRODUCED AND DELIVERED TO YOU.

6.      THE LIABILITY OF EACH AND EVERY PERSON UNDER THIS INDEMNITY SHALL BE JOINT AND SEVERAL AND SHALL NOT BE CONDITIONAL UPON YOUR PROCEEDING FIRST AGAINST ANY PERSON, WHETHER OR NOT SUCH PERSON IS PARTY TO OR LIABLE UNDER THIS INDEMNITY.

7.      THIS INDEMNITY SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH ENGLISH LAW AND EACH AND EVERY PERSON LIABLE UNDER THIS INDEMNITY SHALL AT YOUR REQUEST SUBMIT TO THE JURISDICTION OF THE HIGH COURT OF JUSTICE OF ENGLAND AND NOMINATE AN ADDRESS FOR SERVICE IN ENGLAND.


YOURS FAITHFULLY,
FOR AND ON BEHALF OF [INSERT FULL COMPANY NAME]: ...............

OF [INSERT FULL COMPANY ADDRESS]: ...............


(S I G N E D)

NAME: ..............
TITLE/DESIGNATION: ................

+ + +

WHERE LOI IS TO BE COUNTERSIGNED BY BANK, ADD:

WE JOIN IN THE ABOVE INDEMNITY AS PRIMARY OBLIGOR.

FOR AND ON BEHALF OF [INSERT FULL BANK NAME]: ......................

OF [INSERT FULL BANK ADDRESS]: ........................

(SIGNED)


NAME:
TITLE/DESIGNATION

+ + +

## (B) LETTER OF INDEMNITY FOR CHANGE OF DESTINATION

OWNER'S LOI WORDING FOR DELIVERY OF CARGO AGAINST PRODUCTION OF BILLS OF LADING BUT AT A PORT OTHER THAN THAT STATED IN THE BILLS OF LADING:

TO:      THE OWNERS OF THE MT ..................... DATE: .............

DEAR SIRS

CARGO: ......................

B/L NO: ......................
B/L DATE: ...................
CARGO DESCRIPTION: ..........
QUANTITY (GROSS): ...........
SHIPPER: ....................
CONSIGNEE: ..................
NOTIFY PARTY: ...............
LOADPORT: ...................
DISCHARGE PORT: .............

THE ABOVE CARGO (THE "CARGO") WAS SHIPPED ON THE ABOVE VESSEL (THE "SHIP") BY THE ABOVE SHIPPER AND CONSIGNED TO THE ABOVE CONSIGNEE FOR DELIVERY AT THE ABOVE DISCHARGE PORT.

WE HEREBY REQUEST YOU TO ORDER THE SHIP TO PROCEED TO AND DELIVER THE CARGO AT: ....................... AGAINST PRODUCTION OF THE ORIGINAL BILLS OF LADING.

IN CONSIDERATION OF YOUR COMPLYING WITH OUR ABOVE REQUEST WE HEREBY AGREE AS FOLLOWS: -

1.      TO INDEMNIFY YOU, YOUR SERVANTS AND AGENTS AND TO HOLD ALL OF YOU HARMLESS IN RESPECT OF ANY LIABILITY, LOSS, DAMAGE OR EXPENSE OF WHATSOEVER NATURE WHICH YOU MAY SUSTAIN BY REASON OF DELIVERING THE CARGO IN ACCORDANCE WITH OUR REQUEST.

2.      IN THE EVENT OF ANY PROCEEDINGS BEING COMMENCED AGAINST YOU OR ANY OF YOUR SERVANTS OR AGENTS IN CONNECTION WITH THE DELIVERY OF THE CARGO AS AFORESAID, TO PROVIDE YOU OR THEM FROM TIME TO TIME ON DEMAND WITH SUFFICIENT FUNDS TO DEFEND THE SAME.

3.      IF THE SHIP OR ANY OTHER SHIP OR PROPERTY IN THE SAME OR ASSOCIATED OWNERSHIP, MANAGEMENT OR CONTROL SHOULD BE ARRESTED OR DETAINED OR SHOULD THE ARREST OR DETENTION THEREOF BE THREATENED, OR SHOULD THERE BE ANY INTERFERENCE IN THE USE OR TRADING OF THE SHIP OR ANY OTHER SUCH SHIP OR PROPERTY (WHETHER BY VIRTUE OF A CAVEAT BEING ENTERED AGAINST ITS REGISTRY OR OTHERWISE HOWSOEVER), TO PROVIDE ON DEMAND SUCH BAIL OR OTHER SECURITY AS MAY BE REQUIRED TO PREVENT SUCH ARREST OR DETENTION OR TO SECURE THE RELEASE OF SUCH SHIP OR PROPERTY OR TO REMOVE SUCH INTERFERENCE, AND TO INDEMNIFY YOU, YOUR SERVANTS AND AGENTS IN RESPECT OF ANY LIABILITY, LOSS, DAMAGE OR EXPENSE CAUSED BY SUCH ARREST OR DETENTION OR THREATENED ARREST OR DETENTION OR INTERFERENCE, WHETHER OR NOT THE SAME MAY BE JUSTIFIED.

4.   THE LIABILITY OF EACH AND EVERY PERSON UNDER THIS INDEMNITY SHALL BE JOINT AND SEVERAL AND SHALL NOT BE CONDITIONAL UPON YOUR PROCEEDING FIRST AGAINST ANY PERSON, WHETHER OR NOT SUCH PERSON IS PARTY TO OR LIABLE UNDER THIS INDEMNITY.

5.   THIS INDEMNITY SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH ENGLISH LAW AND EACH AND EVERY PERSON LIABLE UNDER THIS INDEMNITY SHALL AT YOUR REQUEST SUBMIT TO THE JURISDICTION OF THE HIGH COURT OF JUSTICE OF ENGLAND AND NOMINATE AN ADDRESS FOR SERVICE IN ENGLAND.


YOURS FAITHFULLY,
FOR AND ON BEHALF OF [INSERT FULL COMPANY NAME]: .................

OF [INSERT FULL COMPANY ADDRESS]: .................


(S I G N E D)


NAME: ..............
TITLE/DESIGNATION: .............

+ + +

WHERE LOI IS TO BE COUNTERSIGNED BY BANK, ADD:

WE JOIN IN THE ABOVE INDEMNITY AS PRIMARY OBLIGOR.

FOR AND ON BEHALF OF
[INSERT FULL BANK NAME]: .....................
OF [INSERT FULL BANK ADDRESS]: ...............

(SIGNED)


NAME: ..............
TITLE/DESIGNATION: ..............

+ + +

## (C) LETTER OF INDEMNITY FOR ISSUANCE OF NEW BILL OF LADING (WITH SURRENDER OF OLD BILL OF LADING(S))

TO: THE OWNERS OF MT ..............          DATE: .............

DEAR SIRS,

CARGO:                                    PARCEL 1              PARCEL 2
B/L NO:
B/L DATE:
CARGO DESCRIPTION:
QUANTITY (GROSS):
SHIPPER:
CONSIGNEE:
NOTIFY PARTY:
LOADPORT:
DISCHARGE PORT:

THE ABOVE CARGO WAS SHIPPED ON THE ABOVE VESSEL (THE "SHIP") BY THE ABOVE SHIPPER AND CONSIGNED TO THE ABOVE CONSIGNEE.

WE HEREBY UNDERTAKE TO SURRENDER OR PROCURE THE SURRENDER TO YOU OF THE FULL SET OF THE ORIGINAL BILLS OF LADING ISSUED AT THE PLACE AND DATE INDICATED ABOVE (HEREAFTER KNOWN AS THE "EXISTING BILLS OF LADING") AS SOON AS THEY HAVE ARRIVED AT THE DISCHARGE PORT OR COME INTO OUR POSSESSION OR CONTROL.

WE HEREBY REQUEST YOU TO RE-ISSUE ONE COMBINED FULL SET OF ORIGINAL BILLS OF LADING (HEREAFTER KNOWN AS THE "NEW BILLS OF LADING") WITH THE FOLLOWING DETAILS:

CARRIER:
B/L NO:
B/L DATE:
CARGO DESCRIPTION:
SHIPPER:
CONSIGNEE:
NOTIFY PARTY:
LOADPORT:
DISCHARGE PORT:

IN CONSIDERATION OF YOUR COMPLYING WITH OUR ABOVE REQUEST, WE HEREBY AGREE AS FOLLOWS:

1.      TO INDEMNIFY YOU, YOUR SERVANTS AND AGENTS AND TO HOLD ALL OF YOU HARMLESS IN RESPECT OF ANY LIABILITY, LOSS, DAMAGE OR EXPENSE OF WHATSOEVER NATURE WHICH YOU MAY SUSTAIN BY REASON OF ISSUING THE NEW BILLS OF LADING IN ACCORDANCE WITH OUR REQUEST.

2.      IN THE EVENT OF ANY PROCEEDINGS BEING COMMENCED AGAINST YOU OR ANY OF YOUR SERVANTS OR AGENTS IN CONNECTION WITH THE RE-ISSUANCE OF BILLS OF LADING AS AFORESAID, TO PROVIDE YOU OR THEM FROM TIME TO TIME ON DEMAND WITH SUFFICIENT FUNDS TO DEFEND THE SAME.

3.    IF THE SHIP OR ANY OTHER SHIP OR PROPERTY IN THE SAME OR ASSOCIATED OWNERSHIP, MANAGEMENT OR CONTROL SHOULD BE ARRESTED OR DETAINED OR SHOULD THE ARREST OR DETENTION THEREOF BE THREATENED OR SHOULD THERE BE ANY INTERFERENCE IN THE USE OR TRADING OF THE SHIP OR ANY OTHER SUCH SHIP OR PROPERTY (WHETHER BY VIRTUE OF A CAVEAT BEING ENTERED AGAINST ITS REGISTRY OR OTHERWISE HOWSOEVER), TO PROVIDE ON DEMAND SUCH BAIL OR OTHER SECURITY AS MAY BE REQUIRED TO PREVENT SUCH ARREST OR DETENTION OR TO SECURE THE RELEASE OF SUCH VESSEL OR PROPERTY OR TO REMOVE SUCH INTERFERENCE, AND TO INDEMNIFY YOU, YOUR SERVANTS AND AGENTS IN RESPECT OF ANY LIABILITY, LOSS, DAMAGE OR EXPENSE CAUSED BY SUCH ARREST OR DETENTION OR THREATENED ARREST OR DETENTION OR INTERFERENCE, WHETHER OR NOT THE SAME MAY BE JUSTIFIED.

4.    AS SOON AS ALL THE EXISTING BILLS OF LADING FOR THE ABOVE CARGO SHALL HAVE ARRIVED AT THE DISCHARGE PORT OR COME INTO OUR POSSESSION OR CONTROL, TO SURRENDER OR PROCURE THE SURRENDER OF THE SAME TO YOU, WHEREUPON OUR LIABILITY HEREUNDER SHALL CEASE.

5.    THE LIABILITY OF EACH AND EVERY PERSON UNDER THIS INDEMNITY SHALL BE JOINT AND SEVERAL AND SHALL NOT BE CONDITIONAL UPON YOUR PROCEEDING FIRST AGAINST ANY PERSON, WHETHER OR NOT SUCH PERSON IS PARTY TO OR LIABLE UNDER THIS INDEMNITY.

6.    THIS INDEMNITY SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH ENGLISH LAW AND EACH AND EVERY PERSON LIABLE UNDER THIS INDEMNITY SHALL AT YOUR REQUEST SUBMIT TO THE JURISDICTION OF THE HIGH COURT OF JUSTICE OF ENGLAND AND NOMINATE AN ADDRESS FOR SERVICE IN ENGLAND.

YOURS FAITHFULLY,
FOR AND ON BEHALF OF
[INSERT FULL COMPANY NAME]:
OF [INSERT FULL COMPANY ADDRESS]:

( S I G N E D)

NAME:
TITLE/DESIGNATION:

+ + +

WHERE LOI IS TO BE COUNTERSIGNED BY BANK, ADD:

WE JOIN IN THE ABOVE INDEMNITY AS PRIMARY OBLIGOR.

FOR AND ON BEHALF OF
[INSERT FULL BANK NAME]:
OF [INSERT FULL BANK ADDRESS]:

(SIGNED)


NAME:
TITLE/DESIGNATION



# Oil Companies International Marine Forum

## Revised Ship Inspection Report (SIRE) Programme

**Cover Sheet for Printed Vessel Particulars Questionnaire for: Highseas**
**IMO\LR Number: 8717245**

# 1. GENERAL INFORMATION

## General Information

| | | |
|---|---|---|
| 1.1 | Date this VPQ document completed | 31 May 2007 |
| 1.2 | Name of ship | Highseas |
| 1.3 | LR/IMO Number | 8717245 |
| 1.4 | Last previous name | Not Applicable |
| 1.4.1 | Date of name change | Not Applicable |
| 1.5 | Second last previous name | Not Applicable |
| 1.5.1 | Date of name change | Not Applicable |
| 1.6 | Third last previous name | Not Applicable |
| 1.6.1 | Date of name change | Not Applicable |
| 1.7 | Fourth last previous name | Not Applicable |
| 1.7.1 | Date of name change | Not Applicable |
| 1.8 | Flag | Liberia |
| 1.9 | Port of Registry | Monrovia |
| 1.10 | If the flag has been changed, what was previous flag? | Not Applicable |
| 1.11 | Call sign | ELJD7 |
| 1.12 | INMARSAT number | 363699068 |
| 1.13 | Ship's fax number | 363699071 |
| 1.14 | Ship's telex number | 463669150 / 463669250 |
| 1.15 | Mobile Phone Number | Not Applicable |
| 1.16 | Ship's Email address | hsea@tpm.amosconnect.com |
| 1.17 | Type of ship | Oil Tanker |
| 1.18 | Vessel's MMSI No. (Maritime Mobile Selective Call Identity Code) | 636008494 |
| 1.19 | Type of Hull | Double Side |

## Ownership And Operation

| | | | | |
|---|---|---|---|---|
| 1.20 | Registered Owner (Name) | Darr Maritime Inc. | Office telephone number | |
| | Full address | 80, Broad Street, Monrovia, Liberia. | Office telex number | |
| | | | Office fax number | |
| | | | Office Email address | tpms.ops@tanker.com.sg |
| | | | Contact person | Capt. Anil |
| | | | Contact person after hours tel. no. | +65 96341903 |
| | Number of years ship owned | 5 Years | | |
| | | | | |
| | | | | |
| 1.22 | Technical Operator (Name) | Tanker Pacific (Mgmt) Singapore Pte. Ltd. | Office telephone number | +65-64335888 |
| | Full Address | 1, Temasek Avenue, 38-01 Millenia Tower Singapore 039192 | Office telex number | RS 23512 TANKPAC |
| | | | Office fax number | +65-63365311 |
| | | | Office Email address | tpms.ops@tanker .com.sg |
| | | | Contact (Designated Person Ashore) | Capt. Anil Singh |
| | | | Contact person after hours tel. no. | +65-96341903 |
| | Emergency callout number | 65-96341903 | Contact details for person responsible for oil spill response | Capt. Anil Singh |
| | Emergency callout pager number | 65-96341903 | | |
| | No. years controlled by technical operator | 5 Years | | |
| | No. of ships operated by this Operator | 80 | | |
| | | | | |
| | | | | |
| 1.25 | Commercial Operator (Name) | Tanker Pacific (Mgmt) Singapore Pte. Ltd. | Office telephone number | +65-63365211 |
| | Full Address | 1, Temasek Avenue, 38-01 Millenia Tower Singapore 039192 | Office telex number | RS 23512 TANKPAC |



| | | | | Office fax number | +65-63365311 |
|---|---|---|---|---|---|
| | | | | Office Email address | tpms@tanker.c om.sg |
| | | | | Contact person | Capt. Anil Singh |
| | | | | Contact person after hours tel. no. | +65-96341903 |

## Builder

| 1.26 | Builder | Daewoo Shipbuilding, Okpo, Korea |
|---|---|---|
| 1.27 | Date of building contract | 03 Dec 1987 |
| 1.28 | Hull number | 5036 |
| 1.29 | Date keel laid | 26 Dec 1988 |
| 1.30 | Date launched | 06 May 1989 |
| 1.31 | Date delivered | 23 Oct 1989 |
| 1.32 | If applicable, date of completion of major hull changes | Not Applicable |
| 1.33 | List what changes were made. | Not Applicable |

## Classification

| 1.34 | Classification society | American Bureau of Shipping |
|---|---|---|
| 1.35 | Class Notation | +A1, Oil Carrier, AMS, ACCU, VEC |
| 1.36 | If Classification society changed, name of previous society | ABS dual class with RINA |
| 1.37 | If Classification society changed, date of change | 14 May 2002 |
| 1.38 | Date of last dry-dock | 07 Jul 2004 |
| 1.39 | Date of second last dry-dock | 13 Sep 2002 |
| 1.40 | Date next dry-dock due | 06 Jul 2007 |
| 1.41 | Date of last special survey | 07 Jul 2004 |
| 1.42 | Was last special survey an enhanced special survey? | Yes |
| 1.43 | Date next special survey due | 30 Jun 2009 |
| 1.44 | If ship has Condition Assessment Programme (CAP) rating, what is the latest rating? | 1 |
| 1.45 | Date of last annual survey | 31 May 2006 |
| 1.46 | Date of last boiler survey - Port boiler | 07 Jul 2004 |
| 1.47 | Date of last boiler survey - Starboard boiler | Not Applicable |
| 1.48 | Is the ship subject to Continuous Machinery Survey? | Yes |

## Dimensions

| 1.49 | Length overall (LOA) | 178 metres |
|---|---|---|
| 1.50 | Length between perpendiculars (LBP) | 168 Metres |
| 1.51 | Extreme breadth | 30.4 Metres |
| 1.52 | Moulded breadth | 30.4 metres |
| 1.53 | Moulded depth | 19.3 metres |
| 1.54 | Keel to masthead | 45.8 Metres |
| 1.55 | Distance bow to bridge | 137.1 metres |
| 1.56 | Distance bridge front - mid point manifold | 48.8 metres |
| 1.57 | PARALLEL MID-BODY DIAGRAM | |
| 1.57.1 | Distance bow to mid-point manifold | 88.3 metres |
| 1.57.2 | Distance stern to mid-point manifold | 89.7 Metres |
| 1.57.3 | Light ship parallel body length | 61.35 metres |
| 1.57.4 | Light ship parallel body - bow to mid-point manifold | 23.75 metres |
| 1.57.5 | Light ship parallel body - stern to mid-point manifold | 37.6 metres |
| 1.57.6 | Normal ballast parallel body length | 78.05 metres |
| 1.57.7 | Normal ballast parallel body length - bow to mid point manifold | 40.45 metres |
| 1.57.8 | Normal ballast parallel body length - stern to mid point manifold | 37.6 Metres |
| 1.57.9 | Parallel body length at Summer Deadweight (SDWT) | 88.94 Metres |
| 1.57.10 | Parallel body length at SDWT - bow to manifold | 49 metres |
| 1.57.11 | Parallel body length at SDWT - stern to mid point manifold | 39.94 metres |
| 1.58 | Does ship have a bulbous bow? | Yes |



Load
Draft

Ballast
Draft

Light
Ship

CL

## Tonnages

| | | |
|------|-----------------------|---------------|
| 1.59 | Net Registered Tonnage | 11833 Tonnes |
| 1.60 | Gross Tonnage | 27450 Tonnes |
| 1.61 | Suez Tonnage | 25609.7 Tonnes |
| 1.62 | Panama Tonnage | 21732 Tonnes |

## Loadline Information

| | | Freeboard | Draft | Deadweight | Displacement |
|------|-----------------------------|------------------|--------------|------------------|------------------|
| 1.63 | Summer | 6813 millimetres | 12.516 metres | 45017.5 tonnes | 53963.8 tonnes |
| 1.64 | Winter | 7073 millimetres | 12.256 metres | 43770.4 tonnes | 52716.7 tonnes |
| 1.65 | Tropical | 6553 millimetres | 12.776 metres | 46267.3 tonnes | 55213.6 tonnes |
| 1.66 | Lightship | 16.776 Metres | 2.55 Metres | 0 Tonnes | 8946.36 Tonnes |
| 1.67 | Normal Ballast Condition | 13.06 Metres | 6.269 Metres | 16182.54 Tonnes | 25128.9 Tonnes |
| 1.68 | Segregated Ballast Condition | 13.255 Metres | 6.074 Metres | 15324.04 Tonnes | 24270.4 Tonnes |

## Loadline Information and Recent Operational History

| | | |
|--------|------------------------------------------------------------------------|------------------|
| 1.69 | FWA at Summer Draft | 281 Millimetres |
| 1.70 | TPC Immersion at Summer Draft | 48 tonnes |
| 1.71.1 | Draught Fore at normal ballast conditions | 5.391 Metres |
| 1.71.2 | Draught Aft at normal ballast conditions | 7.147 Metres |
| 1.72 | Does ship have Multiple SDWT ? | Yes |
| 1.73 | If yes, what is maximum assigned Deadweight? | 45018 Tonnes |
| 1.74 | Max. height of mast above waterline (air draft) in normal SBT condition? | 38.94 Metres |



| 1.75 | Has the ship traded continuously without requirement for repairs since the last dry-dock, except for normal maintenance? | Yes |
|------|--------|------|
| 1.76 | The nature of the repair was: | |
| 1.77 | Has ship been involved in a pollution incident during the past 12 months? | No |
| 1.78 | Has ship been involved in a grounding incident during the past 12 months? | No |
| 1.79 | Has ship been involved in a collision during the past 12 months? | No |

## 2. CERTIFICATION AND DOCUMENTATION

### Certificates

| | | | Issued | Expires | Last Annual | |
|---|---|---|---|---|---|---|
| 2.1 | Register Number | 222-02-NY | | | | |
| 2.2 | Safety Equipment Certificate | | 31 May 2006 | 30 Jun 2009 | 31 May 2006 | |
| 2.3 | Safety Radio Certificate | | 07 Jul 2004 | 30 Jun 2009 | 31 May 2006 | |
| 2.4 | Safety Construction Certificate | | 07 Jul 2004 | 30 Jun 2009 | 31 May 2006 | |
| 2.5 | Loadline Certificate | | 07 Jul 2004 | 30 Jun 2009 | 31 May 2006 | |
| 2.6 | International Oil Pollution Prevention Certificate (IOPPC) | | 31 May 2006 | 30 Jun 2009 | 31 May 2006 | |
| 2.7 | Type of Oil Tanker  as specified by IOPPC Crude/Product   (If not an oil tanker, specify) | Crude/Product | | | | |
| 2.8 | Safety Management Certificate (SMC) | | 16 Nov 2005 | 05 Oct 2010 | Not Applicable | (Last intermediate) |
| 2.9 | Document of Compliance (DOC) | | 18 Oct 2004 | 07 Sep 2009 | 15 Nov 2006 | (Endorsed) |
| 2.10 | USCG Letter of Compliance (if applicable) | | Not Applicable | Not Applicable | Not Applicable | |
| 2.11 | Date of last USCG Tank Vessel Examination Letter (TVEL) | | 16 Mar 2007 | 16 Mar 2009 | | |
| 2.12 | Minimum Safe Manning Certificate | | 04 Oct 2004 | | | |
| 2.13 | Civil Liability Convention Certificate (1969) | | Not Applicable | | | |
| 2.14 | Civil Liability Convention Certificate (1992) | | 20 Feb 2007 | | | |
| 2.15 | U.S. Certificate of Financial Responsibility | | 16 Aug 2005 | | | |
| 2.16 | Certificate of Fitness (Chemicals) | | Not Applicable | | | |
| 2.17 | Certificate of Fitness (Gas) | | Not Applicable | | | |
| 2.18 | Noxious Liquids Certificate | | Not Applicable | | | |
| 2.19 | Unattended Machinery Space Certificate | | 05 Dec 1989 | | | |
| 2.20 | International Tonnage Certificate | | 12 Apr 1994 | | | |

### Documents

| 2.21 | IMO Safety of Life at Sea Convention (SOLAS 74) | Yes |
|---|---|---|
| 2.22 | IMO International Code of Signals (SOLAS V-Reg 21) | Yes |
| 2.23 | IMO International Convention for the Prevention of Pollution from Ships (MARPOL 73/78) | Yes |
| 2.24 | IMO Ships Routeing | Yes |
| 2.25 | IMO International Regulations For Preventing Collisions at Sea (COLREGS) | Yes |
| 2.26 | IMO Standards of Training, Certification and Watchkeeping (STCW Convention) | Yes |
| 2.27 | ICS Guide to Helicopter/Ship Operations | Yes |
| 2.28 | OCIMF/ICS/IAPH International Safety Guide for Oil Tankers and Terminals (ISGOTT) | Yes |
| 2.29 | OCIMF/ICS Clean Seas Guide for Oil Tankers | Yes |
| 2.30 | OCIMF/ICS Prevention of Oil Spillages Through Cargo Pumproom Sea Valves | Yes |
| 2.31 | OCIMF/ICS Ship to Ship Transfer Guide (Petroleum) | Yes |
| 2.32 | OCIMF Recommendations for Oil Tanker Manifolds and Associated Equipment | Yes |
| 2.33 | OCIMF Mooring Equipment Guidelines | Yes |
| 2.34 | OCIMF Effective Mooring | Yes |
| 2.35 | USCG Regulations for Tankers  (USCG 33 CFR/46 CFR) | Yes |
| 2.36 | Oil Transfer Procedures   (USCG 33 CFR 155-156) | Yes |
| 2.37 | Operator's ISM Manuals | Yes |
| 2.38 | Is the publication IMO-Inert Gas Systems, or Ship Technical Operator's equivalent manual on board? | Yes |
| 2.39 | Is the publication IMO-Cow Systems, or Ship Technical Operator's equivalent manual on board? | Yes |
| 2.40 | ICS Bridge Procedures Guide | Yes |
| 2.41 | IAMSAR Vol.3 | Yes |
| 2.42 | Nautical Institute Bridge Team Management | Yes |
| 2.43 | International Medical Guide for Ships(or equivalent) | Yes |

### For Chemical Tankers Only

| 2.44 | IMO Code for Construction & Equipment of Ships Carrying Dangerous Chemicals in Bulk (IBC Code) | N/A |
|---|---|---|
| 2.45 | IMO Index of Dangerous Chemicals Carried in Bulk | N/A |



| 2.46 | ICS Tanker Safety Guide (Chemicals) | N/A |
|------|-------------------------------------|-----|
| 2.47 | IMO Code for Construction & Equipment of Ships Carrying Dangerous Chemicals in Bulk (BCH Code) | N/A |
| 2.48 | Chemical Data Guide (USCG 1990 CIM 16616.6A) | N/A |
| 2.49 | Medical First Aid Guide for Use in Accidents involving Dangerous goods  (MFAG) | N/A |
| 2.50 | Procedures and Arrangements (P&A) Manual | N/A |

## For Gas Carriers Only

| 2.51 | IMO Code for Construction & Equipment of Ships Carrying Liquified Gases in Bulk (IGC Code) | N/A |
|------|-------------------------------------|-----|
| 2.52 | ICS Tanker Safety Guide (Liquefied Gas) | N/A |
| 2.53 | SIGTTO Liquified Gas Handling Principles on Ships and in Terminals | N/A |
| 2.54 | SIGTTO Guide to Pressure Relief Valve Maintenance and Testing | N/A |
| 2.55 | ICS Ship to Ship Transfer Guide (Liquefied Gases) | N/A |
| 2.56 | IMO  Code for the Construction and Equipment of Ships Carrying Liquefied Gases in Bulk (IGC Code) | N/A |
| 2.57 | IMO Code for Exsisting Ships Carrying Liquified Gases in Bulk (EGC Code) | N/A |
| 2.58 | Life saving Appliances Code | N/A |
| 2.59 | Fire Safety Systems Code | N/A |



# 3. CREW MANAGEMENT

## Crew Management

| 3.1 | Minimum manning required (officers) | 8 | 3.2 | Minimum manning required (ratings) | 8 |
|---|---|---|---|---|---|
| | Actual manning (officers) | 14 | | Actual manning (ratings) | 14 |
| | List Nationality of Officers | INDIAN, UKRAINIAN, FILIPINO MONTENEGRO ROMANIAN CHINESE | | List Nationality of Ratings | FILIPINO, INDIAN BULGARIAN ROMANIAN |
| | Master employed by (Vessel Operator) | Yes | | Master employed by (Manning Agent) | No |
| | Officers employed by (Vessel Operator) | Yes | | Officers employed by (Manning Agent) | No |
| | Ratings employed by (Vessel Operator) | Yes | | Ratings employed by (Manning Agent) | No |
| | Common language used (Vessel Operator) | ENGLISH | | Common language used | ENGLISH |
| | Full name of Manning agent 1 (Officers) | N/A | | Full name of Manning agent 1 (Ratings) | N/A |
| | Full address | N/A | | Full address | N/A |
| | Office telephone number | N/A | | Office telephone number | N/A |
| | Office telex number | N/A | | Office telex number | N/A |
| | Office fax number | N/A | | Office fax number | N/A |
| | Office Email address | N/A | | Office Email address | N/A |
| | Are manning agent(s) wholly or partially owned by Operator? | N/A | | Does vessel's Operator maintain personnel files on ratings assigned to his vessels? | Yes |
| | If No, does Operator have selection rights? | N/A | | Do ratings regularly return to Operator's vessels? | Yes |
| | Does vessel's Operator maintain personnel files on officers assigned to his vessels? | Yes | | | |
| | Do officers regularly return to Operator's vessels? | Yes | | | |

## Continuity

| 3.3 | Do senior officers return to the same ship on a rotational basis? | Yes |
|---|---|---|
| 3.4 | Are senior officers rotated on ships of similar class within company fleet? | Yes |
| 3.5 | Are junior officers and ratings rotated on ships of similar class within company fleet? | Yes |
| 3.6 | If senior officers do not return to same ship on a rotational basis, are changes of Master, Chief Officer and Second Engineer organised to avoid a full change of officers at same time? | Yes |

## Training

| 3.7 | List Operator-sponsored training courses available to officers (Bridge Management etc.) | Ship Security Officer, Bridge Team Resourse Management, Manned Model Ship Handling, Navigation Skills for Deck Officers, NABCO Course, Hydraulic Workshop, Liquid Cargo Handling simulator, Marine Environment Protection, Engine Simulator Course |
|---|---|---|
| 3.8 | List Operator-sponsored training courses available to ratings (Fire Fighting etc.) | Basic Safety Refresher Course, ABS Certification of Fitters, Hydraulic Course |
| 3.9 | Are Masters and Chief Engineers required to attend company office before and after each tour of duty? | Yes |
| 3.10 | Does operator hold regular training seminars ashore for officers? | Yes |
| 3.11 | Are training seminars provided on board for officers and ratings? | Yes |
| 3.12 | What courses, exceeding statutory requirements, are provided for senior officers? | Manned Model Ship Handling, Navigation skills for deck officers, NABCO Course, Hydraulic Workshop, Liquid Cargo Handling Simulator, Marine Environment Protection, Continuous learning course for Master, Continuous learning course for Chief Engineer. |
| 3.13 | What courses, exceeding statutory requirements, are provided for junior officers? | Navigation Skill for Deck Officers, NABCO Course, Hydraulic Workshop, Liquid Cargo Handling Simulator, Marine Environment Protection, Engine Simulator, Boiler Course for Engineers |
| 3.14 | What courses, exceeding statutory requirements, are provided for ratings? | Basic Safety Refresher Course, Hydraulic Course |



## 4. NAVIGATION

### Navigation

| | | Installed | Type | Number of units |
|---|---|---|---|---|
| 4.1 | Magnetic compass | Yes | TOKYO KEIKI 2290 | 1 |
| 4.2 | Gyro compass | Yes | TOKYO KEIKI TG 5000 / TG 6000 | 2 |
| 4.3 | Gyro Autopilot | Yes | TPKYO KEIKI PR-4000 | 1 |
| 4.4.1 | Radar 1 | Yes | JRC JMA 9823 9XA | 1 |
| 4.4.2 | Radar 2 | Yes | JRC JMA 9823 SA | 1 |
| 4.4.3 | Are radars gyro stabilised? | Yes | | |
| 4.5 | Is there at least one radar operating in the 9 Ghz frequency band (3cm/x band)? | | | Yes |
| 4.6 | Are the 3 GHz (10cm/S band) and 9Ghz (3cm / X band) radars fitted with an electronic switching unit? | | | Yes |
| 4.7 | Radar plotting equipment | Yes | JRC - JMA SERIES | 2 |
| 4.8 | ARPA (Installed) | Yes | JRC - JMA SERIES | 2 |
| 4.9 | Depth sounder with recorder | Yes | JRC - JFE 5705 | 1 |
| 4.10 | Speed/distance indicator | Yes | YOKOGAWA NLT 201 | 1 |
| 4.11 | Doppler log | No | N/A | |
| 4.12 | Docking approach doppler | No | N/A | |
| 4.13 | Rudder angle indicator | Yes | DAE YANG 3C - 3008 | 3 |
| 4.14 | RPM indicator | Yes | NOR CONTROL | 4 |
| 4.15 | Controllable pitch propeller indicator | No | N/A | |
| 4.16 | Bow thruster indicator | No | N/A | |
| 4.17 | Stern Thrust indicator | No | N/A | |
| 4.18 | Rate of turn indicator | No | N/A | |
| 4.19 | Radio direction finder | N/A | N/A | |

### Navigation (continued)

| | | Installed? | Type | No. of units |
|---|---|---|---|---|
| 4.20 | Navtex receiver | Yes | JRC NCR-330 | 1 |
| 4.21 | Satellite navigation receiver | No | | 0 |
| 4.22 | GPS (Installed) | Yes | FURUNO GP -80 | 2 |
| 4.23 | Differential GPS (Installed) | Yes | Incorporated in above FURUNO GP-80 | 2 |
| 4.24 | Is there an Electronic Chart Display? | No | | |
| 4.25 | Is the Electronic Chart Display incorporated into an approved ECDIS ? | N/A | | |
| 4.26 | Integrated Navigation System (INS) | No | | |
| 4.27 | Decca navigator | No | | |
| 4.28 | Omega receiver | No | | |
| 4.29 | Loran C receiver | No | | |
| 4.30 | Course recorder | Yes | TOKYO KEIKI CR - 1 | 1 |
| 4.31.1 | Off - course alarm - gyro | Yes | PALPHA PILOT PR-4000, TOKYO KEIKI | 1 |
| 4.31.2 | Off - course alarm - magnetic | Yes | INCORP IN TOKYO KEIKI PR = 4000 | 1 |
| 4.32 | Engine order printer | No | | |
| 4.33 | Anemometer | Yes | MARINE VANE FV - 301 | 1 |
| 4.34 | Weather fax | Yes | JRC JAX - 79 | 1 |
| 4.35 | Does ship carry sextant(s)? | Yes | | |
| 4.36 | Does ship carry a signal lamp? | Yes | | |
| 4.37 | Is each bridge wing fitted with a rudder angle indicator? | Yes | | |
| 4.38.1 | Is each bridge wing fitted with a RPM indicator? | Yes | | |
| 4.38.2 | Is each bridge wing fitted with a gyro repeater? | Yes | | |
| 4.39 | Are there Controllable pitch propeller indicators on the bridge wings? | N/A | | |
| 4.40 | Are steering motor controls and engine controls fitted on bridge wings? | No | | |
| 4.41 | Is bridge equipped with a 'Dead-Man' alarm or equipment? | Yes | | |



## 5. SAFETY MANAGEMENT

### Safety Management

| | | |
|---|---|---|
| 5.1 | Is the vessel operated under a Quality Management System? | Yes |
| 5.1.1 | If Yes, what type of system? (ISO9002 or IMO Resolution A.741(18))? | IMO Resolution A.741 (18) |
| 5.1.2 | If Yes, who is the certifying body? | ABS |
| 5.1.3 | Date of vessel certification | 06 Oct 2005 |

### Helicopters

| | | |
|---|---|---|
| 5.2 | Can the ship comply with the ICS Helicopter Guidelines? | Yes |
| 5.2.1 | If Yes, state whether winching or landing area provided | Winching |
| 5.2.2 | What is diameter of circle provided? | 5 metres |

### Fire Fighting Equipment & Life Saving Equipment

| | | |
|---|---|---|
| 5.3 | Is a fixed foam firefighting system installed for the cargo area? | Yes |
| 5.4 | Type of foam on board | Alcohol |
| 5.5 | Date of foam supply or last analysis certificate | 22 Dec 2006 |
| 5.6 | What fixed fire fighting system is provided for the paint locker? | SPRINKLER |
| 5.7 | What type of fire fighting system is fitted in pumproom(s)? | CO2 system |
| 5.8 | What type of fire fighting system is fitted in engine room(s)? | CO2 system |
| 5.9 | What type of fire fighting system is fitted in void spaces(s)? | None |
| 5.10 | Is a fixed dry powder firefighting system installed for the cargo area? | No |
| 5.11 | Is a fixed water spray firefighting system installed for the cargo area? | No |
| 5.12 | Is vessel equipped with recharging compressor for breathing apparatus? | Yes |
| 5.13 | What type of lifeboat(s) is/are fitted | Conventional |
| 5.14 | Is a dedicated rescue boat carried? | No |
| 5.15 | The type of rescue boat is: Rigid/inflated/ rigid-inflated | Rigid |

# 6. POLLUTION PREVENTION

## Pollution Prevention

| | | |
|---|---|---|
| 6.1 | Is ship fitted with a continuous deck edge fishplate enclosing the deck area? | Yes |
| 6.1.1 | If Yes, what is its minimum vertical height above the deck plating? | 150 millimetres |
| 6.1.2 | What is maximum vertical height above deck plating at aft thwartships coaming? | 380 millimetres |
| 6.1.3 | How far forward of the thwartships coaming is this height maintained? | 9.3 metres |
| 6.2 | Is an athwartship deck coaming fitted adjacent to accommodation and service areas? | Yes |
| 6.3 | What is the height of the coaming? | 380 millimetres |
| 6.4 | Is spill containment fitted under the cargo manifold? | Yes |
| 6.5 | Is spill containment fitted under all bunker manifolds? | Yes |
| 6.6 | Is containment fitted under the bunker tank vents? | Yes |
| 6.7 | Is containment fitted around the deck machinery? | Yes |
| 6.8 | Specify type of scupper plugs | EXPANDABLE RUBBER |
| 6.9 | Are means provided for draining or removing oil from deck area /containment? | Yes |
| 6.10.1 | What type of sorbents are provided? | Yes |
| 6.10.2 | Are non-sparking hand scoops and shovels provided? | Yes |
| 6.10.3 | Disposal Containers | Yes |
| 6.10.4 | Are emulsifiers provided? | Yes |
| 6.10.5 | Non-sparking pumps | Yes |
| 6.11 | Is there two valve segregation between cargo system and sea chest ? | Yes |
| 6.12 | What types of valves are fitted to sea chest? | Butterfly |
| 6.13 | Is a cargo sea chest valve testing arrangement fitted which meets OCIMF recommendations? | Yes |
| 6.14 | Are dump valves fitted that will effectively drain spillage from the deck to designated tanks when tanks are inerted to normal working pressures? | No |
| 6.15 | Are overboard discharges fitted with blanks or alternatively, is there a testing arrangement for the overboard valves? | Yes |
| 6.16 | Is there a discharge below the waterline for Annex II substances | No |
| 6.17 | Is there a discharge above the waterline for Annex I oily mixtures | Yes |
| 6.18 | Does Operator have policy to pressure test cargo piping at intervals no greater than 12 months? | Yes |
| 6.18.1 | If Yes, specify pressure | 12.5 bar |
| 6.19 | Is incinerator fitted? | Yes |

## Opa 90 Requirements

| | | |
|---|---|---|
| 6.20 | Has the vessel Operator submitted a Vessel Spill Response Plan to the US Coast Guard which has been approved by official USCG letter? | Yes |
| 6.21 | Has a Geographic Specific Appendix been filed with the Captain of the Port for each Port Zone the vessel expects to enter or transit? | Yes |
| 6.22 | Has the vessel Operator deposited a letter with the US Coast Guard confirming that the Operator has signed a service contract with an oil spill removal organisation for responding to a 'worst case scenario'? | Yes |

## 7. STRUCTURAL CONDITION

### Structural Condition

| | | |
|---|---|---|
| 7.1 | Are cargo tanks coated? | Yes |
| 7.1.1 | If Yes, specify type of coating | PURE EPOXY |
| 7.1.2 | If partially coated, specify which tanks are coated | NA |
| 7.1.3 | If cargo tanks are coated, specify to what extent | WHOLE TANK |
| 7.2 | What is the condition of coating as determined by the criteria listed below? | Good |
| 7.3 | Are ballast tanks coated? | Yes |
| 7.3.1 | If ballast tanks are coated, specify to what extent | Whole Tank |
| 7.3.2 | What is the condition of cargo/ballast tank coating? | Good |
| 7.4 | Are there anodes in the cargo tanks? | No |
| 7.5 | Are there anodes in the ballast tanks? | Yes |
| 7.6 | What type of anodes are used? | Zinc |
| 7.7 | What is the overall percentage of wastage of the anodes? | 10 % |
| 7.8 | If anodes are aluminum, what is the height above tank bottom? | 0 Millimetres |
| 7.9 | Is a formal programme in place for regular inspection of void spaces, cargo and ballast tanks? | |
| 7.10 | Does ship have planned prevention maintenance programme (PPM)? | Yes |
| 7.10.1 | Is PPM manual (card system) or computerised? | Computerised |
| 7.10.2 | What areas of vessel does PPM cover? | All Ship |
| 7.10.3 | Is PPM Class approved? | Yes |

## 8. CARGO AND BALLAST SYSTEMS

## Cargo And Ballast Handling



Tank

Transverse          Elevation

### Double Hull Vessels

| 8.2 | Is vessel fitted with centreline bulkhead in all cargo tanks? | | NA |
|---|---|---|---|
| 8.2.1 | If Yes, is bulkhead solid or perforated? | | NA |
| 8.2.2 | Is vessel fitted with any full breadth ballast tanks? | | N/A |
| 8.2.3 | If Yes, how many ballast tanks are full breadth? | | 0 |
| 8.2.4 | Does vessel meet the IMO definition of 'double hull'? | | N/A |

### Cargo Tank Capacities

| 8.3 | Cargo Tank Capacities At 98% Full (M3) | | | | | |
|---|---|---|---|---|---|---|
| | Centre | | | | Wings (P & S combined) | |
| | Tank No. | | | | Tank No. | |
| 8.3.1 | 1 | 4809.3 cu. m. | 8.3.16 | 1 | | cu. m. |
| 8.3.2 | 2 | 5689.1 cu. m. | 8.3.17 | 2 | | cu. m. |
| 8.3.3 | 3 | 6238 cu. m. | 8.3.18 | 3 | | cu. m. |
| 8.3.4 | 4 | cu. m. | 8.3.19 | 4 | 4678.6 cu. m. | |
| 8.3.5 | 5 | cu. m. | 8.3.20 | 5 | 4678.6 cu. m. | |
| 8.3.6 | 6 | 6238 cu. m. | 8.3.21 | 6 | | cu. m. |
| 8.3.7 | 7 | 6238 cu. m. | 8.3.22 | 7 | | cu. m. |
| 8.3.8 | 8 | 6237.3 cu. m. | 8.3.23 | 8 | | cu. m. |
| 8.3.9 | 9 | cu. m. | 8.3.24 | 9 | 6204.2 cu. m. | |
| 8.3.10 | 10 | cu. m. | 8.3.25 | 10 | | cu. m. |
| 8.3.11 | 11 | cu. m. | 8.3.26 | 11 | | cu. m. |
| 8.3.12 | 12 | cu. m. | 8.3.27 | 12 | | cu. m. |



| 8.3.13 | 13 | cu. m. | 8.3.28 | 13 | cu. m. |
|---|---|---|---|---|---|
| 8.3.14 | 14 | cu. m. | 8.3.29 | 14 | cu. m. |
| 8.3.15 | 15 | cu. m. | 8.3.30 | 15 | cu. m. |
| 8.4 | Total | 35449.7 Cu. Metres | 8.6 | Total | 15561.4 Cu. Metres |
| 8.5 | Slops 1st Tank | 763.1 cu. m. | 8.7 | Slops 3rd tank | 0 Cu. Metres |
| 8.5.1 | Slops 2nd Tank | 763.1 cu. m. | 8.7.1 | Slops 4th tank | 0 Cu. Metres |
| 8.8 | Total | 36975.9 Cu. Metres | 8.9 | Total | 15561.4 Cu. Metres |
| 8.10 | | | Grand Total Capacity (98%) | | 52537.3 Cu. Metres |

## Ballast Tank Capacities

| 8.11 | Ballast Capacities At 100% Full (M3) | |
|---|---|---|
| | Tank Identity | Capacity |
| 8.11.1 | 1P | 1246.3 Cu. Metres |
| 8.11.2 | 1S | 1246.3 Cu. Metres |
| 8.11.3 | 2P | 1571.9 cu. m. |
| 8.11.4 | 2S | 1571.9 cu. m. |
| 8.11.5 | 3P | 1885.4 cu. m. |
| 8.11.6 | 3S | 1885.4 cu. m. |
| 8.11.7 | 4P | 1506 cu. m. |
| 8.11.8 | 4S | 1506 cu. m. |
| 8.11.9 | 5P | 890.6 cu. m. |
| 8.11.10 | 5S | 890.6 cu. m. |
| 8.11.11 | FPK | 1526.3 cu. m. |
| 8.11.12 | APK | 749.9 cu. m. |
| 8.11.13 | | cu. m. |
| 8.11.14 | Total Ballast Tank Capacities at 100% full | 16476.6 Cu. Metres |

## Ballast Handling

| 8.12.1 | If vessel is a Pre-MARPOL tanker, indicate by tank number, tanks usually designated for departure ballast. | N / A |
|---|---|---|
| 8.12.1.1 | Tank Location | |
| 8.12.2 | If vessel is a Pre-MARPOL tanker, indicate by tank number, tanks usually designated for arrival ballast. | N / A |
| 8.12.2.1 | Tank Location | |
| 8.12.3 | Can vessel handle cargo and non-segregated ballast concurrently maintaining two valve segregation? | N/A |
| 8.12.4 | Can dirty ballast be safely loaded with gas transfer method? (simultaneous cargo discharge and loading of ballast into empty tanks) | N/A |

## If Vessel Is Cbt Tanker With Manual

| 8.13 | If the vessel is a CBT Tanker with Approved Manual: | |
|---|---|---|
| 8.13.1 | Which cargo tanks are indicated as CBT in the IOPP Certificate? | N / A |
| 8.13.2 | What is total capacity of CBT tanks? | 0 Cu. Metres |
| 8.13.3 | Is the piping for CBT common with cargo piping or independent? | Not Applicable |

## If Vessel Is Sbt Tanker

| 8.14.1 | What is total capacity of SBT? | 16476.6 Cu. Metres |
|---|---|---|
| 8.14.2 | What percentage of summer deadweight can vessel maintain with SBT only? | 36.5 % |
| 8.14.3 | Does vessel meet the requirements of MARPOL Reg 13 (2)? | Yes |
| 8.14.4 | Can segregated ballast be discharged through vessel's manifold? | No |
| 8.14.5 | Is vessel equipped with spool piece designed to connect ballast system to cargo system? | Yes |
| 8.14.6 | Do cargo lines pass through any dedicated or segregated ballast tanks? | No |



| | | | |
|---|---|---|---|
| 8.14.7 | If Yes, what type of expansion is fitted? | | Not Applicable |
| 8.14.8 | Do ballast lines pass through any cargo tanks? | | No |
| 8.14.9 | If Yes, what type of expansion is fitted? | | N/A |
| 8.14.10 | Can vessel pump water ashore for line clearing? | | Yes |
| 8.14.11 | If Yes, what is maximum attainable discharge rate? | | 1000 Cu. Metres/Hour |
| 8.14.12 | If Yes, what is maximum acceptable back pressure? | | 12.5 bar |
| 8.14.13 | Which cargo tanks are designated for heavy weather ballast as per IMO? | | 6(CTR) COT |
| 8.14.13.1 | Tank Location | | Center Cargo Tank |

## Cargo Handling

| | | | |
|---|---|---|---|
| 8.15 | How many  grades/products can vessel load/discharge with double valve segregation? | | 4 |
| 8.15.1 | How many grades can vessel load/discharge using blank flanges? | | 4 |
| 8.15.2 | If vessel is fitted with deepwell pumps and heat exchangers, can pumps and heat exchangers be by-passed during loading? | | N/A |
| 8.15.3 | Is there Oil Discharge Monitoring Equipment (ODME) fitted? | | Yes |
| 8.15.4 | Is an Oil Discharge Monitoring System connected to the above waterline discharge? | | Yes |
| 8.15.5 | If yes, is the Oil Discharge Monitoring System designed to automatically stop the discharge of effluent when its oil content exceeds permitted levels? | | Yes |
| 8.16 | Is vessel equipped with class approved or certificated stability computer? | | Yes |
| 8.16.1 | Does this stability programme consider damage stabilty conditions? | | No |
| 8.17 | Is computer integrated with cargo system and equipped with alarm to monitor loading and discharging operations? | | No |

## Cargo And Ballast Pumping Systems

| | | ID | No. | Type | Prime Mover | Self Priming / Draining | Capacity | Normal back pressure | At what head? (Metres) | RPM | Max RPM |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 8.18 | Main Pump 1 | NO. COP | 1 | Centrifugal | Steam | Self Priming | 1000 cu.m./hr. | 12.5 bar | 125 M | | 1770 |
| 8.19 | Main Pump 2 | NO. 2 COP NO.1 | 1 | Centrifugal | Steam | Self Priming | 1000 cu.m./hr. | 12.5 bar | 125 M | | 1770 |
| 8.20 | Main Pump 3 | NO. 3 COP | 1 | Screw | Steam | Self Priming | 1000 cu.m./hr. | 12.5 bar | 125 M | | 1200 |
| 8.21 | Main Pump 4 | NO. 4 COP | 1 | Screw | Steam | Self Priming | 1000 cu.m./hr. | 12.5 bar | 125 M | | 1200 |
| 8.22 | Main Pump 5 | | 0 | | | | 0 Cu. M/Hr | 0 bar | 0 M | | 0 |
| 8.23 | Main Pump 6 | | 0 | | | | 0 Cu. M/Hr | 0 bar | 0 M | | 0 |
| 8.24 | Main Pump 7 | | 0 | | | | 0 Cu. M/Hr | 0 bar | 0 M | | 0 |
| 8.25 | Main Pump 8 | | | | | | cu.m./hr. | bar | metres | | 0 |
| 8.26 | Booster Pumps | | | | | | Cu. M/Hr | bar | M | | |
| 8.27 | Stripping | | 1 | Pos. Disp | Steam | | 150 cu.m./hr. | 12.5 bar | 125 M | | |
| 8.28 | Eductors | | 2 | | Cargo | | 250 cu.m./hr. | bar | metres | | |
| 8.29 | Ballast Handling Main Pump | | 2 | Centrifugal | Electric | | 600 cu.m./hr. | 12.5 bar | 25 M | | 1800 |
| 8.30 | Ballast Stripping | | | | | | cu.m./hr. | | metres | | |
| 8.31 | Ballast Eductors | | 1 | | | | 100 Cu. M/Hr | | metres | | |
| 8.32 | Is vessel fitted with dedicated stripping lines and pumps? | No | | | | | | | | | |



## Cargo And Ballast Pumping Systems and Control Room

| | State location of cargo pump emergency stops | |
|---|---|---|
| 8.33 | (i) | CCR |
| 8.34 | (ii) | PUMPROOM ENTRANCE |
| 8.35 | (iii) | MANIFOLD (P&S) |
| 8.36 | (iv) | PUMPROOM BOTTOM |
| 8.37 | (v) | ENGINE ROOM |
| | | |
| 8.38.1 | Are bearings of cargo pumps fitted with high temperature alarms? | Yes |
| 8.38.2 | Are bearings of cargo pumps fitted with high temperature trips? | Yes |
| 8.39.1 | Are bearings of ballast pumps fitted with high temperature alarms? | Yes |
| 8.39.2 | Are bearings of ballast pumps fitted with high temperature trips? | Yes |
| 8.40.1 | Are casings of cargo pumps fitted with high temperature alarms? | Yes |
| 8.40.2 | Are casings of cargo pumps fitted with high temperature trips? | Yes |
| 8.41.1 | Are casings of ballast pumps fitted with high temperature alarms? | Yes |
| 8.41.2 | Are casings of ballast pumps fitted with high temperature trips? | Yes |
| 8.42.1 | Are pumproom shaft glands through bulkheads fitted with high temperature alarms? | Yes |
| 8.42.2 | Are pumproom shaft glands through bulkheads fitted with high temperature trips? | Yes |
| 8.43 | What is the principal type of cargo valve? | Butterfly |
| 8.44 | What type of cargo valve actuator is fitted? | Hydraulic |
| | | |
| 8.45 | Is ship fitted with a Cargo Control Room? (CCR) | Yes |
| 8.46 | Can cargo and ballast pumps be controlled from the CCR? | Yes |
| 8.47 | Can all valves be controlled from the CCR? | No |
| 8.48 | Can tank innage/ullage be read from the CCR? | Yes |
| 8.49 | Is ODME readout fitted in the CCR? | Yes |
| 8.50 | Can the IGS be controlled from the CCR? | Yes |

## Gauging And Sampling

| | | |
|---|---|---|
| 8.51 | Can vessel operate under closed loading conditions in accordance with Section 7.6.3 of ISGOTT? | Yes |
| 8.51.1 | What type of fixed closed tankgauging system is fitted? | Skarpenord Press Sensors |
| 8.52 | Does tank gauging system have local reading? | No |
| 8.52.1 | Is gauging system certified and calibrated? | Yes |
| 8.52.2 | If it is a portable system does the sounding pipe extend to full tank depth? | N/A |
| 8.53 | Are bunker tanks fitted with a full depth gauging system? | Yes |
| 8.54 | Are high level alarms fitted to cargo tanks? | Yes |
| 8.54.1 | If Yes, indicate whether to all tanks or partial? | All |
| 8.54.2 | Are high level alarms independent of the gauging system? | Yes |
| 8.55 | Are bunker tanks fitted with high level alarms? | Yes |
| 8.56 | If Yes, are bunker tank high level alarms part of the primary tank gauging system? | No |
| 8.57 | Are closed sampling devices on board? | Yes |
| 8.58 | Are cargo tanks fitted with dipping points as per IMO Res 497 4.4.4? | Yes |
| 8.59 | If portable equipment for gauging uses vapour locks, are vapour locks calibrated? | Yes |
| 8.59.1 | If Yes, by whom are vapour locks calibrated? | YARD |
| 8.59.2 | If Yes, by whom are vapour locks certified? | DNV |
| 8.60 | If portable equipment used for gauging who is manufacturer? | MMC |
| 8.60.1 | If portable equipment used for gauging how many units are supplied? | 4 |
| 8.61 | What is size of vapour lock? | 50 Millimetres |
| 8.61.1 | Can vapour lock be used for ullaging? | Yes |
| 8.61.2 | Can vapour lock be used for temperature? | Yes |
| 8.61.3 | Can vapour lock be used for interface? | Yes |
| 8.61.4 | Can vapour lock be used for cargo sampling? | Yes |
| 8.62 | Specify portable equipment for checking oil/water interface | MMC |
| 8.63 | Can cargo samples be taken at the manifold? | Yes |
| 8.64 | What is the means of taking cargo temperatures? | SKARPENORD TEMP SENSORS |



## Vapour Emission Control

| | | |
|---|---|---|
| 8.65 | Is a vapour return system fitted? | Yes |
| 8.65.6 | If fitted, is vapour line return manifold in compliance with OCIMF Guidelines? | No |
| 8.66 | Is vessel certified for vapour transfer? | Yes |
| 8.66.1 | If yes, by which organisation? | ABS |

## Venting

| | | |
|---|---|---|
| 8.67 | State what type of venting system is fitted | HIGH VELOCITY |
| 8.68 | State maximum venting capacity | 1580 Cu. Metres/Hour/Tank |
| 8.69 | State P/V valve opening pressure | 1400 mm/Wg |
| 8.70 | State P/V valve vacuum setting | -350 mm/Wg |
| 8.71 | Does each tank have isolating valve? | Yes |
| 8.72 | Are cargo tanks fitted with full flow P/V valves without isolating valves between the P/V valve and tank? | Yes |
| 8.73 | Is there a means of measuring the pressure in the vapour space in each cargo tank? | Yes |
| 8.74 | Is venting through a mast riser? | No |
| 8.75 | Are mast risers fitted with high velocity vents? | N/A |
| 8.76 | If Yes, state opening pressure | mm/Wg |
| 8.77 | State vacuum setting of mast riser | mm/Wg |
| 8.78 | State throughput capacity of mast riser. | cu.m./hr. |
| 8.79 | What is the maximum loading rate for homogenous cargo? | 3750 Cu. Metres/Hour |

## Cargo Manifolds

| | | |
|---|---|---|
| 8.80 | Does vessel comply with the latest edition of the OCIMF 'Recommendations for Oil Tanker Manifolds and Associated Equipment'? | Yes |
| 8.81 | What type of valves are fitted at manifold? | Butterfly |
| 8.82 | If hydraulic valves fitted, what are closing times? | 0 seconds |
| 8.83 | What is the number of cargo connections per side? | 4 |
| 8.84 | What is the size of cargo connections? | 300 Millimetres |
| 8.85 | Are pressure gauges fitted outboard of manifold valves? | Yes |
| 8.86 | What is the material of the manifold? | Steel |
| 8.87 | Is the vessel fitted with a crossover at the manifold? | No |
| 8.88 | Are manifold cross-connections made by hard or flexible piping? (chemical carriers) | N/A |

## Bunker Manifolds

| | | |
|---|---|---|
| 8.89 | What is the number of bunker connections per side? | 2 |
| 8.90 | What is the size of the bunker connection? | 150 Millimetres |

## Manifold Arrangement

| | | |
|---|---|---|
| 8.91 | Manifold Arrangement Diagram | |
| 8.92 | Distance A bunker manifold to cargo manifold | 2000 millimetres |
| 8.93 | Distance B cargo manifold to cargo manifold | 2000 millimetres |
| 8.94 | Distance C cargo manifold to vapour return manifold | 2000 millimetres |
| 8.95 | Distance D manifolds to ship's rail | 4400 millimetres |
| 8.96 | Distance E spill tank grating to centre of manifold | 900 Millimetres |
| 8.97 | Distance F main deck to centre of manifold | 2100 millimetres |
| 8.98 | Distance G maindeck to top of rail | 1320 millimetres |
| 8.99 | Distance H top of rail to centre of manifold | 780 millimetres |
| 8.100 | Distance J manifold to ship side | 4600 millimetres |





## Manifold Arrangement - continued

| | | |
|---|---|---|
| 8.101 | What is the height of the manifold connections above the waterline at loaded (Summer Deadweight) condition? | 8.913 metres |
| 8.102 | What is the height of the manifold connections above the waterline in normal ballast? | 15.16 metres |
| 8.103 | What is the distance between the keel and centre of manifold? | 21.429 Metres |
| 8.104 | Is vessel fitted with a stern manifold? | No |
| 8.104.1 | If stern manifold fitted, state size | millimetres |
| 8.105 | Is vessel fitted with a bow manifold? | No |
| 8.105.1 | If bow manifold fitted, state size | millimetres |

## Reducers

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 8.106 | Number of Reducers carried | 8 | from | 300 Millimetres | to | 400 Millimetres | (diameter) |
| 8.107 | Number of Reducers carried | 6 | from | 300 Millimetres | to | 300 Millimetres | (diameter) |
| 8.108 | Number of Reducers carried | 4 | from | 300 Millimetres | to | 250 Millimetres | (diameter) |
| 8.109 | Number of Reducers carried | 4 | from | 300 Millimetres | to | 200 Millimetres | (diameter) |
| 8.110 | Number of Reducers carried | 2 | from | 300 Millimetres | to | 150 Millimetres | (diameter) |
| 8.111 | To what standard are manifold reducers manufactured? | ANSI | | | | | |

## Gas monitoring

| | | |
|---|---|---|
| 8.112 | Is the vessel fitted with a fixed system to continuously monitor for flammable atmospheres? | Yes |
| 8.112.1 | What spaces are monitored? | Pumproom + Accomodation Aircon Intakes |
| 8.113 | Where are sensors/sampling points located in pumproom? | Bottom (Port & Starboard) and Pumproom Top |
| 8.113.1 | Are sensors/sampling points calibrated/tested? | Yes |
| 8.113.2 | Who is responsible for testing sensors/sampling points? | CHIEF OFFICER |
| | | |
| | Portable and Personal gas detection equipment carried | Number of units |
| 8.114 | TANKSCOPE | 2 |

| 8.115 | COMBUSTIBLE GAS DECTECTOR | 2 |
|-------|---------------------------|---|
| 8.116 | OXYGEN ANALYSER | 2 |
| 8.117 | TOXIC GAS DETECTOR | 2 |
| 8.118 | PERSONAL MULTI GAS DETECTOR | 6 |
| 8.119 | N/A | 0 |

## Cargo Heating

| 8.120 | Are cargo tanks fitted with heating coils? | Yes |
|-------|--------------------------------------------|-----|
| 8.121 | State the Number of independent sets of coils per tank | 1C, 2C, 3C, 6C, 7C & 8C - 4 EACH  4P, 4S, 5P, 5S, 9P, 9S, SLOP P - 2 EACH, SLOP S - 1, |
| 8.122 | Are all tanks coiled? | Yes |
| 8.123 | What is the Height of coils above tank bottom? | 125 Millimetres |
| 8.124.1 | Heating surface per tank | 1C-74.2 Sq.M, 2C-77.2 Sq.M; 3C,6C,7C,8C-83.7 Sq.M ; 4P,4S,5P, 5S-31.4 Sq.M; 9P,9S-41.7 Sq.M; Slop(P)-39.91 Sq.M;Slop(S)- 8.55 Sq.M |
| 8.124.2 | Heating surface per tank volume ratio (X:Y) | 1C-0.01543, 2C-0.01357; 3C,4W,5W,6C,7C,8C,9W - 0.0134;Slop(P)-0.0523;Slop(S)-0.0112 |
| 8.125 | Are heating coils welded or coupled? | Welded |
| 8.126 | Are heat exchangers external to cargo tanks? | No |
| 8.127 | Are there external ducts? | No |
| 8.128 | What is the Material of heating coils? | Stainless Steel |
| 8.129 | Inlet heating medium to coils... | Steam |
| 8.130.1 | ...with Sea temperature | 0 Degrees C |
| 8.130.2 | ...with air temperature | 0 Degrees C |
| 8.131 | Heating agent | Steam |
| 8.132 | Number of heaters | 0 |
| 8.133.1 | Able to raise temperature from | 44 Degrees C |
| 8.133.2 | Able to raise temperature to | 66 Degrees C |
| 8.133.3 | Time taken to raise temperature | 96 Hours |
| 8.134 | Total capacity of boilers | 30 Kcal |

## 9. INERT GAS AND CRUDE OIL WASHING SYSTEMS

### Inert Gas And Crude Oil Washing

| | | |
|---|---|---|
| 9.1 | Is an inert gas system (IGS) fitted? (If No, ignore remainder of this section) | Yes |
| 9.2 | Is a P/V breaker fitted? | Yes |
| 9.3 | Is IGS supplied by flue gas, inert gas (IG) generator and/or nitrogen? | IG Generator |
| 9.4 | Are fixed O2 alarms fitted in inert gas generating spaces? | Yes |
| 9.5 | What is the capacity of the IGS? | 5000 cu.m./hr. |
| 9.6 | How many fans does it have? | 2 |
| 9.7 | What is the total combined fan capacity? | 5000 cu.m./hr. |
| 9.8 | Is a top-up IG generator fitted? | No |
| 9.8.1 | If Yes, what is its capacity? | 0 Cu. Metres/Hour |
| 9.9 | Is an IGS operating manual on board? | Yes |
| 9.10 | What type of deck seal is fitted? | Wet |
| 9.11 | How many segregations does the IGS have? | 1 |
| 9.12 | What method is used to isolate individual tanks? | BUTTERFLY V/V / BLANKS |
| 9.13 | What type of non-return valve is fitted? | Gravity flap |
| 9.14 | What means of protection is fitted, other than minimum thermal variation P/V valves, if tanks can be individually isolated from the IG ? | Remote Pressure Monitoring |
| 9.15 | If ship has double hull or sides, are facilities available to inert ballast tanks and other void spaces? | Yes |
| 9.15.1 | Can these tanks/spaces be purged with air? | Yes |
| 9.16 | Where is the location of the emergency IGS connection? | Port Aft Main Deck Area |
| 9.16.1 | What is the size of the emergency IGS connection? | 300 millimetres |
| 9.17 | Is a Crude Oil Washing (COW) installation fitted? (If No, ignore remainder of this section) | Yes |
| 9.18 | Are COW drive units fixed or portable? | Fixed |
| 9.19 | Are COW drive units programmable? | No |
| 9.20 | Is vessel capable of performing COW at the same time as cargo discharge? | Yes |
| 9.21 | Is there an approved COW Manual on board? | Yes |
| 9.22 | What is the working pressure of the COW lines? | 9 bar |



## 10. MOORING



### Mooring Wires (on Drums)

| 10.1 | Does the vessel comply with the latest edition of OCIMF Mooring Equipment Guidelines? | Yes | | | | |
|---|---|---|---|---|---|---|
| | | | | | | |
| | Mooring Wires (On Drums) | Number | Diameter | Material | Length | Breaking Strength |
| 10.2 | Forecastle | | | | | |
| 10.3 | Forward Main Deck | | | | | |
| 10.4 | Aft Main Deck | | | | | |
| 10.5 | Poop | | | | | |
| | | | | | | |
| | Mooring Wire Tails | Number | Diameter | Material | Length | Breaking strength |
| 10.7 | Forecastle | | | | | |
| 10.8 | Forward Main Deck | | | | | |
| 10.9 | Aft Main Deck | | | | | |
| 10.10 | Poop | | | | | |
| 10.6 | Type of shackle | | | | | |
| | | | | | | |
| | Mooring Ropes (On Drums) | Number | Diameter | Material | Length | Breaking Strength |
| 10.11 | Forecastle | 2 | 56 mm | BEXCOLINE | 220 Metres | 55 Tonnes |
| 10.12 | Forward Main Deck | 1 | 56 mm | BEXCOLINE | 220 Metres | 58 Tonnes |
| 10.13 | Aft Main Deck | 1 | 56 mm | BEXCOLINE | 220 Metres | 58 Tonnes |
| 10.14 | Poop | 2 | 60 mm | BEXCOLINE | 220 Metres | 55 Tonnes |
| | | | | | | |
| | Other Mooring Lines | Number | Diameter | Material | Length | Breaking Strength |
| 10.15 | Forecastle | 6 | 56 mm | BEXOLINE/MARINA MAXI | 220 Metres | 58 Tonnes |
| 10.16 | Forward Main Deck | 1 | 56 mm | BEXCOLINE | 220 Metres | 58 Tonnes |
| 10.17 | Aft Main Deck | 1 | 56 mm | MARINA MAXI | 220 Metres | 58 Tonnes |

| 10.18 | Poop | | 6 | 56 mm | BEXCOLINE | 220 Metres | 58 Tonnes |
|---|---|---|---|---|---|---|---|

## Spare Mooring Wires

| | Spare Mooring Wires | Number | Diameter | Material | Length | Breaking strength |
|---|---|---|---|---|---|---|
| 10.19 | | | | | | |
| 10.19.1 | | | | | | |
| | | | | | | |
| | Spare Mooring Ropes | Number | Diameter | Material | Length | Breaking strength |
| 10.20 | Fwd Store | 2 | 56 Millimetres | Bexcoline/Tipto Eight | 220 | 58 Tonnes |
| 10.20.1 | Aft Store | 2 | 56 Millimetres | Bexcoline/Tipto Eight | 220 | 58 Tonnes |
| | | | | | | |
| | Spare Mooring Tails | Number | Diameter | Material | Length | Breaking strength |
| 10.21 | | | | | | |
| 10.21.1 | | | | | | |

## Mooring Winches

| | | Number | Single/Double Drums | Split Drums | Motive Power | Heaving Power | Brake Capacity | Hauling Speed |
|---|---|---|---|---|---|---|---|---|
| 10.22 | Forecastle | 2 | Single Drum | No | Hydraulic | 15 Tonnes | 33 Tonnes | 15 Mtrs/Min |
| 10.23 | Forward Main Deck | 1 | Single Drum | No | Hydraulic | 15 Tonnes | 33 Tonnes | 15 Mtrs/Min |
| 10.24 | Aft Main Deck | 1 | Single Drum | No | Hydraulic | 15 Tonnes | 33 Tonnes | 15 Mtrs/Min |
| 10.25 | Poop | 2 | Single Drum | No | Hydraulic | 15 Tonnes | 33 Tonnes | 15 Mtrs/Min |
| | | | | | | | | |
| 10.26 | What type of winch brakes are fitted? | Band Brakes | | | | | | |
| 10.27 | Is brake testing equipment on board? | Yes | | | | | | |
| 10.28 | When were the brakes last tested? | 06 Mar 2007 | | | | | | |

## Mooring Bits

| 10.29 | How many sets of mooring bits are fitted on forecastle? | 6 |
|---|---|---|
| 10.29.1 | What is their Safe Working Load? | 64 Tonnes |
| 10.30 | How many sets of mooring bits are fitted on forward main deck? | 4 |
| 10.30.1 | What is their Safe Working Load? | 64 Tonnes |
| 10.31 | How many sets of mooring bits are fitted on aft main deck? | 2 |
| 10.31.1 | What is their Safe Working Load? | 64 Tonnes |
| 10.32 | How many sets of mooring bits are fitted on poop deck? | 8 |
| 10.32.1 | What is their Safe Working Load? | 64 Tonnes |
| 10.33 | Distance of mooring chock for breast/spring lines forward of center of manifold | 48.4 Metres |
| 10.34 | Distance of mooring chock for breast/spring lines aft of center of manifold | 35.6 Metres |

## Anchors And Windlass

| 10.35 | What is the motive power of the windlass? | Hydraulic |
|---|---|---|
| 10.36 | What is the cable diameter? | 70 millimetres |
| 10.37 | Number of shackles - port cable? | 11 |
| 10.38 | Number of shackles - starboard cable? | 12 |
| 10.39 | Are bitter end connections to both cables capable of being slipped? | Yes |

## Emergency Towing Arrangemnts

| 10.40 | Is the vessel fitted with an Emergency Towing Arrangement? | Yes | |
|---|---|---|---|
| | (if "No" then ignore the remainder of this section) | | |
| | | Forward | Aft |
| 10.41 | Type of system | TONGUE | SMIT BRACKET |
| 10.42 | Safe Working Load (SWL) of system | 200 Tonnes | 100 tonnes |
| 10.43 | Is pick-up gear provided? | No | Yes |
| 10.44 | Towing pennant length | metres | 125 metres |
| 10.45 | Towing pennant diameter | millimetres | 54 Millimetres |
| 10.46 | Type of strong point (Smit bracket etc) | TONGUE | SMIT BRACKET |
| 10.47 | Chafing chain size | 54 millimetres | millimetres |
| 10.48 | Fairlead size (in format ABCmm x XYZmm) | 600mm X 450 mm | 600mm X 450 mm |
| 10.49 | Is pedestal roller fitted? | No | No |

| 10.50 | Is vessel provided with towing wire? | No | Yes |
|---|---|---|---|
| 10.50.1 | If Yes, what is the diameter of towing wire? | millimetres | 58 millimetres |
| 10.50.2 | If Yes, what is the length of towing wire? | metres | 70 metres |
| 10.52 | What is the number of bitts in the bow area? | 4 | |
| 10.53 | What is the height of the bitts in the bow area? | 770 millimetres | |
| 10.54 | What is the safe working load of the bitts in the bow area? | 64 Tonnes | |
| 10.55 | What is the distance between bow fairleads and nearest bitts? | 142 Millimetres | |
| 10.56 | Is the bow area clear of any obstructions which would hamper towing connections? | Yes | |

## Escort Tug

| 10.57 | SWL of closed chock on stern | 200 Tonnes |
|---|---|---|
| 10.58 | SWL of bollard on poopdeck suitable for escort tug | 64 Tonnes |
| 10.59 | Are stern chock and bollard capable of towing astern to 90 degrees? | Yes |

## Single Point Mooring (spm) Equipment

| 10.60 | Does vessel comply with the latest edition of OCIMF 'Recommendations for Equipment Employed in the Mooring of Vessels at Single Point Moorings (SPM)'? | Yes |
|---|---|---|
| 10.61 | Is vessel fitted with chain stopper(s)? | Yes |
| 10.61.1 | If Yes, how many? | 1 |
| 10.61.2 | If Yes, state type | TONGUE |
| 10.61.3 | If Yes, what is the Safe Working Load (SWL)? | 200 Tonnes |
| 10.62 | What is the maximum size chain diameter the bow stopper(s) can handle? | 76 millimetres |
| 10.63 | Are closed fairleads of OCIMF recommended size (600mm x 450mm)? | Yes |
| 10.63.1 | If not, give details of size (in format ABCmm x XYZmm) | 0 Millimetres |
| 10.64 | If two forward bow fairleads are fitted give distance between them | millimetres |
| 10.65 | What is the distance between the bow fairlead and stopper/bracket? | 3400 millimetres |
| 10.66 | What is the distance from the stopper bracket to roller lead/winch drum? | 5.4 metres |
| 10.67 | Is there a direct lead from the bow stopper to the winch drum (not the warping end)? | No |
| 10.68 | Is the winch storage drum capable of safely accommodating 150m X 80mm fibre pick up rope? | Yes |
| 10.69 | Is the winch storage drum capable of accommodating 200m x 80mm fibre pick-up rope? | Yes |



## Manifold Arrangement

| | | |
|---|---|---|
| 10.71 | Manifold Arrangement Diagram | |
| 10.72 | Distance K end of drip tray to center line of deck cleat | 1500 millimetres |
| 10.73 | Distance L spill tray to centre line of bollard | 300 millimetres |
| 10.74 | Distance M length of bollard | 400 millimetres |



## Lifting Equipment

| | | |
|---|---|---|
| 10.75 | How many derricks does the vessel have? | 0 |
| 10.75.1 | What is their safe working load (SWL)? | 0 tonnes |
| 10.75.2 | Date last tested | Not Applicable |
| 10.76 | If cranes are fitted, how many? | 2 |
| 10.76.1 | What is their safe working load (SWL)? | 10 T |
| 10.76.2 | Date last tested | 07 Jul 2004 |
| 10.77 | Is Safe Working Load (SWL) clearly marked on all lifting equipment? | Yes |
| 10.78 | Do the vessel's derricks or cranes reach at least 1 metre outboard of rail? | Yes |
| 10.79 | How many bitts are there on each side of the manifold for tying off submarine hoses? | 3 |

## Other Equipment

| | | |
|---|---|---|
| 10.80 | Are accommodation ladders arranged to face aft when rigged? | Yes |
| 10.81 | Does vessel have Suez Canal boat davits? | No |
| 10.82 | Does vessel have Suez Canal projector? | Yes |

## 11. COMMUNICATIONS AND ELECTRONICS

### Communications And Electronics

| | | |
|---|---|---|
| 11.1 | Is vessel certified for GMDSS? | Yes |
| 11.2 | What GMDSS areas is the vessel classed for? | A3 |
| 11.3 | Transponder (SART) | Yes |
| 11.4 | EPIRB | Yes |
| 11.5 | How many VHF radios are fitted on the bridge? | 4 |
| 11.6 | Is vessel fitted with VHF in the cargo control room (CCR)? | Yes |
| 11.7 | Is the CCR connected to the vessel's internal communication system? | Yes |
| 11.8 | How many intrinsically safe walkie talkies are provided for cargo handling? | 8 |
| 11.9 | Is vessel fitted with an INMARSAT satellite communications system? | Yes |
| 11.10 | Does vessel carry at least three survival craft two-way radio telephones? | Yes |
| 11.11 | List any other communications equipment carried: | INMARSAT B TELEPHONE , FAX & E-MAIL. |
| 11.12 | Can vessel transmit the helicopter homing signal on 410 KHz? | No |



## 12. ENGINE ROOM AND STEERING GEAR

### Main Propulsion

| | | |
|---|---|---|
| 12.1 | Means of main propulsion | Motor |
| 12.1.1 | If motor state whether two stroke or four stroke | 2 Stroke |
| 12.1.2 | If four stroke, state how many engines fitted | 0 |
| 12.2 | Does vessel have single or twin propellers? | Single |
| 12.3 | Is vessel fitted with fixed or controllable pitch propeller(s)? | Fixed Pitch |
| 12.4 | How many boilers are fitted? | |
| 12.4.1 | What is rated output of boilers? | 30 Tonnes/Hour |
| 12.5 | What type of fuel is used for main propulsion? | HFO 380 CST |
| 12.6 | Are pressurised fuel pipes double sheathed? | Yes |
| 12.7 | When moored at SBM, is main engine capable of being run astern at low revolutions for extended periods (up to 24 hours continuously)? | No |
| 12.8 | Is vessel capable of maintaining speed below 5 Knots? | Yes |
| 12.9 | Is vessel fitted for Unmanned Machinery Space (UMS) operation? | Yes |
| 12.9.1 | Is vessel operated in UMS mode? | No |

### Thrusters

| | | |
|---|---|---|
| 12.10 | Is vessel fitted with a bow thruster? | No |
| 12.10.1 | If Yes, give Brake Horse Power | |
| 12.11 | Is vessel fitted with a stern thruster? | No |
| 12.11.1 | If Yes, give Brake Horse Power | 0 bhp |
| 12.12 | Is vessel fitted with high angle rudder? | No |
| 12.12.1 | If yes, what type | |

### Generators

| | | |
|---|---|---|
| 12.13 | How many power generators are fitted? | 3 |
| 12.13.1 | Indicate type of power generator(s) | Diesel Engine driven Generator |
| 12.14 | What type of fuel is used in the generating plant? | DIESEL |
| 12.15 | Is vessel fitted with emergency generator or batteries? | Emergency Generator |

### Main Engine Air Start Compressors

| | | |
|---|---|---|
| 12.16 | Number of main engine start compressors | 2 |
| 12.17 | Operating pressure | 30 bar |
| 12.18 | Motive power of emergency compressor | ELECTRIC |

### Bunkers

| | Fuel Oil | | Diesel Oil | | Gas Oil | |
|---|---|---|---|---|---|---|
| | Tank name | Capacity | Tank name | Capacity | Tank name | Capacity |
| 12.19 | BUNKER T . P | 972.6 cu.m. | STOR TK P | 117.9 cu.m. | N/A | cu.m. |
| 12.20 | BUNKER T . S | 864.1 cu.m. | STOR TK S | 120.4 cu.m. | N/A | cu.m. |
| 12.21 | SETTL TK | 51.5 cu.m. | SETTL TK | 15.7 cu.m. | N/A | cu.m. |
| 12.22 | SERVC TK | 57.6 cu.m. | SERV TK | 11.7 cu.m. | N/A | cu.m. |
| 12.23 | N/A | 0 Cu. Metres | N/A | cu.m. | N/A | cu.m. |
| 12.24 | N/A | cu.m. | N/A | cu.m. | N/A | cu.m. |
| 12.25 | N/A | cu.m. | N/A | cu.m. | N/A | cu.m. |

### Steering Gear

| | | |
|---|---|---|
| 12.26 | What type of steering gear fitted? | Cylinder |
| 12.27 | How many motorised hydraulic pumps or motors fitted? | 2 |
| 12.28 | How many telemotors fitted? | 2 |
| 12.29 | Is an emergency rudder arrest/rudder control fitted? | Yes |

### Anti-pollution

| | | |
|---|---|---|
| 12.30 | Is an engine-room bilge high level alarm fitted? | Yes |
| 12.31 | Is a pump room bilge high level alarm fitted? | Yes |
| 12.32 | Is there a permananently installed system for the disposal of residues from the machinery space sludge tank to shore? | Yes |
| 12.33 | Are there facilities on board to incinerate machinery space sludge? | Yes |

## 13. SHIP TO SHIP TRANSFER SUPPLEMENT

### Ship To Ship Transfer

| | | | |
|------|-----------------------------------------------------------------------------------------------------------------------|--|-----------|
| 13.1 | Does vessel comply with recommendations contained in OCIMF/ICS Ship To Ship Transfer Guide (Petroleum)? | | Yes |
| 13.2 | Are at least 7 ratings available to assist with mooring operations? | | Yes |
| 13.3 | What is Safe Working Load (SWL) of bitts in the manifold area? | | 22 Tonnes |
| 13.4 | Are manifold bitts at least 35 metres away from the breastlines leading fore and aft? | | Yes |
| 13.5 | What is maximum outreach of vessel's cranes or derricks outboard of the ship's side? | | 5 Metres |
| 13.6 | Are four (4) 200m x 40mm messenger lines available for Ship-To-Ship (STS) mooring operations? | | Yes |
| 13.7 | Are there two (2) closed chocks with associated bollards and leads to winches located within 35 metres forward and aft of the centre of the cargo manifold? | | Yes |

